```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3   ------------------------------X
                                   :
 4   YARID JUAREZ-CARDOSO,         :
                                   :   15-CV-6671 (VMS)
 5                 Plaintiff,      :
                                   :
 6            v.                   :
                                   :   October 28, 2016
 7   LA FLOR de SANTA INES, INC.,  :   Brooklyn, New York
      et al.,                      :
 8                                 :
                   Defendants.     :
 9   ------------------------------X

10

11          TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
              BEFORE THE HONORABLE VERA M. SCANLON
12                 UNITED STATES MAGISTRATE JUDGE

13
     APPEARANCES:
14

15   For the Plaintiff:      JOSEF NUSSBAUM, ESQ.
                             Joseph & Kirschenbaum LLP
16                           233 Broadway, 5th Floor
                             New York, New York 10279
17

18   For the Defendants:     EZRA BERNARD GLASER, ESQ.
                             MARION ANN CONDE, ESQ.
19                           Conde & Glaser, LLP
                             305 Broadway, Suite 801
20                           New York, New York 10007

21

22   Court Transcriber:      SHARI RIEMER, CET-805
                             TypeWrite Word Processing Service
23                           211 N. Milton Road
                             Saratoga Springs, New York 12866
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

I N D E X

|          | Direct | Cross | Redirect | Recross | Further Redirect |
|----------|--------|-------|----------|---------|------------------|

WITNESSES:

Yarid Juarez-Cardoso   19    48


EXHIBITS                                    Marked    Received

DEFENDANT:

1     Interrogatories                        68          80

2     Complaint                              78         103

3     Piece of paper                        124

4     Poster                                127




OPENING STATEMENT BY PLAINTIFF                         11

OPENING STATEMENT BY DEFENDANT                         14

3

1   (Proceedings began at 10:00 a.m.)

2           THE COURT:  Let's go on the record.  Can you call

3   the case?

4           THE CLERK:  Sure.  Civil Cause for Bench Trial, Case

5   No. 15-CV-6671, <u>Juarez-Cardoso v. La Flor de Santa Ines, Inc.</u>

6           Counsel, please state your name for the record.

7           MR. NUSSBAUM:  Good morning, Your Honor.  Josef

8   Nussbaum from Joseph & Kirschenbaum representing plaintiff.

9   To my left is Debora Torres.  She's a paralegal at our firm.

10          MR. GLASER:  On behalf of the defendant, Glaser from

11  Conde & Glaser LLP.  I'm going to let my business partner

12  introduce herself for the record.

13          MS. CONDE:  Good morning, Your Honor.  Marion Conde

14  of Conde & Glaser on behalf of the defendants.

15          THE COURT:  Good morning everyone.  Let's talk about

16  a couple of logistics and we'll get going.  I understand you

17  had an issue about the interpreter.  Have you worked that out?

18          MS. CONDE:  Yes, Your Honor.

19          MR. NUSSBAUM:  The parties have agreed to split the

20  cost.  I just wanted to make that clear for the record.

21          THE COURT:  Is that right?

22          MS. CONDE:  Yes, Your Honor.

23          THE COURT:  For the plaintiff, the witnesses, who

24  are you going to offer and I just want to make sure that for

25  the rest of the folks in the back that if they're all

4

1    witnesses then they should wait in the -- there's an ante room

2    and we could just hear one witness at a time unless it's a

3    party and then that person can stay.  So I'm not sure who this

4    is here.

5              MR. NUSSBAUM:  Yes, Your Honor.  That's the

6    plaintiff.  The defendant I believe in the back.

7              THE COURT:  Then they're welcome to stay.  They're

8    also welcome to come sit up with you if there's room if that

9    works for you or at the table right behind.  Whatever you'd

10   like.

11             MR. NUSSBAUM:  The plaintiff is going to be the

12   first witness.  I'm not sure if the Court was expecting

13   opening arguments because I would send her out for opening

14   arguments if that's what the Court wanted but --

15             THE COURT:  No, no, that's okay.

16             MR. NUSSBAUM:  Okay.

17             THE COURT:  The other witnesses, are there going to

18   be other witnesses?

19             MR. NUSSBAUM:  Per the JPTO, it's just the plaintiff

20   and the defendant, and one of the defendants.

21             THE COURT:  That's what you're going to do as all?

22             MS. CONDE:  That's right.

23             THE COURT:  Do you want to do opening statements?

24   It's totally up to you.

25             MR. NUSSBAUM:  I can be brief.

5

1            THE COURT:  Sure.

2            MR. NUSSBAUM:  I don't know if there's any other

3    house cleaning --

4            THE COURT:  Just generally.  Just to let you know,

5    I'm going to do naturalization which will either be at 1:30 or

6    two.  It takes about 20 minutes.  So if we're still going in

7    the afternoon you should know that.  Any other restraints

8    anybody else has?  I know you have -- any issues with the

9    state trial for today?

10                          (SEALED PORTION)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

PAGE INTENTIONALLY LEFT BLANK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

PAGE INTENTIONALLY LEFT BLANK

8

1  (Back on the record at 10:18 a.m.)

2          THE COURT:  So we're back on the record in Juarez-

3  Cardoso v. La Flor de Santa Ines, Inc.

4          So were your settlement discussions fruitful?

5          MR. GLASER:  No, Your Honor.

6          THE COURT:  So let's start with if you'd like

7  opening statements and then we can hear the evidence.

8          MR. NUSSBAUM:  Your Honor, just before the opening

9  statements, there are two small housekeeping matters.

10          THE COURT:  Yes.

11          MR. NUSSBAUM:  The first is that there is a

12  stipulation which the parties entered into in May which I

13  don't believe made its way into the joint pretrial order.

14  It's just -- it amends one part of the complaint and one

15  paragraph of defendant's answer, and I believe the Court

16  should have a copy of that as well.

17          THE COURT:  Does your client -- we have the

18  translator here.  our client is not understanding everything I

19  assume.

20          MR. NUSSBAUM:  No, but I'm happy to send her outside

21  until she's --

22          THE COURT:  No, she's welcome to stay.  She's a

23  party.  It's do you want the translator to be translating

24  everything for her.

25          MR. NUSSBAUM:  I don't think we need translation

9

1  until she's testifying.

2          THE COURT:  You can have a seat while we do this

3  because we're making a record on the recording and it's much

4  easier if you're closer to the microphone.

5          So there's the amended document.  Does the

6  defendant, do you have any position with regard to that?

7          MS. CONDE:  No, Your Honor, I think it's a

8  stipulation that we both signed.

9          THE COURT:  It would be good if I have a copy.

10  Thanks.

11          MS. CONDE:  With the exception that there's some

12  testimony which will be relevant to the 2013 year.  There will

13  be some questioning about that year.

14          THE COURT:  Okay.  And the second thing?

15          MR. NUSSBAUM:  The second thing plaintiff wanted to

16  clarify is in the joint pretrial order, which I have an extra

17  copy if the Court needs one handy, on the second page, the

18  first full paragraph, there seems to have been a

19  miscalculation in the middle of that paragraph where it says,

20  for example -- I don't know if the Court has a copy in front

21  of it.

22          THE COURT:  No, but you can tell me.  Go ahead.

23          MR. NUSSBAUM:  It says in 2012 plaintiff worked 16

24  hours a day six days a week.  That's a miscalculation.  That

25  should have said approximately 14 hours a day six days a week.

```
 1              THE COURT:  Okay.

 2              MR. NUSSBAUM:  Therefore the total is also a

 3    miscalculation.

 4              THE COURT:  Okay.

 5              MR. NUSSBAUM:  Again, that's on Page 2, the second

 6    paragraph.

 7              THE COURT:  Any comment from defendants about that?

 8              MR. GLASER:  A characterization -- the

 9    characterization they make of a joint pretrial order sounds

10    more consistent with a complaint than what Mr. Nussbaum is

11    saying now.  So I don't -- I don't know what to say about what

12    is his representation but what's in the pretrial order is

13    consistent with the complaint and I think -- maybe not the

14    testimony but it sounds like -- that's an issue, it's a

15    factual issue that defendant sort of -- that the plaintiff is

16    sort of changing now.

17              THE COURT:  Let's just deal with this through

18    hearing the evidence.  Okay.

19              MR. NUSSBAUM:  In terms of our opening statements.

20              THE COURT:  It's really fine if everyone stays

21    seated unless you really can't make yourself do it.  We have

22    the mobile mics but just the recordings are not as good.  So

23    if you don't mind from your seat move the microphone so that

24    you're speaking fairly close to one.

25              So let's hear from plaintiff with regard to your
```

11

1  opening statement.

2              OPENING STATEMENT BY PLAINTIFF

3        MR. NUSSBAUM:  I'll be brief, Your Honor.

4        This is a simple and straightforward Fair Labors

5  Standard Act and New York Labor Law case.  It's the type of

6  case that unfortunately we've seen a proliferation of in

7  recent years where non English speaking illiterate individuals

8  are basically put into indentured servitude by small

9  businesses in New York State.

10        Basically, the case involves an employer who the

11  flouted the minimum wage overtime laws, laws that have been in

12  place for decades.

13        In addition, this is a case which is often referred

14  to as a no pay for case.  In other words, it involves an

15  employer, the defendants, who did not keep any records of the

16  payroll that they paid to their employees and no records of

17  the actual hours that their employees worked.

18        For clarity purposes, let me just break down

19  plaintiff's allegations into three basic allegations.  The

20  major allegation in the case is that plaintiff was scheduled

21  to work a minimum schedule each week for which she was paid a

22  salary.  In addition to that schedule, plaintiff worked

23  additional hours which she was paid a flat amount for those

24  additional hours.  Now, those additional hours were not

25  overtime hours.  They were just hours she was paid for in

1    addition to her predetermined scheduled time which was far in

2    excess of the 40 hour overtime limit.

3              To break it down, the Court will hear that

4    plaintiff, plaintiff's testimony is that she worked a minimum

5    of 72 hours each week for which she was paid a salary and then

6    any hours she worked in addition to those 72 hours defendants

7    paid her a nominal fee for bonus basically which was less than

8    the overtime rate required under state and federal law.

9              The salary that the Court will hear plaintiff was

10   paid did not in any way account for the staggering number of

11   overtime hours, like I just said, 70 -- she worked 72 hours a

12   week at minimum.  That salary did not account for the overtime

13   hours that she worked.

14             As I'm sure the Court is well familiar, cases such

15   as this one are governed by the well established burden

16   shifting standards set forth by the Supreme Court in Anderson

17   v. Mt. Clemens that where an employer fails to maintain

18   complete and adequate time records and the employer cannot

19   offer their own substitutes the employee is able to carry her

20   burden such as will be the case here by producing evidence of

21   her reasonable recollection of the amount of time that she

22   worked.

23             At that point the burden will shift to defendants

24   who will have the opportunity to either prove the precise

25   amount of time that the plaintiff worked or to refute

1  plaintiff's evidence.  The Court is going to see that that's

2  simply impossible here as defendant did not maintain any

3  records at all of the amount of time that plaintiff worked and

4  defendant will not be able to offer anything other than self-

5  serving statements of the amount of time that plaintiff

6  worked.

7          In addition, and maybe I should touch on this in the

8  closing, there's a New York State regulation which will impact

9  the manner in which defendant's salary should be calculated

10 and that it should only cover the first 40 hours that she

11 worked and we believe the Court will find that the additional

12 overtime hours she worked were not paid for at all.

13         Plaintiff's second claim in this lawsuit is that she

14 was not paid any spread of hours pay.  Under New York State

15 law where an employee works in excess -- a day that spans in

16 excess of ten hours they're entitled to an additional hour's

17 pay.  That pay was never paid to plaintiff.  Defendant at her

18 deposition testified that she did not know what spread of

19 hours is and that she never paid plaintiff spread of hours

20 pay.

21         Finally, defendants failed to meet the notice

22 requirements that are set forth in Section 195 of the New York

23 Labor Law which, for example, required that defendants issue

24 weekly wage statements or wage statements with plaintiff's

25 pay.  Defendants admit that they never issued such wage

14

1   statements and thus the plaintiff Ms. Juarez-Cardoso is

2   entitled to the statutory penalties set forth under the

3   relevant regulations.

4           In addition to these underlying claims plaintiff is

5   seeking FLSA New York Labor liquidated damages, prejudgment

6   interest and if successful on her claims reasonable attorney's

7   fees and costs under the FLSA New York Labor law's burden

8   shifting standards.

9           I'd be happy to answer any questions if the Court

10  has any.

11          THE COURT:  Is there any dispute here about the size

12  of the business?  Is that going to be an issue here in terms

13  of the revenue?

14          MR. NUSSBAUM:  Defendant at her deposition, the

15  defendant, one of the defendants who will be testifying here

16  today testified that she doesn't know how much the business

17  earned.

18          THE COURT:  On defendant's side.

19              OPENING STATEMENT BY DEFENDANT

20          MR. GLASER:  Yes, Your Honor.  My open statement is

21  going to be brief but I just want to touch on a few issues,

22  and I think it starts with the whole point that plaintiff made

23  where he actually compares his client to indentured servants.

24  She's not an indentured servant.  She's really a professional

25  plaintiff and claimant and you'll see, Your Honor, that

1   literally the numerous claims she made is based on the

2   significant lack of credibility where she literally is asking

3   other people what her hours are.  She doesn't know her own

4   hours and the claim that she's literally working 76 hours a

5   week I think it was, is so outrageous and so not in keeping

6   with the testimony that exists in this case.

7           The evidence will show Your Honor that we're talking

8   about hours worked during a week that could have amounted to

9   53 hours but we believe the plaintiff's own test -- the

10  plaintiff's own testimony says somewhere in the area of 50

11  hours, that 50 hours would be essentially the maximum.

12          This is just a woman that takes advantage of a

13  system where her employer was really very good to her.  Did

14  the employer make some mistakes in terms of the payments?

15  We've actually conceded that that's correct.  But, Your Honor,

16  we believe that those calculations -- the calculations are

17  actually quite minimal and we've actually -- this has been

18  part of I suppose a -- it's been part of an ongoing factual

19  issue where we discussed some of these mistakes and we've

20  tried to -- and she has actually tried to remedy it in certain

21  ways.

22          I will say that notice did exist in certain ways.

23  There might have been some mistakes made as to notice but

24  you'll see, Your Honor, that some of the violations of the

25  plaintiff is not -- was not knowingly and they really amount

1  to de minimus claims on the part of the plaintiff.

2        Having said that, the exaggerations on the part of

3  the plaintiff -- I'm sorry, did I just say -- I think I just

4  said that it was mistakes on the part of the plaintiff.  The

5  mistake is on the part of the defendant.  Having said that,

6  Your Honor, you'll see that the extraordinary exaggerations of

7  the plaintiff who was again treated well, who was allowed to

8  have flexible hours to go for treatment, who was actually --

9  stayed with her employer over the course of I suppose

10 approximately four years when she knew exactly what the pay

11 structure was and in all that time also never really had any

12 problems with her employer until she found out from other

13 people that there are ways for her to make money that are

14 different than what she's normally accustomed to.

15        Having said that, Your Honor, we believe that if

16 Your Honor does find against the defendant they will be as to

17 de minimus claims and we are willing to deal with those issues

18 but having said that we're absolutely ready to defend this

19 case in so many numerous aspects and particularly as it

20 relates to the plaintiff's credibility on a whole host of

21 issues and particularly on the claim that she ever worked 76

22 hours in a week.

23        THE COURT:  Okay.  Let's start with the plaintiff.

24        MR. NUSSBAUM:  Your Honor, just before I call my

25 first witness, we didn't make a motion in limine because it's

17

1  bench trial but I'd like to move the Court to preclude

2  defendant from referring to any other litigations that the

3  plaintiff has been a party to.  It's simply irrelevant to

4  anything that's happening today.

5       MR. GLASER:  It's absolutely relevant, Your Honor.

6  It's the way she makes her living and there's been actions in

7  this Court.  I can count approximately seven actions that have

8  been made.  Six of them -- I think seven actions, six in the

9  last two or three years.  I guess one that stretches back a

10 certain number of years.  This is how she makes her living and

11 she started actually to make her living on this literally

12 during the time that she was employed by the defendant.

13      Your Honor, it's so relevant to this claim.  We're

14 talking about a woman that makes money on literally a cut

15 finger.  She's cut her finger a few times.  Once --

16      MR. NUSSBAUM:  Your Honor --

17      THE COURT:  Stop.

18      MR. NUSSBAUM:  -- this is exactly what I didn't

19 want.  It's exactly --

20      THE COURT:  Well, this is the argument.  Go ahead.

21      MR. GLASER:  We're talking about a cut finger on one

22 occasion.  We're talking stitches on another occasion.  We're

23 talking the same claims over th same years against different

24 defendants.  We're talking about overlapping issues where

25 we're even talking about a stipulation -- and this is

18

1    extremely relevant to this specific case, Your Honor.  We're

2    talking about claims made against two different employers.

3    One of these claims is something that the plaintiff just

4    brought up as a part of a withdrawn portion of the claim.

5    We're talking about claims that are made against two different

6    employers at the same time for the same period of time.

7              THE COURT:  All right.

8              MR. GLASER:  Your Honor, every single one of these

9    issues are relevant.  These are actually -- some of these are

10   resolved cases.  Some of these are not resolved cases.  But

11   the fact is this is how she makes her living.

12             THE COURT:  So the motion is denied.  You can talk

13   about it at trial.  See if you can elicit the information.

14   How persuasive it is is yet to be seen.

15             Any other motion?

16             MR. NUSSBAUM:  No, Your Honor.

17             THE COURT:  How about for defendants, any motions?

18   Any motions on the defendant's side?

19             MR. GLASER:  No, Your Honor.

20             THE COURT:  Okay.  Now do you want to call the

21   plaintiff?

22             MR. NUSSBAUM:  Yes, please, Your Honor.

23             THE COURT:  Sure.  The plaintiff should come up

24   here.  She's going to use a Spanish translator; is that right?

25             MR. NUSSBAUM:  Yes.

Juarez-Cardoso                    19

1          THE COURT:  Swear in the translator.

2                    Spanish translator, Sworn

3          THE CLERK:  Can you state your name for the record?

4          THE INTERPRETER:  James Ontorio, Spanish certified

5    interpreter.

6          THE COURT:  Just for the record, you speak English

7    and Spanish; is that right?

8          THE INTERPRETER:  Yes.

9          THE CLERK:  Can you ask her to please stand and

10   raise your right hand.

11              Yarid Juarez-Cardoso, Plaintiff, Sworn

12         THE CLERK:  Can you state your name for the record?

13         THE WITNESS:  Yarid Juarez-Cardoso.

14         THE CLERK:  Thank you.  You can have a seat.

15         THE COURT:  Just let us know when you're ready.

16         THE INTERPRETER:  I'm ready.

17         THE COURT:  All right.

18                    DIRECT EXAMINATION

19   BY MR. NUSSBAUM:

20   Q.   Good morning, Ms. Juarez-Cardoso.

21   A.   Good morning.

22         MR. NUSSBAUM:  Does the Court prefer if I go to the

23   podium or --

24         THE COURT:  It's still up to you as long as you're

25   by a microphone.  You can do it from there, you can do it from

```
                    Juarez-Cardoso                      20
```

1   the podium.

2   BY MR. NUSSBAUM:

3   Q.   Ms. Juarez-Cardoso --

4            THE COURT:  Hold on.  Try it again.

5   Q.   Good morning again, Ms. Juarez-Cardoso.

6   A.   Good morning.

7   Q.   Do you know why you're here today?

8   A.   Yes.

9   Q.   Can you please tell the Court why you are here today?

10  A.   The reason why I'm here today --

11           THE COURT:  Can you help them move the mic?

12           THE INTERPRETER:  I'm fine.

13           THE COURT:  Thank you.

14           THE INTERPRETER:  She has a problem with the chair.

15  She says she's too high.

16           THE COURT:  Are you better?

17           THE WITNESS:  Yes.

18           THE COURT:  For the interpreter, do you want a

19  chair?

20           THE INTERPRETER:  I have to hear her.  No, don't

21  worry about that.  Maybe later for the time being I'm fine.

22           THE COURT:  Okay.

23           THE INTERPRETER:  Thank you, Your Honor.

24           THE COURT:  Let's continue with the questions.  Do

25  you know why you're here today.

```
                    Juarez-Cardoso                    21
```

1  BY MR. NUSSBAUM:

2  Q.   Ms. Juarez-Cardoso, can you please the tell Court why

3  you're here today?

4  A.   The reason why I'm here today is because I work with a

5  Ms. Luisa Zenteno and Mario Zenteno at La Flor de Santa Ines.

6  Q.   What happened when you worked for them?

7  A.   I work over 40 hours and they were not paid properly.

8  Q.   Can you please tell the Court what La Flor de Santa Ines

9  is?

10  A.   It's a store.  It's a bread distributor and it's a

11  restaurant.

12  Q.   What was your job at La Flor de Santa Ines?

13  A.   I was a cook.  I did cleaning work and I also was a

14  waitress.

15  Q.   So you would serve customers in the restaurant?

16  A.   Yes, when orders were entered I would prepare the orders

17  and I will waitress them.

18  Q.   Is it clear to you if I refer to La Flor de Santa Ines as

19  simply La Flor?

20  A.   I didn't understand the question.

21  Q.   Would it be clear to you if going forward I refer to the

22  La Flor de Santa Ines as just La Flor?

23  A.   You want me to call it La Flor?

24  Q.   I'm going to be calling it La Flor and I just wanted to

25  inform you that just so we can get through this quicker.

```
                    Juarez-Cardoso                    22
```

1   A.    That's right.

2   Q.    Can you please tell the judge where La Flor is located?

3   A.    It's located at 731 Church Avenue, Brooklyn, New York

4   11218.

5   Q.    Thank you.  Can you please tell the Court what your

6   highest level of education is?

7   A.    I got up to second -- second degree -- second grade.

8   Q.    What age were you when you got up to the second grade?

9   A.    Eight years.

10  Q.    Did you have any other education after the age of eight?

11  A.    No.

12  Q.    So you never studied any math after the age of eight;

13  right?

14  A.    No.  At eight years of age I had to leave the school

15  because I had to start working at that age.

16  Q.    Do you know any math?

17              MR. GLASER:  Objection.

18              THE COURT:  Denied.  You can answer the question.

19  A.    My math is extremely poor.

20  Q.    Do you read English?

21  A.    No.

22  Q.    Do you speak English?

23  A.    No.

24  Q.    Did you require any level of education in order to be

25  able to work for La Flor?

Juarez-Cardoso                           23

1  A.   When I started there I was supposed to receive some

2  training for two weeks.

3  Q.   Aside from that training, was there any other

4  requirement, educational requirement to work at La Flor?

5  A.   No, none.

6  Q.   Can you please tell the Court when you worked what dates

7  you worked for La Flor?

8            THE INTERPRETER:  The interpreter, dates or days?

9            MR. NUSSBAUM:  What dates?  The dates of your

10 employment for La Flor.

11 A.   I started on January 6, 2009.

12 Q.   Do you recall approximately when your last day of

13 employment was at La Flor?

14 A.   Approximately October 2013.

15 Q.   Can you please tell the Court what your typical job

16 duties were when you worked at La Flor?

17 A.   I was a cook.  I was a cleaning person, and I was a

18 waitress.

19 Q.   Can you give the Court some more detail about what it

20 means to be a cook at La Flor?

21 A.   Okay.  When I came in the morning I had to prepare

22 sandwiches.  Then I had to prepare meals and also to put

23 together orders when a client will request it.

24 Q.   How many other people usually worked at La Flor in a

25 typical work day?

                      Juarez-Cardoso                      24

1   A.    In 2009 about seven persons.

2   Q.    What were their jobs?

3   A.    One was a baker, another was a bread packer.   Another

4   person works also a cook.   Francisco was a bread packer.

5   Jorge was also a bread packer, and in December 2009 the last

6   month Maria started as a cook.

7   Q.    Were there any other job positions at La Flor that you

8   remember?

9   A.    Could you repeat the question, please?

10  Q.    Sure.   Besides the positions you just listed such as

11  baker, bread packer, cook, were there any other positions,

12  jobs at La Flor?

13  A.    Mario Zenteno, Mr. Mario Zenteno was also a bread packer

14  that he also would do deliveries.

15  Q.    Who owns La Flor?

16  A.    Luisa and Mario Zenteno.

17  Q.    Could you tell the judge how many days a week La Flor is

18  open?

19  A.    Monday through Sunday.

20  Q.    Do you know what business hours La Flor is open?

21  A.    Will you repeat the question?

22  Q.    Can you tell the Court what hours of operation La Flor

23  had?

24  A.    I don't understand.   Can you repeat again, please?

25  Q.    What time did La Flor open for customers in the morning?

```
                    Juarez-Cardoso                      25
```

 1  A.   At seven a.m.

 2  Q.   Was that every day?

 3  A.   Sometimes it was different because in Ms. Luisa Zenteno

 4  is the one opening the doors.

 5  Q.   Would it be earlier or later?

 6  A.   The latest was at seven.

 7  Q.   So sometimes it would open earlier?

 8           MR. GLASER:  Objection.

 9           THE COURT:  What's the objection?

10           MR. GLASER:  Leading.

11           THE COURT:  Denied.

12  A.   Just there was no fixed time to open.

13  Q.   Does Luisa Zenteno live in the same building as La Flor?

14  A.   Yes, upstairs of the store in the second floor.

15  Q.   So the opening time would just depend on what time she

16  came down and opened the store?

17           THE COURT:  Now you're leading.

18  Q.   What time did La Flor close?

19  A.   On occasions I would leave at eleven but at that time it

20  was already closed to the public.

21  Q.   What time would it close for the public -- to the public?

22  A.   That time it was totally closed.

23  Q.   What time would the store be closed for the public?

24  A.   Maximum eleven or ten to eleven at night.

25  Q.   Did the store have a set time that it closed every day?

Juarez-Cardoso                                    26

1   A.   There was no set times because on occasions I would leave

2   earlier.  So I was not -- I couldn't witness when it was

3   actually closed.

4   Q.   Do you know if the store had a set time that it closed?

5   A.   No, because sometimes I would leave before it was closed.

6   Q.   How did you come to start being employed at La Flor?

7   A.   Okay.  A friend of mine who worked there called me and

8   asked me if I knew someone that would be interested in working

9   at La Flor de Santa Ines.

10  Q.   What happened after that?

11  A.   I told him I was available.

12  Q.   And then?

13  A.   Do you want to come to see Ms. Luisa and you may come any

14  time.

15  Q.   What did you say to him?

16  A.   I went there the same day.

17  Q.   Did you speak to Ms. Luisa?

18  A.   Yes, I spoke with Ms. Luisa Zenteno.

19  Q.   Can you tell the Court generally what your conversation

20  was about?

21  A.   I introduced myself and I told Ms. Luisa Zenteno that I

22  cold work for her.

23  Q.   Did she offer you a job?

24  A.   Yes.  Yes, she hired me immediately because there was no

25  one available to work.

                   Juarez-Cardoso                    27

1   Q.    Do you remember what date that was?

2   A.    January 6, 2009.

3   Q.    Is there any specific reason that you remember that that

4   was the date?

5   A.    Yes.

6   Q.    What reason is that?

7   A.    Because on January 6th is a day that we Mexicans

8   celebrate.

9   Q.    When Ms. Luisa offered you the job, did she tell you what

10  your schedule would be?

11  A.    At that time she just told me to start working and we

12  would discuss the schedule later.

13  Q.    Did she tell you how much you would get paid?

14  A.    Not at that time.

15  Q.    When did you first find out how much you would get paid?

16  A.    Around January 20, 2009.

17  Q.    How did you come to find out on January 20th how you were

18  getting paid?

19  A.    When she asked me if I was available to work from six

20  a.m. to six p.m.

21  Q.    So when she asked you that that's when you found out how

22  much you were getting paid?

23  A.    She told me that my salary would be 420 per week.

24  Q.    And did you agree to that?

25  A.    Yes.

```
                   Juarez-Cardoso                    28
```

1   Q.   Did you agree to work a schedule of at least six a.m. to

2   six p.m.?

3   A.   Yes.  Yes, she told me that my hours would be from six

4   a.m. to six p.m.

5   Q.   Did that continue to be the amount you were paid and the

6   minimum schedule that you worked?

7            THE INTERPRETER:  Can you repeat for the

8   interpreter, please?

9   Q.   Did that continue to be the amount you were paid and the

10  minimum schedule that you worked?

11           MR. GLASER:  Objection, Your Honor.

12           THE COURT:  Denied.  You can answer the question.

13  She can answer the question.

14  A.   I didn't -- I didn't hear the question.

15  Q.   Did that continue to be the amount you were paid and the

16  minimum amount of time that you worked?

17  A.   Well, my schedule was to work from six a.m. to six p.m.

18  and leaving for two hours one day each week.

19  Q.   We'll come back to the two hours that you left each week.

20       That schedule, that minimum schedule of six a.m. to six

21  p.m., is that the schedule that you started to work starting

22  from January 20, 2009?

23  A.   Okay.  Yes, in January 6th I started working from six

24  a.m. to six p.m. but in 2013 Ms. Luisa after opening changed

25  my hours.

Juarez-Cardoso                               29

1              MR. GLASER:  Objection.

2    BY MR. NUSSBAUM:

3    Q.   I'm sorry  What was the date that you said your hours

4    were changed?

5    A.   After April 2013.

6    Q.   From January 2009 until April 2013, did you continue to

7    be paid $420 each week?

8    A.   Yes, that is correct.

9              THE COURT:  If I could ask how many days a week she

10   worked.

11             MR. NUSSBAUM:  Yes, coming up.

12   Q.   How many days each week did you work?

13   A.   Six days.  Sundays I had off.

14   Q.   From January 2009 until April 2013, did you work every

15   week?

16   A.   Yes.

17   Q.   Did you work six days every week?

18   A.   Yes.  Every week.

19   Q.   If there was a snow storm outside, would you come to

20   work?

21   A.   Yes, I even went to work when there was a hurricane by

22   the name of Sandy.

23   Q.   Did La Flor pay you only $420 a week or did they pay you

24   anything else?

25   A.   Well, my salary was 420.  Nothing including overtime.

```
                      Juarez-Cardoso                          30
 1   Q.    Is it overtime or extra hours?

 2              MR. GLASER:  Objection.

 3              THE COURT:  Sustained.

 4   BY MR. NUSSBAUM:

 5   Q.    When you say overtime, what do you mean?

 6   A.    Because after six p.m. I would leave sometimes at eight,

 7   eleven or nine p.m.

 8   Q.    Would that happen every week?

 9   A.    Yes.

10   Q.    I just want to be clear.  So the overtime you're

11   referring to is time that you worked after six p.m.?

12              MR. GLASER:  Objection.

13              THE COURT:  Denied.  You can answer it.  Go ahead.

14   A.    Could you repeat the question?

15   Q.    So the overtime you're referring to is time that you

16   worked after six p.m.; right?

17   A.    Yes.

18   Q.    Those extra hours would -- you would work those extra

19   hours every week?

20   A.    Yes.

21   Q.    What's the latest you worked at La Flor?  What's the

22   latest time you would leave a shift at La Flor?

23   A.    Eleven p.m.

24   Q.    Would that happen every week?

25   A.    Could you repeat the question?
```

                         Juarez-Cardoso                      31

1   Q.   Would you leave at 11:00 at the end of a shift every

2   single week?

3   A.   Depending on the amount of work it would be 8:00, 9:00 or

4   11:00.

5   Q.   Do you know approximately how many extra hours after six

6   p.m. you would work a week?

7   A.   Well, my math is really bad.  What I can tell you is I

8   was supposed to work the six p.m. and I would be leaving at

9   eight, eleven or 9:00.

10  Q.   Now, you testified that the salary you were paid of $420

11  covered your schedule of six a.m. to six p.m.; correct?

12  A.   Yes.

13  Q.   How were you paid for hours that you worked after six

14  p.m.?

15  A.   They were paid on the same day.  If I would work two

16  hours Ms. Zenteno will pay me $20.

17  Q.   Were you paid $10 for each hour that you worked after six

18  p.m.?

19  A.   Yes, that is correct.

20  Q.   Were you always paid those $10 amounts on the day that

21  you worked the extra hours?

22  A.   Yes.  Yes, she would pay me in accordance with the hours,

23  of the extra hours that I had worked.

24  Q.   When were you paid the $420 salary?

25  A.   The last day of my work week which was Saturday.

Juarez-Cardoso                    32

1  Q.   Were you always paid that on Saturday?

2  A.   Yes.

3  Q.   If you worked 20 minutes after six p.m., were you paid

4  that extra $10 bonus?

5          THE INTERPRETER:  Could you repeat for the

6  interpreter, please?

7  Q.   If you worked 20 minutes after six p.m., were you still

8  paid an extra $10 an bonus?

9  A.   No.  No, they weren't paid.

10  Q.   So those 20 minutes in that example would be covered by

11  your $420 salary?

12          MR. GLASER:  Objection.

13          THE COURT:  Sustained.  Don't answer the question.

14  Q.   How were you paid for those extra 20 minutes that you

15  worked?

16  A.   Could you repeat the question, please?

17  Q.   Sure.  Were there occasions that you worked 20 minutes

18  after six p.m.?

19  A.   Yes.

20  Q.   Were you paid for those 20 minutes or were they covered

21  by your salary?

22  A.   It was covered by my salary because I was never paid a

23  single dollar for my 20 minutes.

24  Q.   So would you only get the extra $10 bonus if you worked a

25  full hour after your scheduled time?

```
                  Juarez-Cardoso                    33
```

1   A.   Yes, as far as I remember only $10 per hour.

2   Q.   Were there occasions that you worked less than --

3           MR. NUSSBAUM:  Strike that.

4   Q.   Were there occasions that you worked later than six p.m.

5   but less than one hour after six p.m.?

6   A.   I didn't understand the question.  Could you repeat?

7   Q.   Were there occasions that you worked after six p.m. but

8   you didn't work a full hour after six p.m.?

9           MR. GLASER:  Objection.

10          THE COURT:  Denied.  Go ahead.  If you know the

11  answer you can answer it.

12  A.   Yes.

13  Q.   Did that happen frequently?

14  A.   It happened frequently.  There were times that I had to

15  work seven hours and another occasions I would not complete

16  one full hour.

17  Q.   You testified that that not complete hour would be

18  covered by your salary; right?

19          MR. GLASER:  I didn't hear the -- I just didn't --

20          THE COURT:  I'm sorry.  Can we ask the question

21  again?

22  Q.   How were you paid for that time that you worked which was

23  not a complete hour?

24          MR. GLASER:  Objection.

25          THE COURT:  Denied.  Go ahead.

                    Juarez-Cardoso                       34

1   A.   It wasn't paid.

2   Q.   You testified that your schedule, scheduled time to start

3   a shift was at six a.m.; right?

4           MR. GLASER:  Objection.

5           THE COURT:  Denied.  Go ahead.  If you can answer

6   the question you can answer it.

7   A.   My schedule was from six a.m. to six p.m.

8   Q.   Did you always arrive at six a.m.?

9   A.   I would arrive ten minutes before six a.m.

10  Q.   Do you recall ever arriving after six a.m.?

11  A.   Not as far as I remember.  I always tried to be there

12  right on time.

13  Q.   Did you take any vacation while you worked at La Flor de

14  Santa Ines?

15  A.   From the time I started in 2009 until about September

16  2013 that was the first time that I asked for one vacation.

17  Q.   Aside from that one week vacation, did you take any other

18  vacations?

19  A.   Could you repeat the question, please?

20  Q.   Aside from that one week vacation in September 2013 that

21  you just mentioned, did you take any other vacations?

22  A.   As far as I remember I never got from Ms. Luisa a week of

23  vacation.

24  Q.   If a holiday fell on one of the days you were scheduled

25  to work from Monday to Saturday, were you required to work on

                    Juarez-Cardoso                          35

1  that holiday?

2  A.   Yes, I had to -- I had to appear at work.

3  Q.   Did you ever work Christmas?

4  A.   Yes.

5  Q.   Did you ever work New Year's?

6  A.   Yes, also.

7  Q.   Thanksgiving?

8  A.   Yes, also.

9  Q.   You testified earlier that the store, La Flor, would open

10 at seven or 6:30 but you arrived at six.  Could you please

11 tell the Court what you would do when you arrived at La Flor

12 before the store or restaurant opened?

13 A.   I would arrive at six a.m. and I will call Ms. Luisa to

14 come down and open the store for me.  Then she will give me

15 instructions of what to do and I will start preparing say, for

16 example, 20 sandwiches, 20 -- 30 sandwiches.

17 Q.   Do you recall that you mentioned earlier that you would

18 leave for approximately two hours every week?

19           MR. GLASER:  Objection.

20           THE COURT:  Sustained.  Ask the question

21 differently.

22           MR. NUSSBAUM:  Sure.

23 Q.   Did you take any breaks between work at La Flor?

24           THE INTERPRETER:  Let me inquire if she not

25 understood my word.

```
                    Juarez-Cardoso                      36
```

1             MR. NUSSBAUM:  Do you want me to ask it again?

2             THE INTERPRETER:  Yes, please.

3    BY MR. NUSSBAUM:

4    Q.    Were you given any breaks when you worked at La Flor?

5    A.    No.

6    Q.    Did you eat at any point during the day that you worked

7    at La Flor?

8    A.    Yes, we ate but we actually never took time to eat

9    because we were interrupted by the clients.

10   Q.    Were you able to leave the restaurant during the time

11   that you ate?

12   A.    Not that I remember.  Not that I remember.

13   Q.    You testified that the 420 salary was paid to you until I

14   believe you said April 2013; is that correct?

15            MR. GLASER:  Objection.

16            MR. NUSSBAUM:  I'm just trying to expedite this.

17            THE COURT:  Just ask it again.

18   Q.    How long were you paid the 420 weekly salary for?

19   A.    Okay.  I was paid 420 since January 6, 2009 but two weeks

20   after I return from my accident they started paying me less.

21   Q.    From January 2009 until April 2013, were you paid

22   anything besides for the $420 salary and $10 hourly bonuses?

23            MR. GLASER:  Objection.

24            THE COURT:  Denied.  You can answer.  Yes?

25   A.    Yes.

```
                    Juarez-Cardoso                    37
```

1    Q.   What else were you paid?

2    A.   When Ms. Luisa Zenteno had received an order, a large

3    order for a party then I will get some additional money.

4            THE COURT:   One second.   Do you need water, either

5    one of you?   Can you just get them some water?   There's water

6    in those pitchers.   Thank you.   Go ahead.

7    Q.   Do you recall how frequently those parties would happen?

8    A.   As far as I remember it was frequent.

9    Q.   Was it every month usually?

10   A.   About every two weeks.

11           THE INTERPRETER:   Excuse me.   Correction by the

12   interpreter.   About every two months.

13   Q.   How much extra were you paid for those parties?

14           THE INTERPRETER:   May I inquire, Your Honor?

15   A.   She will give me $10 per container.

16   Q.   Would you prefer those containers during your regular

17   schedule?

18   A.   When Ms. Zenteno would receive an order she will come

19   with a list and we come to me and she will ask me cook, can

20   you prepare this and then she will pay me for each platter I

21   guess is a better word.   For each platter at $10.

22   Q.   Do you know why she paid you extra for those platters?

23   A.   Because she had to get that order ready and prepared

24   during my regular work hours.

25   Q.   Do you know why she would pay you extra for that?

Juarez-Cardoso                                    38

1          MR. GLASER:  Objection.  Asked and answered.

2          THE COURT:  Denied.  You can answer the question.

3   A.    Because I had to still continue doing my normal work,

4   take care of customers and double that they had to do the

5   platters.

6   Q.    How many platters did Ms. Zenteno usually order for these

7   parties that occurred every two months approximately?

8   A.    Can you repeat the question?

9   Q.    When those parties occurred, how many platters did Ms.

10  Zenteno usually ask you to make?

11  A.    Well, the number will change.  So it's hard for me to

12  tell you what the number.

13  Q.    Was it more than five usually?

14          MR. GLASER:  Objection.

15  A.    Yes.

16  Q.    You're not able to recall how many platters you usually

17  made for you -- she usually asked you to make?

18  A.    I cannot remember the number.  I can tell you what I did.

19  Q.    So aside from the $420 salary, the $10 bonuses you were

20  paid for hours you worked after your schedule, and the amounts

21  you were paid for these platters, were you paid anything else

22  from January 2009 until April 2013?

23  A.    No.  That was all.

24  Q.    Starting in April 2013, how much were you paid?

25  A.    After my accident when I went back to work in the morning

Juarez-Cardoso                    39

1   Ms. Luisa told me that I was not going to work the same hours

2   that I used to work before.

3   Q.   Did she tell you what your new schedule would be?

4   A.   She told me that I was not going to make the $420 that

5   she was paying me before, that my hours were going to be from

6   six a.m. to two p.m.

7   Q.   How many days a week would that be?

8   A.   Six days per week.

9   Q.   The same six days that you had worked before April 2013?

10  A.   Yes.

11  Q.   Is that the schedule that you worked starting in April

12  2013?

13          THE COURT:   What was the date?  I'm sorry.

14          MR. NUSSBAUM:   April 2013.

15          THE COURT:   '13.  I'm sorry.  I thought you said

16  something different.  Go ahead.

17  A.   Yes.  In April 2013 two weeks after my accident she gave

18  me -- she set the hours from six a.m. to two p.m.

19  Q.   Did you also work extra hours after two p.m.?

20  A.   Not that I remember.

21  Q.   So starting in April of 2013 your schedule was very close

22  to always being six a.m. to two p.m.?

23          MR. GLASER:   Objection.

24          THE COURT:   Denied.

25  A.   In April, two weeks after my accident, Ms. Luisa told me

Juarez-Cardoso                              40

1   that my hours were going to be six a.m. to two p.m.

2   Q.   Did she tell you how much you were going to be paid for

3   that schedule?

4   A.   She said that she was not going to pay -- Ms. Luisa had

5   told me that she was not going to pay me the 420, that she was

6   going to pay 250 from which she would deduct $30 per week for

7   taxes.

8   Q.   Was it always exactly $30?

9   A.   It was -- well, yes, it was a few cents under $30.

10  Q.   So you ended up walking away with approximately $220?

11  A.   Yes, per week.

12  Q.   How long were you paid that amount for?

13  A.   Same as April two weeks after my accident until October

14  when I resigned from my work.

15  Q.   During that time period did you always work from six a.m.

16  to two p.m.?

17  A.   Yes.  Correct.

18  Q.   Did you work every week during that time period?

19  A.   Yes, from April to October I work in accordance with that

20  schedule.

21  Q.   But was there ever a year at La Flor that you worked more

22  time after your set schedule?

23  A.   Could you repeat the question, please?

24  Q.   Did you work the same amount of extra hours in 2011 as

25  you did in 2010, and I'm asking for an approximation?

```
                    Juarez-Cardoso                    41
```

1    A.    Yes.  As far as I remember, yes, I did.

2    Q.    Did the extra hours increase in 2012?

3    A.    Yes.

4    Q.    Was there any mechanism or system for you to track your

5    time at La Flor?

6    A.    No, there was a clock in the kitchen and by looking at

7    the clock we will determine it was time to leave.

8    Q.    Was there any way for you to record it, the time that you

9    came in and the time that you left?

10   A.    No, nothing.

11   Q.    Did you keep any personal records of the time that your

12   shift started and ended?

13   A.    No.

14   Q.    Do you have any idea how much La Flor earns?

15   A.    Ms. Luisa Zenteno told me on one occasion that they --

16   her business was making $2,500 per day.

17   Q.    Do you remember when that conversation occurred?

18   A.    Okay.  No, I don't remember a date.  I don't remember

19   that Ms. Zenteno told me or gave me that figure because she

20   had another -- a different business and she wanted me to buy

21   it.

22   Q.    I'm sorry.  Was the number 2,000 or 2,500?

23   A.    2,500 per day.

24   Q.    Aside from that conversation, do you have any other idea

25   how much La Flor earned?

                    Juarez-Cardoso                    42

1   A.   No, she told me that she was making $2,500 per day there.

2   Not including the distribution part of the business or the

3   store.

4   Q.   Aside from that conversation, did you ever have any other

5   conversations with Ms. Zenteno --

6              MR. GLASER:  Objection.

7   Q.   -- about how much you earned?

8              THE COURT:  Denied.  You can answer the question.

9   A.   I don't want to mislead you so I could you repeat the

10  question again?

11  Q.   For sure.  Aside from the conversation you just

12  mentioned, do you have any other idea as to how much La Flor

13  earns?

14  A.   No.  I don't have any other idea because she only told me

15  that she was making $2,500 per day, and as I told you before

16  my math is not very good.

17  Q.   How did you receive your pay at La Flor?

18  A.   They paid me in cash.

19  Q.   Were you ever paid in anything besides cash?

20  A.   No.

21  Q.   Were you ever provided with a paper or a statement

22  together with the cash you received?

23  A.   No.  I was always paid that way.  If I was -- if I was

24  working and Ms. Luisa would come to where I was working to my

25  table and will just place the money on the table or on the

Juarez-Cardoso                          43

1    tablecloth.  No envelope.  No receipt.  Nothing.

2    Q.    Only the cash; right?

3    A.    Yes.

4    Q.    Who was your boss at La Flor?

5    A.    Mr. Mario Zenteno and Ms. Luisa Zenteno.

6    Q.    Do you know if they were the only owners of La Flor?

7    A.    Could you repeat the question, please?

8    Q.    Do you know if Mr. Mario Zenteno and Ms. Luisa Zenteno

9    are the only owners of La Flor de Santa Ines?

10   A.    Yes, I believe they are the owners because when I was

11   hired by Ms. Zenteno they told me that she was hiring me

12   because she was the owner and that Mr. Mario Zenteno was her

13   husband and he was also an owner.

14   Q.    Do you know if there are any other owners?

15   A.    No, I don't know.

16   Q.    Do Mario and Luisa have the authority to hire or fire

17   employees at La Flor?

18              MR. GLASER:  Objection.

19              THE COURT:  I'm sorry.  Say the question again.

20              MR. NUSSBAUM:  Do Mario Zenteno and Luisa Zenteno

21   have the authority to hire and fire employees at La Flor.

22              THE COURT:  The objection is denied.  If you know

23   the answer you can answer it.

24   A.    Ms. Luisa was in charge of hiring and firing people.

25   Q.    You were hired by Luisa; correct?

```
                    Juarez-Cardoso                    44
```

1   A.    Yes.

2   Q.    Why you do you believe that Mario Zenteno has the

3   authority to hire employees at La Flor?

4   A.    Will you repeat the question, please?

5   Q.    Sure.  Why do you believe that Mario Zenteno had the

6   authority to hire employees at La Flor?

7   A.    I don't understand the question.

8   Q.    Did you believe that Mario Zenteno had the authority to

9   hire individuals to work at La Flor?

10  A.    Okay.  Ms. Luisa told me -- correction.  Ms. Luisa used

11  to say that she was the one in charge of the business.

12  Q.    Do you believe that Mr. Zenteno was in charge of the

13  business as well?

14            MR. GLASER:  Objection.

15            THE COURT:  Denied.  You can translate the question.

16  Q.    Did you believe that Mr. Zenteno had the authority to

17  hire employees at La Flor?

18  A.    Well, not to hire but he had the authority to tell me

19  what to do because I received the instructions from him.

20  Q.    Is that because he was the owner?

21            MR. GLASER:  Objection.

22            THE COURT:  Sustained.

23  Q.    Did Ms. Zenteno, Luisa Zenteno supervise your schedule?

24  A.    Yes, because she was the one who opened for me.

25  Q.    And she's the one who asked you to work -- why else --

1          MR. NUSSBAUM:   Strike that.

2  Q.   Why else do you believe she controlled your schedule?

3  A.   She was the one who paid me.

4  Q.   Is she the one who asked you to work extra hours?

5  A.   Yes, she would tell me very simple cook, you are going to

6  make a strawberries for me today.

7  Q.   Do you know who determined how much you were going to get

8  paid?

9  A.   No, I don't know who will make that decision.

10 Q.   Do you know if it was anyone besides the owners of La

11 Flor?

12 A.   No, Luisa Zenteno was the one who gave me my money every

13 week.

14 Q.   Do you have any reason to believe that the amount you

15 were paid was determined by anyone besides the owners of La

16 Flor?

17 A.   Could you repeat the question, please?

18 Q.   You testified that you don't know who determined your

19 rate of pay.  So I'm asking if you have any reason to believe

20 that the amount you were paid was decided by someone besides

21 the owners of La Flor.

22 A.   No.  Ms. Zenteno, Luisa Zenteno was the person who

23 decides how much the employees were going to be paid.

24 Q.   Why do you believe that Mario Zenteno was your boss?

25          MR. GLASER:   Objection.

```
                    Juarez-Cardoso                    46
```

1          THE COURT:  Sustained.

2          MR. NUSSBAUM:  Your Honor, she testified earlier

3   that she --

4          THE COURT:  Sustained.  Ask the question

5   differently.

6   BY MR. NUSSBAUM:

7   Q.   Do you consider Mario Zenteno to be your boss at La Flor?

8          MR. GLASER:  Objection.

9          THE COURT:  Denied.

10  A.   Yes, he was my boss because I received orders from him.

11  Q.   Can you give the Court an example of orders you received

12  from Mario Zenteno?

13  A.    Well, for example, every day Mr. Zenteno will tell me

14  cook, prepare something for me, and also there was an order

15  that came in every day there were part of my regular job that

16  I was asked to prepare under his instructions.

17  Q.   Do you recall any other examples of how Mr. Zenteno

18  controlled you?

19  A.   He would tell me cook, today we have to clean the

20  freezers.

21  Q.   Any other examples you can recall?

22  A.   That's about it.  Excuse me.  He will also tell me clean

23  up the frying machine or the hood above it.

24  Q.   I'm sorry.  I didn't hear that.

25          THE INTERPRETER:  The interpreter will repeat.

Juarez-Cardoso - Cross                    47

1  The -- he will ask me to clean, to clean up the frying machine

2  and also the hood above it.

3           MR. NUSSBAUM:  Thank you.  Your Honor, could I have

4  a moment to review my notes, and I think I'll be done?

5           THE COURT:  Sure.

6                   [Pause in proceedings.]

7           THE COURT:  Are you going to take a break or --

8  they're going to do cross-examination.  Do you want to take a

9  break in between?

10          THE INTERPRETER:  Just five minutes, ten minutes.

11          MR. NUSSBAUM:  No further questions, Your Honor.

12          THE COURT:  So we're going to take a break to give

13  the interpreter a break.  So it's twenty to twelve.  I'll come

14  back at ten to twelve and we'll pick up.  Is that enough time?

15          THE INTERPRETER:  Yes.

16          THE COURT:  So if you could just tell the witness

17  you can't talk to anybody about your testimony, either what

18  has happened or what you anticipate will happen in between.

19          THE WITNESS:  That's fine.

20          THE COURT:  We're going to come back here in ten

21  minutes.

22          MR. GLASER:  Your Honor, I think that clock is five

23  minutes behind.

24          THE COURT:  Well, then it will be five to.  Sorry.

25          MR. GLASER:  With permission of the Court, we're

```
                    Juarez-Cardoso - Cross                  48
```

1    going to sort of move over there.

2              THE COURT:  That's fine.  So it will be five to

3    twelve.

4    (Off the record at 11:47 a.m.)

5    (Back on the record at 12:01 p.m.)

6              THE COURT:  So, Counsel, are you ready?

7              MR. GLASER:  Yes, Your Honor.

8              THE COURT:  I'm just going to remind the witness

9    that you're still under oath so you need to tell the truth.

10             MR. GLASER:  Your Honor, I have a transcript.

11             THE COURT:  Do you have a copy?  This is for the

12   cross-examination, you're gong to ask her about her testimony?

13             MR. GLASER:  Yes, Your Honor.

14             THE COURT:  Do you have a copy?

15             MR. GLASER:  Yes.

16             THE COURT:  Do you have an extra copy?

17             MR. GLASER:  This is for Your Honor.

18             THE COURT:  Is there an extra one for you?

19             MR. GLASER:  Yes.

20             THE COURT:  That's fine.  Is everybody ready?  So

21   what's going to happen now is that the defendant attorney is

22   going to ask you questions.

23             THE WITNESS:  Okay.

24                          CROSS-EXAMINATION

25   BY MR. GLASER:

Juarez-Cardoso - Cross                    49

1  Q.   Good morning, Ms. Juarez-Cardoso.  I just want to give

2  you a few instructions regarding cross-examination.  My

3  question calls for a yes or no answer.

4           THE COURT:  No, no.  None of that.  I don't want

5  those kinds of instructions.  You ask the question.  If she

6  can answer the question she'll answer it.  Go ahead.

7  Q.   Ms. Juarez-Cardoso, you are no stranger to the courtroom;

8  correct?

9  A.   That is correct.

10 Q.   You make a living making claims and lawsuits against

11 employers; correct?

12          MR. NUSSBAUM:  Objection.

13          THE COURT:  Denied.  You can answer the question.

14 A.   That is totally incorrect.  I earn my living by working,

15 working more than 40 hours per week.  That's why I'm here

16 today.

17 Q.   Are you employed now?

18 A.   I am not working at this time.

19 Q.   You're on a workers compensation leave at this moment;

20 correct?

21          MR. NUSSBAUM:  Objection, Your Honor.  What does

22 this have to do with this case?

23          THE COURT:  Denied.  You can answer the question.

24 A.   Why are you asking me these questions?  That doesn't have

25 anything to do with our case here today.

Juarez-Cardoso - Cross                    50

1      THE COURT:  Correct.  The lawyer, your lawyer makes

2  the objection to the question.  I denied his objection.  If

3  you have an answer to the question, if you know answer the

4  question.  If you don't know, don't answer, or let us know

5  that you don't know the answer.

6          So do you want to ask your question again?

7          MR. GLASER:  Well, the answer to my question is yes,

8  Your Honor, workers compensation.

9          THE COURT:  No, no.  You're not testifying.  Ask the

10  question.  If she knows the answer she'll answer.  If she

11  doesn't know the answer she'll let us know that.  So ask your

12  question.

13  BY MR. GLASER:

14  Q.  You're on workers compensation leave right now; correct?

15          THE COURT:  Stop with the instructions.  If she has

16  the answer she'll let you know.

17  A.  Could you repeat the question, please?

18  Q.  You are on a workers compensation leave right now;

19  correct?

20  A.  That is incorrect.  I'm not receiving any check for money

21  for anything.  I receive the same.

22  Q.  I didn't ask whether you're receiving a check.  I asked

23  whether you are on a workers compensation leave.  So to be --

24  so to clarify it a little bit more, do you --

25          THE COURT:  Hang on.  Just give the interpreter a

                    Juarez-Cardoso - Cross                    51

1   chance.  Go ahead.

2   Q.   So --

3             THE COURT:  I'm sorry.  You have to stand by the

4   microphone first to get a recording.

5   Q.   So to clarify this a bit more, you claimed to have been

6   injured at work by picking up meat and you are no longer --

7   and you are -- you took a leave as a result of that claimed

8   injury; correct?

9   A.   That is not -- that is not correct but I will try to

10  explain what you are asking.

11            THE COURT:  Okay.  Go ahead.  Yes, you asked the

12  question.  What's your explanation?

13            THE WITNESS:  After -- at La Flor after my accident

14  of April 2013 I received that check after I injured my left

15  wrist and I didn't get that check until my case was completed

16  or was finished.

17            MR. GLASER:  Move to strike for being non

18  responsive.

19            THE COURT:  No.  It's a bench trial.  Go.  What's

20  your next question?

21  Q.   Ms. Juarez-Cardoso, my question is this.  At this time

22  you are not working specifically because you claimed to have

23  injured both of your wrists by picking up meat; correct?

24  A.   I didn't say that I hurt both wrists but I could tell you

25  what's the reason why I am not working now.

Juarez-Cardoso - Cross                    52

1    Q.    You were working in 2015; right?

2    A.    That is correct.

3    Q.    You claim to have been injured at the last job you worked

4    at by picking up meat; true or untrue?

5    A.    Could you repeat the question?

6              MR. GLASER:  Can we read back the question, Your

7    Honor?

8              THE COURT:  No, because we only have a recording.

9    Q.    My question is, Ms. Cardoso, you claim to have been

10   injured in an accident that occurred in 2015 while you were

11   working for a Mr. Santos because you were picking up meat and

12   that's why you're not working now; true or untrue?

13   A.    I don't understand the question.  Could you give me some

14   time to repeat it for me?

15   Q.    Absolutely.  Ms. Luisa Zenteno also doesn't speak

16   English.  Correct?

17   A.    I don't know whether she speaks English or not.  That's a

18   personal question for her.  My work was in the kitchen and I

19   don't know whether she spoke good English or not.

20   Q.    Well, you worked with her every day for approximately

21   three to four years; correct?

22   A.    Well, that is true.  I work with her since January 2009

23   to October 2013 and Ms. Zenteno mentioned on one occasion that

24   she was going to learn -- that she was going to learn English.

25   Q.    Did you ever hear her speak in English; yes or no?

Juarez-Cardoso - Cross                    53

1   A.   Well, first of all, I don't know any English.  So it's

2   hard to me to tell whether she speaks English properly or not.

3   I know that on occasions when a client will arrive they will

4   exchange a few words but I'm not sure whether it was proper

5   English or not.

6   Q.   Can you tell me whether you ever heard her speak in

7   another language during the three to four years or so that you

8   worked with her?

9   A.   I didn't understand the question.  Could you repeat the

10  question?

11  Q.   Can you tell us whether you actually heard her speaking

12  in any language other than Spanish during the three to four

13  years that you worked with her?

14  A.   As far as I remember I don't know because my work was in

15  the kitchen.  She was up in the front.  So I don't know.

16  Q.   During the three to four years that you worked with Mario

17  Zenteno you never saw him or heard him speaking in any

18  language other than the English language; true or false?

19       THE COURT:  I'm sorry.  English or Spanish.  He

20  speaks English?

21       MR. GLASER:  Sorry.  Withdrawn.

22  Q.   During the three to four years that you worked at La Flor

23  you never heard Mario Zenteno speak in any other language

24  other than the Spanish language; correct?

25  A.   That is not correct because I was not present.  I saw him

Juarez-Cardoso - Cross                    54

1   in conversations with people but I was not present at the

2   conversation.  I couldn't hear him.

3   Q.   You heard him having conversations with people in the

4   kitchen; right?

5   A.   I was not paying attention to what he was doing.  I was

6   very busy the whole day and not only that he wasn't all the

7   time at the kitchen at La Flor.

8   Q.   So just so it's clear, you really can't tell us, you

9   don't know whether during the three to four years that you

10  interacted with both Luisa --

11          THE COURT:  Zenteno.

12  Q.   -- Zenteno and Mario Zenteno whether they spoke in any

13  other language than the Spanish language; true?  Specifically

14  I'm asking whether you saw or heard them doing that.

15          MR. NUSSBAUM:  Objection.

16          THE COURT:  Denied.  You can answer.

17  A.   No, I don't know.

18  Q.   Ms. Juarez-Cardoso, you can read in Spanish; correct?

19          THE INTERPRETER:  From interpreter, could you repeat

20  the question?

21  Q.   Ms. Juarez-Cardoso, just so it's clear, you do know how

22  to read in Spanish; correct?

23  A.   Not very well.  My education ended at eight.

24  Q.   Well, you can count American money; right?

25  A.   What I can say is that I was being paid for $420 that I

                    Juarez-Cardoso - Cross                    55

1    could know that since they were just a few hours $10 a month

2    that she was paying me for but that's about it.

3               THE COURT:  You need to answer his questions.  If

4    you know the answer, give us the answer.  If you don't know or

5    can't answer let us know that.  The question is do you know

6    how to count American money.

7    A.    Not a large amount.

8    Q.    You can count to 420; right?

9    A.    A little past that point.

10   Q.    Well, you can count to 620; can't you?

11   A.    Yes.

12   Q.    What number can you count to?

13              MR. NUSSBAUM:  Objection.

14              THE COURT:  Denied.

15              MR. NUSSBAUM:  He's harassing her, Your Honor.

16              THE COURT:  Careful.  Go ahead.  The objection is

17   denied.

18   A.    20, 30.

19   Q.    You never got to learn -- I'm sorry.  You never got to

20   learn the hourly rate that you were being paid at La Flor

21   while you worked there; true?

22   A.    No, because when I started they just told me that I was

23   going to make $420, and even at this time I don't know what

24   the minimum salary is.

25   Q.    Well, Ms. Cardoso, Ms. Juarez-Cardoso, you were paid --

Juarez-Cardoso - Cross                      56

1   as you sit here now you can tell us, can't you, that you were
2   paid a minimum $7.25 an hour for every single hour you worked
3   at La Flor; correct?
4   A.   Yes, because of the time that Ms. Zenteno changed my
5   schedule she told me that she was going to pay me $7.25 per
6   hour.
7   Q.   Ms. Juarez-Cardoso, you were paid a minimum of $10 an
8   hour for every hour of extra time or overtime that you worked;
9   correct?
10            MR. NUSSBAUM:   Objection to the term overtime, Your
11   Honor.
12            THE COURT:   Sustained.
13   Q.   Ms. Juarez-Cardoso, you were paid a minimum of $10 an
14   hour for all the extra time you worked; correct?
15   A.   I'll try to explain how she paid me.   My hours were from
16   six a.m. to six p.m.   If I worked two hours after six p.m. she
17   would pay me $20.
18   Q.   Ms. Juarez-Cardoso, you received $10 an hour for all --
19   for each hour of extra time that you worked; correct?
20   A.   Yes, after my standard quitting time that was six p.m.
21   she paid me $10 per hour.
22   Q.   Well, in truth six p.m. was not your standard quitting
23   time; correct?
24   A.   For my -- on my schedule that was my -- the time I was
25   supposed to leave.

                    Juarez-Cardoso - Cross                    57

1  Q.   Well, in truth 2:00 was the time you were supposed to

2  leave; true?

3  A.   In 2013 two p.m., was my quitting time because she

4  changed my schedule after my accident.

5  Q.   2:00 was your standard quitting or leaving time the

6  entire time you worked for La Flor; correct?

7           MR. NUSSBAUM:  Objection.

8           THE COURT:  Denied.

9  A.   No.   From January 6, 2009 to April 2013 my hours were

10 from six a.m. to six p.m.  Only after two weeks -- after my

11 accident in April 2013 my hours were changed from six a.m. to

12 two p.m. by Ms. Luisa.

13 Q.   Just one more time.  I'm talking about the time period

14 from January 6, 2009 up until April of 2013.  True or untrue,

15 your standard quitting time was 2:00 p.m.; right?

16          MR. NUSSBAUM:  Objection.  Asked and answered.

17          THE COURT:  Denied.  If you could translate and see

18 if she knows the answer.

19 A.   That's incorrect.  My standard quitting time or my

20 normal quitting time was six p.m. not including the extra

21 hours.

22 Q.   We are clear, aren't we, that when you went back to work

23 after your accident in 2013 that you were paid a minimum of

24 $7.25 an hour for every hour you worked; correct?

25 A.   When I went back after my accident she told me she was

Juarez-Cardoso - Cross                    58

1  going to pay me $7.15 per hour and then we reach an agreement

2  that she would pay me $250 per week for six days of work this

3  come to $30 per day before taxes -- per week, excuse me.  $30

4  per week for taxes.

5           THE COURT:  7.15; is that correct?  Is that the

6  number that you're saying?

7           THE WITNESS:  No.  She wanted to pay me $7.15 and I

8  felt that was too little.  So I asked her if she could pay

9  $250 so that she could take out the $30 for the taxes.

10 BY MR. GLASER:

11 Q.   You gave prior testimony in this case; correct?

12 A.   Can you repeat the question again, please?

13 Q.   You gave prior testimony in this case at what we call a

14 deposition or an examination before trial where you sat before

15 a court reporter and you answered questions of Ms. Conde who's

16 sitting right here to my left, correct?

17 A.   Could you repeat the name of the person who asked the

18 questions?

19 Q.   Marion Conde.  She's sitting --

20          THE COURT:  Why don't you stand up just so we know

21 who we're talking about.

22 A.   Yes, that is correct.

23 Q.   And when you gave testimony on that day which was April

24 7, 2016, you were sworn to tell the truth, correct?

25 A.   Yes, I swore.

Juarez-Cardoso - Cross                      59

1   Q.   And today just before you took the stand here you swore

2   to tell the truth, correct?

3   A.   Yes.

4   Q.   Did you give the following answers to the following

5   questions when you testified on April 7, 2016?

6            THE COURT:  All right.  Can you give us the page

7   number and line?

8            MR. GLASER:  Yes.  At Page 86, Line 15.

9   "Q.   So are you saying that your schedule changed from 7 a.m.

10  to 2 o'clock p.m. sometime after that April 16th workers

11  compensation accident?

12  "A.   Yes.

13  "Q.   So from around April 16, 2013 until your employment ended

14  around October 2013 you were getting paid $300 weekly?

15  "A.   Yes, more or less.  I do not have the specific number."

16  Q.   Did you give those answers to those questions when you

17  testified on April 7, 2016?

18           THE COURT:  Okay.  So what we're going to do, the

19  interpreter, you have the transcript?

20           THE INTERPRETER:  Yes, I do.

21           THE COURT:  Okay.  So is that okay?  That was a long

22  part so you can read it.  Okay.  Get the question right.  Your

23  question then is were you asked those questions, did you give

24  those answers, right?

25           THE WITNESS:  Could you repeat that for me because

1  you were going very fast.

2          THE COURT:  Okay.  So what happens here when the

3  lawyer is asking these kinds of questions he's referring to

4  your previous testimony.  So we're going to ask the

5  interpreter to read the questions again maybe a little more

6  slowly.  And the lawyer's question is were you asked these

7  questions, did you give these answers?  That's his only

8  question.  He's going to read you the questions.

9          THE WITNESS:  No.

10         THE COURT:  The only question is were you asked that

11 question, did you give that answer?  Just so the record is

12 clear, what the interpreter just read was Page 86, Lines 15 to

13 Line 19.  Just why don't we break it into the two questions.

14 Were you asked that question, did you give that answer?  Yes

15 or no?

16         THE WITNESS:  At that time she was making reference

17 to some text messages.

18         THE COURT:  Okay.

19         THE WITNESS:  And I told her yes.

20         THE COURT:  The only question you're being asked

21 right now is -- the interpreter is going to read the question

22 again and give your answer.  And if you remember, where you

23 asked this question, did you give the answer?  If you don't

24 know, you can let us know that.  Again we're looking at Page

25 86, Line 15 to 19 and then we'll ask the next question after

Juarez-Cardoso - Cross                      61

1   that.  He's going to read the question.

2              THE WITNESS:  I don't remember.

3   Q.   Well, now that I've read that --

4              THE COURT:  Hold on.  Do you want us to ask her

5   about the -- do you want the interpreter to ask the question

6   that comes afterward which is the one that you read which is

7   Line 20 to 24, or do you want to change your line of

8   questioning?

9              MR. GLASER:  No, I'd like the question answered.

10             THE COURT:  Okay.  So then the next question is?  Do

11  you remember being asked the question?

12             THE WITNESS:  Yes, I remember answering that

13  question.  Hang on.  And was that your answer?

14             THE WITNESS:  (Not translated).

15             THE COURT:  You have to answer the question if you

16  can answer the question.  And these kinds of questions are

17  very straightforward.  If you remember, were you asked the

18  question, did you give the answer?

19             MR. NUSSBAUM:  Your Honor, can we have what she said

20  translated?  She did give a response.  It was not translated

21  for the record.

22             THE INTERPRETER:  She did.  It was totally

23  incomplete.

24             MR. NUSSBAUM:  I know.  I understand.

25             THE COURT:  This is what we're doing.  These are the

1    instructions.  Do you remember if you were asked the question

2    and did you give this answer?

3              THE WITNESS:  Yes, the question was asked.

4              THE COURT:  All right.  You can have redirect if you

5    want to ask her about this later on.  All right.  Go ahead.

6    Further cross examination.

7    Q.   Was that the answer you gave.  We understand it was

8    asked.  Was that the answer you gave on Page 86, Line -- I'm

9    going to read it back again.  I know that the question was

10   asked at Page 86, Line 20, question, "So from around April 16,

11   2013 until your employment ended around October 2013 you were

12   getting paid $300 weekly?"  Answer, "Yes, more or less.  I do

13   not have the specific number."  Were you asked that question

14   and given that answer?

15             THE COURT:  [Indiscernible].  She's asking you to

16   read it again?  Okay.

17             THE INTERPRETER:  The question again.

18             THE COURT:  Okay.  Again, the question is do you

19   remember were you asked the question, did you give the answer?

20             THE WITNESS:  Yes, the question was asked.

21             THE COURT:  And did you give the answer that he just

22   read to you?

23             THE WITNESS:  Yes, I answered that because I did not

24   remember the amount at that time.

25             THE COURT:  Okay.  Now, next question.  It's the

Juarez-Cardoso - Cross                          63

1    best, counsel.

2    Q.   When was your memory better as to the events between 2009

3    and 2013?  Was it -- is it now or is it back in April 2016

4    when you were giving answers to the questions we just

5    discussed?

6    A.   I believe it would be better today because when the

7    questions were being asked I was not -- I had not been paying

8    attention to the previous years, to the facts that happened

9    during the previous years.

10   Q.   Did something happen today or yesterday or this week that

11   made you pay more attention to the details from several years

12   ago?

13   A.   No, nothing.

14   Q.   Okay.  And just so we're clear, what I'm asking you these

15   questions about April 16th, that's approximately five months

16   ago, right?

17   A.   I don't know how many months ago.  You are the one

18   telling me that that happened in April.

19   Q.   And you don't remember testifying in April?

20   A.   Yes, I do.

21   Q.   Did something happen to you memory between April and now

22   that you can't remember the questions that you were asked at

23   the time?

24              THE COURT:  Sustained.

25              MR. NUSSBAUM:  Objection.

Juarez-Cardoso - Cross                    64

1        THE COURT:  Rein it in.

2    Q.   Now that we've read those portions of the transcript that

3    we just discussed, does that refresh your recollection that

4    you were actually making $300 weekly when you returned to work

5    after your April 16 accident?

6    A.   The reason I remember, that makes me remember the $250,

7    is because Ms. Zenteno is present here.

8    Q.   Her presence here jogged the memory from 2013, correct?

9    A.   Yes.  I remember that she was paying me 250.

10   Q.   The testimony we just discussed, does it refresh your

11   recollection that you actually working for a shift of 7

12   o'clock a.m. to 2:00 p.m. after you returned to work following

13   the workers compensation, following your accident?

14   A.   What I remember is that I got to work at 6 a.m. and

15   worked to 2 p.m. after the month of April.

16   Q.   What I was asking you is whether anything from the

17   transcript that we just read regarding your work schedule for

18   7 o'clock a.m. to 2 o'clock p.m., does that actually refresh

19   your recollection that those were actually your hours?

20   A.   What I was asked by Ms. Conde was about some messages and

21   that's all I remember and that's why I said that.

22   Q.   Can you tell me anything about those questions where the

23   issue of messages was discussed?

24   A.   It may not be here but what Ms. Conde was referring to

25   was at that -- those hours for the messages she was referring

                    Juarez-Cardoso - Cross                    65

1   to.

2   Q.   Because you remember that even though it's not in the

3   transcript, right?

4   A.   What is, what is not there -- what is there that is not

5   there?

6   Q.   If we take that I'm going to say a 7 to 2 schedule and we

7   consider that you worked six days a week, that would be 42

8   hours a week, right?

9            MR. NUSSBAUM:   Objection, Your Honor.   She testified

10  that her schedule is not starting at 7 a.m.

11           THE COURT:   Denied.

12  A.   In 2013 my hours ran from 6 to 2 and I answered that way

13  because she was referring to the messages.

14  Q.   I'm asking you -- well, you're talking about a message.

15  In actuality, we'll get to the messages in a minute, but in

16  actuality the messages that you are talking about, those were

17  messages from your friends where they were telling you the

18  hours that you worked, right?

19  A.   Could you repeat the question, please?

20  Q.   You just talked about the testimony that we were

21  discussing referring to a text message but in actuality the

22  text messages discussed at the deposition were actually about

23  the hours that you worked and had nothing to do with the

24  hours, with the rate that you were making in 2013, correct?

25  A.   I would like to mention that Mrs. Conde is signaling me

Juarez-Cardoso - Cross                         66

1   with her head and is this proper to do in court?

2            THE COURT:  I don't see the attorney doing anything

3   wrong so let's --

4            MR. NUSSBAUM:  Your Honor, she does continue to make

5   sounds in response to answers right behind me.

6            THE COURT:  Go ahead and continue.  All right.  So

7   do we have a question?  We are we at?  Is there a question

8   about the messages pending?  Is that where we were?

9            MR. GLASER:  Am I being asked to re-ask it?

10            THE COURT:  I think so.  Yes.

11            MR. NUSSBAUM:  Your Honor, if I may, the witness

12   testified that she has a second grade level education.  I

13   think if we maybe shorten the questions we might have an

14   easier time getting through here.  These are very long drawn

15   out sophisticated questions that defense is examining the

16   witness with.

17            MR. GLASER:  Your Honor, if I would get yes or no

18   answers to any question, any one, then I could certainly cut

19   my cross examination short.  But right now I'm still on my

20   first area.

21            THE COURT:  All right.  Try to make them simple if

22   you can and if you can tell the witness, just so she

23   understands how this works, her lawyer asked her questions,

24   the defendant's counsel is going to ask questions.  If there's

25   a need for clarification, that her at attorney thinks should

Juarez-Cardoso - Cross                    67

1   be asked, he's going to have an opportunity to ask her a

2   question again and then the defendant's counsel will ask

3   again.  So if you answer the question, answer the question.

4         THE WITNESS:  The problem I'm having is that the

5   questions are very long and I cannot follow the complete

6   question in one stretch.  So if he could shorten the

7   questions.

8         MR. GLASER:  Move to strike, Your Honor.

9         THE COURT:  No.  It's denied.  Just try to ask the

10  questions as simply as you can.  Please try to pay attention

11  and follow the question and see where we get at that point.

12  All right.  Why don't you ask the question again about the

13  text message?

14  Q.   You said earlier that with respect to the testimony that

15  was just read to you that the subject was about text messages

16  but the text messages --

17        THE COURT:  Why don't we do the translation as you

18  go along, okay?  Try that.

19  A.   Yes.  That is correct.

20  Q.   But the text messages discussed at the deposition were

21  actually to get the hours that you worked while you worked at

22  La Flor because you couldn't remember them, correct?

23        THE COURT:  Yes or no?

24  A.   Yes.

25  Q.   The text messages had nothing to do with the testimony

Juarez-Cardoso - Cross                    68

1  that was read to you earlier, correct?

2  A.   They don't have anything to do with that.

3  Q.   Now, you stated that you have witnesses to the events

4  involving La Flor, correct?

5  A.   About my hours, yes.

6  Q.   And actually signed a document, you actually signed a

7  verification to a document called plaintiff Yarid Juarez-

8  Cardoso's response and objections to defendant's first set of

9  interrogatories where you list 20 witnesses, correct?

10  A.   Yes.

11           MR. GLASER:  And can I have this marked, Your Honor?

12           THE COURT:  What's it going to be, Defendant's 1?

13           MR. GLASER:  Yes.

14           THE COURT:  All right.  For identification.  Is that

15  what you want it for, for identification?

16           MR. GLASER:  Sure.

17              (Defendant's Exhibit 1, Marked.)

18           THE COURT:  Do you have -- please write it on that.

19  Oh here, I have the sticker here.  For defendants.

20           MR. GLASER:  Let me approach.  May I approach, Your

21  Honor?  May I approach the witness.

22           THE COURT:  Yes.  You can put the sticker on it.

23  Just give it to him.

24           THE CLERK:  Yeah, that's what I was going to do.

25           THE COURT:  Yes.  Thanks.

```
                    Juarez-Cardoso - Cross                    69
```

1  Q.   I'm showing you --

2           THE COURT:  Yes, you can approach.

3           THE CLERK:  If you approach, the mics aren't going

4  to pick you up.

5           MR. GLASER:  I don't have to walk up to her.  I need

6  her to turn the page.  That's essentially -- I'm asking can I

7  either get some help or approach her?

8           THE COURT:  Why don't you ask the question over

9  there, then just bring it over.  Unfortunately -- I mean are

10 those working?  Are they charged?

11          THE CLERK:  I think they do, Your Honor.

12          MR. GLASER:  I can speak loud enough if that's what

13 you want, Your Honor.  Believe me.

14          THE COURT:  These mics are not great.  All right.

15 We can give you the lapel mic.  We can use it while you're

16 walking over.  It's just these goose neck ones don't pick up

17 much sound away from the mic.  Okay.

18 Q.   I'm showing you what's been marked Defendant's Exhibit 1,

19 and I'm showing you a page from that exhibit marked

20 verification.  And I'm going to ask you is that your signature

21 on the verification page?

22 A.   Yes, that's my signature.

23 Q.   And when you signed that verification page you understood

24 that you were stating that the items in that document were

25 true, correct?

Juarez-Cardoso - Cross                    70

1  A.   Yes, I remember it was read to me.  I don't remember what

2  they read to me, but I signed it.

3  Q.   And you were signing it stating that it was true,

4  correct?

5  A.   Yes, I signed it.  I don't remember the contents.

6  Q.   Well, you were signing it with the understanding that the

7  statements you were making in the document was under the

8  penalties of perjury just like your testimony today in this

9  courtroom, correct?

10  A.   Well, I can see my signature.  I don't know what it says

11  because it's in English.

12       THE COURT:  He's asking a different question.  Why

13  don't you ask the question again?

14  Q.   Did you understand when you were signing that document

15  and were stating that that document was true, that the whole

16  document was true under the penalties of perjury, just like

17  your testimony here today in this courtroom?

18  A.   Yes.  All I'm saying is that I signed it and they read it

19  to me.  I said yes.  I don't know what it says, this document

20  that I have in my hand now.

21       MR. GLASER:  Can I have the document, please?  Oh,

22  do you want this?

23       THE COURT:  Yes.  Actually, why don't you get it?  I

24  think it will --

25       THE CLERK:  Right.

Juarez-Cardoso - Cross                    71

1          MR. GLASER:  Thank you, Your Honor.

2   Q.   Ms. Juarez-Cardoso --

3          THE COURT:  I'm sorry, just before you go, this is

4   just a timing question.  Are you going to need to take a break

5   at some point or can we keep going with this cross

6   examination?  I think it's about five after 1.

7          THE INTERPRETER:  You said you are going to -- you

8   need to do something else, Your Honor has to do something

9   else?

10         THE COURT:  That will be 1:30 or 2, yes.

11         THE INTERPRETER:  Okay.  I can do it till 1:30.

12         THE COURT:  Okay.  All right.  Let's keep going.

13  Sorry.  All right.  Counsel continue.

14  Q.   One of the witnesses that you claimed would be coming,

15  would be a witness in your case was Mr. Armondo Ordaz,

16  correct?

17         MR. NUSSBAUM:  Objection, Your Honor.  She never

18  said that Mr. Ordaz was going to be a witness in her case.

19  He's mischaracterizing interrogatory responses.  I can read

20  the interrogatories if it makes things simpler.  It asks to

21  identify witnesses, not witnesses who would actually be

22  testifying in her case.

23         THE COURT:  All right.  Do you want to rephrase the

24  question?

25  Q.   Was Armondo Ordaz a witness to the events that transpired

Juarez-Cardoso - Cross                    72

1   involving La Flor?

2   A.   Yes.  And not only that, Mr. Armondo Ordaz arrived to

3   work before I did and --

4               THE INTERPRETER:  Excuse me, Your Honor.

5               THE COURT:  You can --

6               THE INTERPRETER:  Let me inquire.

7                       [Pause in proceedings.]

8               THE INTERPRETER:  Okay.  The interpretation was

9   correct.

10  A.   He arrived to work every day before I did and he's still

11  working at La Flor.

12              MR. GLASER:  And Your Honor, I'm just going to ask

13  at least with respect to individuals, I'm asking that she

14  identify certain individuals and not give a speaking answer to

15  my question because I just want to identify them.

16              THE COURT:  You want to know if they were witnesses?

17              MR. GLASER:  I need a yes or no answer to these

18  questions.

19              THE COURT:  What's your yes or no question?

20              MR. GLASER:  Well, my next yes or no question will

21  be Jesus Reyes -- I'm sorry.

22              THE COURT:  What's the question.

23              MR. GLASER:  When I get to the next witness it's a

24  yes or no question as to whether that person is one of the

25  witnesses to the events.

Juarez-Cardoso - Cross                    73

1          THE COURT:  Okay.  So to remind you again, the

2   defendant's counsel is trying to ask the questions very

3   simply, as simple as he can.  You should focus on the question

4   and if you can answer it simply, answer it.  If you don't know

5   the answer, let us know that.

6          THE WITNESS:  Yes, I understand.

7   Q.   In fact, Mr. Armondo Ordaz is one of the people that you

8   were talking about earlier that you exchanged text messages

9   with, correct?

10  A.   Yes, that is correct.

11  Q.   And Jesus Reyes, he was a witness to the events, correct?

12  A.   Yes, correct.

13  Q.   And he was another individual that you exchanged text

14  messages with, right?

15  A.   Yes.

16  Q.   And again, those were the text messages that you were

17  speaking about earlier, right?

18  A.   Yes.

19  Q.   And you go to the same church as Armando Ordaz, right?

20  A.   Could you repeat the question?

21  Q.   You go to the same church as Armando Ordaz, correct?

22  A.   Not anymore.  I did that before.

23  Q.   You went to church with him, you went to the same church

24  as Mr. Armando Ordaz -- withdrawn.  You were still going to

25  the same church as Armando Ordaz at the time you gave your

Juarez-Cardoso - Cross                          74

1  deposition, correct?  In April?

2  A.    No, that's not correct.

3  Q.    Armondo Ordaz won't be coming to testify for you in court

4  today, right?

5  A.    I haven't spoken with him.

6  Q.    Jesus Reyes won't be coming to court to testify for you,

7  correct?

8  A.    I don't know.

9  Q.    As you sit here now you don't know whether Jesus Reyes

10 will be coming to court for you or not today or sometime

11 during this trial?

12 A.    It is correct that I don't know.

13 Q.    I'm going to ask you to take a look at response number

14 four to these interrogatories.  There's a list of people that

15 I believe are number 20.

16       THE COURT:  What's the question?  There are 20

17 names?  Is that what you want to know?

18 Q.    There are 20 names listed on that document that you claim

19 to have been witnesses to the events involving La Flor,

20 correct?

21       MR. NUSSBAUM:  Objection, Your Honor.  That's not

22 what the interrogatory asks.

23       MR. GLASER:  Your Honor, for one thing, it doesn't

24 matter what the interrogatory says.  I'm asking her.  She's

25 claiming they're witnesses.  It's a lead-in question.

Juarez-Cardoso - Cross                          75

1    THE COURT:  Don't ask her about the inter -- refer

2  to the -- ask her about the names on the list.

3  Q.   All of those 20 people --

4    THE COURT:  You have to by the microphone otherwise

5  it's not going to make a clear transcript.

6    MR. GLASER:  I'm sorry.

7    THE COURT:  Go ahead.

8    MR. GLASER:  I'm sorry, Your Honor.

9    THE COURT:  Go ahead.

10  Q.   Each one of the 20 people listed on response number four

11  are witnesses to the events involving La Flor, correct?

12  A.   That is correct.

13  Q.   And none of those people will be coming to testify on

14  your behalf in this case, correct?

15  A.   I haven't spoken with them to have them come to this

16  case.

17  Q.   So that means they won't be coming to testify in this

18  case, right?

19  A.   That is correct.

20  Q.   Now, let's get back to the hours that you were working in

21  2013.  I'm going to ask you to assume a 7 to 2 schedule and a

22  6 to 2 schedule.  Okay?  We're going to try both.  With a 7 to

23  2 schedule working --

24    THE INTERPRETER:  Counsel, give me a second.  I need

25  to interpret that section.  Thank you.

Juarez-Cardoso - Cross                    76

1  Q.   Assuming a 7 to 2 schedule six days a week, that would be

2  a total of 42 hours, correct?

3  A.   I haven't calculated the hours.

4  Q.   Well, how long would it take you to calculate that.

5  Could you calculate it?

6  A.   I don't have an idea.

7  Q.   If I pull out my calculator --

8         THE COURT:  No, just --

9         MR  NUSSBAUM:  You're asking the witness to do

10 math?

11         THE COURT:  It's a math question and it's

12 unnecessary.

13 Q.   Assuming a 6 to 2 schedule at six days a week, that would

14 be a total of 48 hours, correct?

15 A.   I cannot tell you because I haven't counted them.

16 Q.   And for each day you worked, you got a one hour lunch

17 break, correct?

18 A.   Incorrect.

19 Q.   Okay.  If we considered 42 hours a week at 7.25 an hour,

20 that would be a total income of 290 to $300, right?

21         MR. NUSSBAUM:  Objection, Your Honor.  His math is

22 wrong.

23         THE COURT:  All right.  Your math --

24         MR. GLASER:  Is my math off?

25         THE COURT:  Yes.  So we can do the math.  Let's get

Juarez-Cardoso - Cross                    77

1  the facts into the record and go from there.  She doesn't need
2  to be the person doing the math.  Go ahead.
3          MR. NUSSBAUM:  All right.  So I'm just going to try
4  to get --
5          MR. NUSSBAUM:  Your Honor, can I object to all
6  questions going forward to the witness concerning --
7          THE COURT:  No.
8          MR. NUSSBAUM:  -- mathematical calculations?
9          THE COURT:  No.  You don't have a standing
10 objection.  Let's just --
11 Q.   If we consider a 42 hour week, that would be around $300
12 and if you considered a 48 hour week, that would be around --
13 the hours that you -- withdrawn.  Now, you do remember you
14 stopped working for La Flor in October of 2013, correct?
15 A.   Correct.
16 Q.   And in fact, you have a very good memory of these events
17 when you started working and when you stopped working,
18 correct?
19 A.   Yes because I was doing the work.
20 Q.   Right.  And in fact you distinctly remember starting
21 January 6, 2009 and you distinctly remember that your workers
22 compensation accident, or the accident at La Flor, occurred on
23 April 16, 2013, right?
24 A.   I remember that because in 2009. January 6 is a holiday
25 and the day I got my cut is my son's birthday.

Juarez-Cardoso - Cross                          78

1  Q.   So are you saying you don't have a good memory?

2          MR. NUSSBAUM:  Objection.

3          THE COURT:  Can you answer the question?

4  A.   I remember that that day my son had arrived from Mexico

5  and that's the day I cut myself.

6          MR. GLASER:  Move to strike for being nonresponsive.

7          THE COURT:  Denied.  Okay.  Next question.

8  Q.   Ms. Cardoso, you filed a lawsuit -- withdrawn.  When you

9  worked for La Flor, you weren't working for any other company

10 or corporation, were you?

11 A.   No.

12 Q.   But in fact, you started a lawsuit against Picnic Food

13 Corporation where you claimed to have been hired by Picnic

14 Food Corporation in February 2013 to work as an assistant cook

15 for that restaurant, correct?

16 A.   That is incorrect because in 2013 I was working with Ms.

17 Santano up to April.

18          MR. GLASER:  Can I have this marked, please?

19          THE COURT:  Yes, you can mark it.  This is going to

20 be Defendant's 2.

21          (Defendant's Exhibit 2, Marked.)

22          THE CLERK:  Do you have the first one?

23          MR. GLASER:  I don't.

24          THE COURT:  You're looking for the --

25          THE CLERK:  The first one of the [inaudible].

```
                Juarez-Cardoso - Cross                    79
```

1              THE COURT:  Is it up here?

2              MR. GLASER:  You know, Your Honor, that it is a --

3     Defendant's Exhibit, what's been marked for identification as

4     Defendant's Exhibit 1 is a legal document that's filed in this

5     claim.  I'd like to move that into evidence as Defendant's

6     Exhibit 1.

7              MR. NUSSBAUM:  Objection, Your Honor.  It's

8     inadmissible.

9              THE COURT:  It's inadmissible?

10             MR. NUSSBAUM:  It's other lawsuits.

11             MR. GLASER:  This is this lawsuit.

12             THE COURT:  No, I'm sorry, you're talking about

13    interrogatories, right?  The first --

14             MR. GLASER:  Yeah.

15             MR. NUSSBAUM:  Oh, I'm sorry.  I thought he was

16    talking about --

17             THE COURT:  No, he was going back to the first one.

18             MR. NUSSBAUM:  My apologies.

19             THE COURT:  Any objection to its admission?

20             MR. NUSSBAUM:  No, Your Honor.

21             THE COURT:  All right.  So Defendant's Exhibit 1,

22    which is plaintiff's responses to defendant's interrogatories,

23    is --

24             MR. NUSSBAUM:  I would like, however, to be able to

25    hold onto that during this cross examination and it'll --

Juarez-Cardoso - Cross                    80

1          THE COURT:  Physically you want it?

2          MR. GLASER:  Well, I don't need it this moment but

3    I'm saying I might need it again --

4          THE COURT:  Okay.  That's fine.

5          MR. GLASER:  -- during the course of this trial.

6          THE COURT:  Okay.  So just so the record is clear,

7    it's marked and admitted.  That's Exhibit Number 1.

8               (Defendant's Exhibit 1, Received.)

9      The complaint is just marked right now as Defendant's 2.  I

10   assume that's what that document is, the complaint.  Is that

11   right?

12         MR. GLASER:  All right.  And --

13         THE COURT:  The document being marked as 2 is a

14   complaint, is that right?

15         MR. GLASER:  Yes, Your Honor.  And for the record,

16   Your Honor, the index number is 15-CV-1805 in this court.

17   Q.   And I'm going to ask you to take a look at the last page

18   of this document which is labeled consent to sue under Fair

19   Labor Standard Act.

20         THE COURT:  He wants you to bring the copy over

21   there.

22   Q.   Standards Act.

23         MR. NUSSBAUM:  Do you have a copy for us?

24         THE COURT:  Do you need to look at it?

25         MR. NUSSBAUM:  No.  For now we're all right.

Juarez-Cardoso - Cross                    81

1           THE COURT:  Okay.

2           MR. NUSSBAUM:  Your Honor, I object to questions

3    about this other lawsuit.  It's just not relevant to the

4    instant proceedings.

5           THE COURT:  Denied.  I guess you want an answer to

6    that question.  You're asking if this is the lawsuit.  You

7    have a question about the last page?

8           MR. GLASER:  I do.

9    Q.   Is that your signature on that document?

10   A.   Yes, it is my signature.

11   Q.   And by signing that document, did you understand that you

12   were affirming what was stated in the several pages of that

13   lawsuit to be true?

14          MR. NUSSBAUM:  Objection.  Your Honor, the document

15   speaks for itself and it says nothing about an affirmation.

16          MR. GLASER:  I'll withdraw the question.

17   Q.   Did you understand by signing that document, I'm asking

18   your understanding, did you understand by signing that

19   document that you were affirming that the contents of the

20   pages, the several pages of documents, were in fact true?

21          MR. NUSSBAUM:  Objection.

22          THE COURT:  Hang on.  Let me see it.  All right.

23   It's a consent.  I don't understand your question given the

24   objection.  It's a consent to sue under Fair Labor Standards

25   Act.  [Inaudible] plaintiff's counsel [inaudible].

Juarez-Cardoso - Cross                    82

1  Q.   You were consenting to being part of that lawsuit by

2  signing that document.

3  A.   Could you repeat the question?

4  Q.   By signing that document, you were consenting to be part

5  of that lawsuit, correct?

6  A.   That is correct.

7  Q.   And did you understand that the statements made in that

8  document were true?  I'm talking about the whole document.

9  A.   Yes, I understand.

10  Q.   And did you understand --

11       MR. GLASER:  Can I have the document for a moment,

12  Your Honor.  I'll come --

13       THE CLERK:  It's okay.

14       MR. GLASER:  Should I [inaudible] the microphone?

15       THE COURT:  Yes.  You need to turn it off when you

16  get close to the other mic because sometimes the volume will

17  interfere.

18       MR. GLASER:  Thank you.  I'm going to give it back

19  in a moment.

20       THE COURT:  Okay.

21  Q.   I'm reading from Paragraph 33 of the document.  "In or

22  about February 2013 the defendants hired plaintiff, Yarid

23  Juarez-Cardoso, to work as a non-exempt cook for the

24  defendant's Mexican restaurant known as Perla Picnic Food

25  located at 3913 13th Avenue, Brooklyn, New York."  I'm going to

Juarez-Cardoso - Cross                                83

1  pass this up to you.  You can look at it.  Paragraph 33.  Do

2  you recall --

3              THE COURT:  Hang on.  Let's get the --

4              MR. NUSSBAUM:  Objection.  Your Honor, the witness

5  already testified that she does not read English.

6              MR. GLASER:  We'll have the interpreter -- that's

7  not an issue.  We'll have the interpreter read it to her.

8              THE COURT:  Yes.  Go ahead.

9              MR. GLASER:  Or translate to her.

10              THE COURT:  So now he's going to ask you a question

11  about that.

12  Q.  Does that refresh your recollection that it was stated

13  here that you were suing Picnic Foods for the time period of

14  February 2013 going forward for the same period of time that

15  you're suing, that you're presently suing La Flor and Ms.

16  Zenteno in this lawsuit here?

17  A.  That's not correct because in 2013 I was working with Ms.

18  Zenteno.

19              THE COURT:  Okay.  He asked you a different

20  question.  So ask the question again.

21  Q.  It's true, isn't it, that you were suing Picnic Foods for

22  the time period of February going forward for the same time

23  period that you're presently suing La Flor and Ms. Zenteno in

24  this lawsuit here?  That's what that document says, right?

25  A.  I understand.  Well, if you say that that's what the

1   document says, that's what the document says.  I don't -- this

2   document was read to me through an interpreter and I don't

3   know exactly what they are referring to with this paragraph.

4   Q.   Well, you don't know what the interpreter just read to

5   you in Spanish?

6            THE INTERPRETER:  The plaintiff was referring it was

7   read to her by another interpreter, not by this interpreter.

8   Q.   All right.  You just heard the interpreter here in this

9   courtroom, right?

10  A.   Yes.

11  Q.   Is there anything that this interpreter read to you that

12  you didn't understand from the paragraph that was just read to

13  you?

14  A.   What I don't understand is why it says here that I was

15  working in February when in February I was working for Ms.

16  Zenteno.

17  Q.   And that's what it says, correct?  That you were working

18  for Picnic Foods in February 2013, correct?

19  A.   Yes, well you are saying so but I don't know how to read

20  in English.

21  Q.   I'm saying so?  The interpreter just read to you what

22  that paragraph said.  Do we need to have him read it back to

23  you again?  Do you confirm that you were suing Picnic Foods

24  from February 2013 going forward for the same time period that

25  you were suing La Flor, that you're presently suing La Flor?

Juarez-Cardoso - Cross                        85

1  A.   Well, it may be read to me again but it's incorrect.  I

2  was working for La Flor, not at Picnic Foods at that date.

3  Q.   Does it say that you were working for -- that you were

4  employed by Picnic Foods in February 2013 going forward?  Yes,

5  it does say that?  No, it doesn't?  Or do we need the

6  interpreter to read it back to you?

7           MR. NUSSBAUM:  Objection.  Asked and answered.

8           THE COURT:  Denied.  Go ahead.

9  A.   If possible, yes to the question of do you need the

10  interpreter to read it again.

11           THE COURT:  Okay.  Read it again to her, the

12  paragraph in the complaint.  Okay.  So you want to ask the

13  question one more time.

14  Q.   It does say that you were -- it does say and you were

15  making a claim to have been employed by Picnic Clothes in

16  February 2013 during the same time period that you were

17  employed by La Flor, correct?

18  A.   Yes, it says that but I would like to clarify.

19           THE COURT:  Your attorney can ask you questions

20  later on.

21           THE WITNESS:  Okay.

22           THE COURT:  So let me -- for counsel, when you're

23  finished this line of questioning we're going to take a lunch

24  break, so just let me know when you're finished on this issue.

25  Q.   Ms. Juarez-Cardoso, isn't it true that you intentionally

Juarez-Cardoso - Cross                    86

1   gave your attorney false information with respect to that

2   lawsuit when you first filed it as to when you were employed

3   by Picnic Foods?

4   A.   Could you repeat the question?

5   Q.   Isn't it true that you intentionally made the false claim

6   to your attorney that you were employed by Picnic Foods back

7   in February 2013, for the same time period that you were

8   employed by La Flor?

9   A.   Well, Ms. Zenteno knows that I was working for her during

10  that period.  This could have been -- I don't recall saying

11  that to anyone.  And it could be an error by the translator or

12  by the interpreter.

13          MR. NUSSBAUM:  Your Honor, I'd like to make a

14  standing objection to all questions that relate to attorney-

15  client privilege.  The last question asked about

16  communications to her lawyer.  I mean I don't even really need

17  a --

18          THE COURT:  You can't have a standing objection when

19  you don't make it in time but --

20          MR. NUSSBAUM:  Going forward.

21          THE COURT:  It's not a standing objection.  You have

22  to make the objection.  Did you say something at the end of

23  her statement that didn't get translated?

24          THE INTERPRETER:  Not that I'm aware of.

25          THE COURT:  Okay.

Juarez-Cardoso - Cross                    87

1   Q.   The question is a very specific one.  Did you give false

2   information, intentionally give false information with respect

3   to that lawsuit when you were making the claim that you were

4   employed by Picnic Foods in February 2013 during the same time

5   period that you were employed by La Flor?

6              THE COURT:  So is there -- but there's his

7   objection.  Are you saying gave false information to the

8   lawyer or you allowed a false statement to be included in the

9   lawsuit?

10             MR. NUSSBAUM:  Your Honor, it's also asked and

11  answered.

12             THE COURT:  What is the --

13             MR. NUSSBAUM:  It's the same question.

14             MR. GLASER:  It's not answered for sure.

15             THE COURT:  No, it's not.  She didn't answer the

16  question.  So which is --

17             MR. NUSSBAUM:  She said she doesn't know how it came

18  about.

19             THE COURT:  What's the -- I mean there's the

20  objection on the privilege which I'm going to sustain if

21  that's the question you're asking.  If you're asking if it's

22  included in the complaint then it's false and you can ask that

23  question.

24             MR. NUSSBAUM:  And I'm objecting that it's asked and

25  answered.

Juarez-Cardoso - Cross                    88

1          THE COURT:  Denied.  Which question?

2          MR. GLASER:  I don't know, Your Honor.

3          THE COURT:  All right.  Try one last time and then

4     we're taking a lunch break.

5          MR. GLASER:  I agree with you that we should finish

6     this line of questioning.  I have like two or three questions

7     but I can't get through anything in the time period that I'm

8     trying.  Is it --

9          THE COURT:  You have to get closer to the mic.

10    Q.   Isn't it true --

11         THE COURT:  Go to the mic, go to the mic, go to the

12    mic.

13    Q.   Isn't it true that you gave false information

14    intentionally to be included in the complaint that we're

15    talking about against Picnic Foods for the same time period

16    that you were employed by La Flor?

17    A.   No.  At no time I provided false information.

18         THE COURT:  All right.  Can you please use the

19    microphone.  You can bend the microphone in the other

20    direction if you want to stay on the side.

21    Q.   Ms. Juarez-Cardoso, isn't it -- well for one thing, when

22    you went into court and settled this case, Ms. Conde sitting

23    right here, she was the attorney for the defendant in that

24    case as well, correct?

25    A.   Yes.  Actually she smiled when she saw me.

```
                    Juarez-Cardoso - Cross                    89
 1  Q.   And you saw her there and that's the only reason we know
 2  about that lawsuit, right?
 3            THE COURT:  Sustained.  You object, yes?
 4            MR. NUSSBAUM:  Yes, Your Honor.
 5            THE COURT:  Sustained.
 6  Q.   And you settled that case, right?
 7  A.   I don't understand why I have to discuss that case when
 8  we are in a different case.
 9  Q.   I know.
10            THE COURT:  All right.  So the instructions come
11  from me.  You have to answer the questions.  I had this
12  discussion with the lawyer about whether the question is
13  appropriate.  I'm letting him ask you about these questions.
14  If you know the answer, give the answer.
15            THE WITNESS:  So what was the question?
16  Q.   You settled that case that day you were in court in this
17  courthouse with Ms. Conde, correct?
18  A.   That is correct.
19  Q.   And you're getting paid right now those claims that are
20  part of the lawsuit including the false claim we're talking
21  about in the paragraph that we were reading, right?
22  A.   I don't understand what you mean by this time.
23  Q.   You're being paid payments for that very same case that
24  you settled that includes that false claim that we just read
25  for the record, right?
```

1   A.   Are you speaking about Picnic Foods?

2   Q.   Picnic Foods.  They're making payments to you, right?

3   A.   Yes.  I will be getting the last payment during this

4   month of $1,666.

5              MR. GLASER:  That's my last question on that topic,

6   Your Honor.

7              THE COURT:  All right.  So it's a quarter to 2.  I'm

8   just going to talk to the deputy for a second.

9                      [Pause in proceedings.]

10             THE COURT:  All right.  Naturalization is scheduled

11  for 2 so it's usually 20 minutes, a half an hour.  So will an

12  hour work?

13             MS. CONDE:  Yes, Your Honor.

14             MR. NUSSBAUM:  Yes, Your Honor.  I just need to

15  check with the interpreter because he was originally scheduled

16  for just half a day.

17             THE COURT:  Okay.

18             MR. NUSSBAUM:  Could we just go off --

19             MR. GLASER:  Your Honor, before we do that, can --

20             THE COURT:  Hold on.

21             THE INTERPRETER:  It's fine.

22             THE COURT:  You're good?  Okay.

23             MR. NUSSBAUM:  It's Friday afternoon and I've got to

24  be done at 5 if that's possible?

25             THE COURT:  It's totally fine.  Will 5 work?  Is

1   that enough time for you?

2            MR. GLASER:  For me?

3            THE COURT:  This obviously is going to continue I

4   think if we continue at this pace.  But is 5 o'clock enough

5   time for you to do whatever you need to do after work?

6            MR. NUSSBAUM:  Well, 4:45 would be ideal.

7            THE COURT:  It's better?  All right.  We're going to

8   finish at 4:45.  So we'll come back at a quarter to --

9            MR. NUSSBAUM:  2:30?

10           THE COURT:  It's up to you all.  Do you want to do

11  2:30?  I mean the uncertainty for me is just naturalization.

12  If they start late, they start late.

13           THE CLERK:  So one hour?

14           THE COURT:  We'll do one hour.  We're going to come

15  back at a quarter to 3.  All right?  Does that work for you?

16           MR. GLASER:  Yes.

17           THE COURT:  Okay.  Let me just remind the witness.

18  Because your testimony is continuing, you can't talk to

19  anybody about the testimony that you've given or the testimony

20  that you may be asked to give.  Do you understand?

21           THE INTERPRETER:  She was asking whether she can

22  remain here.

23           THE COURT:  You can stay in this courtroom.  There's

24  a cafeteria.  You can go outside, come back.  We're going to

25  come back here at a quarter -- you need to be back here at a

Juarez-Cardoso - Cross                    92

1  quarter to 3.  And you can't talk to anybody about -- you can

2  talk about baseball, but you can't talk about --

3          MR. GLASER:  On this specific point, I'm not tattle

4  tailing or making any application, but I did see a person at

5  counsel's table speaking to the witness in Spanish.  And Your

6  Honor, I can't speak Spanish.  I know Ms. Conde can.  And to

7  me, an instruction that she can't speak with her about the

8  testimony is applicable to everybody else.  But as to counsel,

9  I don't think she should be speaking to anybody from counsel's

10 table at all.

11         THE COURT:  They can talk about baseball.  You can

12 talk about something neutral.  You cannot talk about your

13 testimony.

14         MR. NUSSBAUM:  She wants to know how to get to the

15 cafeteria.

16         THE COURT:  All right.  We'll show you where the

17 cafeteria is.  You can go outside.  You can whatever.  Be back

18 here in an hour unless -- does that work for you?  All right.

19 (Off the record at 1:49 p.m.)

20 (Back on the record at 3:08 p.m.)

21         THE COURT:  So we're going to pick up testimony.

22 I'm just going to remind the plaintiff, as a witness you've

23 been sworn to tell the truth and that oath continues through

24 this afternoon's testimony.

25         THE WITNESS:  Yes.

                    Juarez-Cardoso - Cross                    93

1          THE COURT:  All right.

2          MR. GLASER:  Thank you, Your Honor.  Is the

3    complaint -- I believe the interpreter has the complaint on

4    the Picnic Foods case still in front of him.

5          THE COURT:  I think so.

6          THE INTERPRETER:  Yes, I do.

7          MR. GLASER:  Okay.

8                    CONTINUED CROSS EXAMINATION

9    BY MR. GLASER:

10   Q.   Now, Ms. Juarez-Cardoso, your lawyer on the Picnic Foods

11   case was Cilenti & Cooper, right?

12   A.   Yes.

13   Q.   You didn't hire Cilenti & Cooper for this case, the case

14   we have today, did you?

15   A.   No.

16   Q.   You went shopping for a new lawyer, right?

17   A.   I don't understand what you mean by shopping.

18   Q.   You went shopping.  You went looking for another lawyer,

19   right?

20   A.   Yes.

21   Q.   And you hired Joseph & Kirschenbaum, correct?

22   A.   Yes.

23   Q.   And that's because you made these similar claims for the

24   same period of time, correct?

25          MR. NUSSBAUM:  Objection.

1           THE COURT:  Sustained.  You don't have to answer the

2  question.  Go ahead.

3  Q.   Well, it's because your claims were so similar, correct?

4           MR. NUSSBAUM:  Objection.

5           THE COURT:  Sustained.  You can't ask her why she

6  hired her lawyer.

7  Q.   Let's go back to the complaint.  You stated in Paragraph

8  37 of the complaint against Picnic Foods that you had been

9  working about 66 hours a week, correct?

10          MR. NUSSBAUM:  Objection.  Your Honor, she didn't

11  state anything in the complaint.  It's mischaracterizing and I

12  think with the translation it really takes her down a path

13  she's not going to understand the difference.

14          THE COURT:  All right.  I'm sorry, say the question

15  again.

16          MR. GLASER:  I'll withdraw the question but I mean -

17  -

18          THE COURT:  We already -- it's a bench trial.  I get

19  your point.  I know what it said.  If you want to ask a more

20  questions, okay, but --

21  Q.   At Paragraph 37, your complaint against Picnic Foods

22  states that you had been working about 66 hours a week for the

23  time period February 2013 to December 2013, correct?

24          MR. NUSSBAUM:  Objection.  Your Honor, the paragraph

25  doesn't say anything about February 2013.

Juarez-Cardoso - Cross                    95

1      THE COURT:  Does it have a date on it?

2      MR. NUSSBAUM:  No.  It says from the beginning of

3  her employment and continuing through approximately December

4  2013.

5      THE COURT:  Is there a date --

6      MR. NUSSBAUM:  The plaintiff earlier testified that

7  that's a typo.

8      THE COURT:  Don't repeat her testimony.  Does the

9  complaint have a date --

10     MR. GLASER:  The issue --

11     THE COURT:  -- for the beginning of her employment?

12     MR. GLASER:  The issue is about the 66 -- it already

13 says -- Paragraph 33, it says that she started in February

14 2013.  If we take that -- I didn't state it exactly the way

15 it's read in the complaint but she already testified that the

16 complaint says that in February 2013 that she was hired.

17     MR. NUSSBAUM:  Your Honor, the complaint says

18 whatever it says.

19     THE COURT:  Stop.

20     MR. GLASER:  It says whatever it says.  That's true.

21     THE COURT:  Denied on the objection.  Ask her about

22 the number of hours.  Go ahead.  You can ask.  Just ask the

23 question again so the record is clear.

24 Q.   In Paragraph 37 in the Picnic Foods case that was filed

25 on your behalf it states that from the beginning of your

Juarez-Cardoso - Cross                    96

1  employment, which is stated to be February of 2013, through

2  approximately 2013 the number of hours you were working were

3  approximate -- were 66 hours a week, correct?

4  A.    (Not translated).

5          THE COURT:  I'm going to tell you again, he's asking

6  the questions as straightforward as he can.  You need to

7  answer the question if you know the answer.  If you don't know

8  the answer, you can let us know you don't know.  He's asking a

9  specific question about a paragraph in the complaint.

10 A.    I don't remember.

11 Q.    All right.  Well, let's have the Paragraph 37 read to you

12 up until the end of the parentheses where it says 7.58 per

13 hour.

14         THE COURT:  Okay.  So just for the record, can you

15 read it?

16         MR. GLASER:  Yes.

17         THE COURT:  Thanks.

18         MR. GLASER:  So I'm going to read up to Paragraph 37

19 of the complaint and I'm going to have the translator

20 translate it.

21 Q.    Was it stated on your behalf in the complaint that on

22 Paragraph 37 that from the beginning of her -- starting from

23 the word from.  From the beginning of her employment and

24 continuing through approximately December 2013 plaintiff did

25 not receive proper overtime compensation.  During this period,

1   plaintiff was paid in cash at the rate of $500 per week

2   straight time for all hours worked and worked 66 hours per

3   week for a regular rate of pay of 7.58 per hour, $7.58 per

4   hour.  And I'd ask the translator to read it to her.  Please

5   have the translator read it.  And now that that's been read to

6   you, does that refresh your recollection as to what was

7   claimed on your behalf in Paragraph 37 of the complaint on

8   behalf of -- against Picnic Foods?

9   A.    No.

10  Q.    Does it refresh your recollection that you claim to have

11  worked 66 hours per week for a period of time?

12  A.    No.  I only remember my schedule.

13  Q.    Do you have any recollection that you claim to have

14  worked 66 hours per week in the Picnic Foods claim?

15  A.    No because I didn't do the accounting myself.

16  Q.    And that 66 per hours per week that you claim in the

17  Picnic Foods claim, that's very similar to the number of hours

18  you're claiming to have worked for La Flor, correct?

19  A.    Actually, I don't know how many hours I used to work at

20  La Flor because I was not keeping an account of that.

21  Q.    Okay.  Thank you for that but my -- so it's very clear

22  that you don't know the number of hours that you worked at La

23  Flor, correct?

24            MR. NUSSBAUM:  Objection.

25            THE COURT:  Denied.

1  A.   Okay.  Since I don't know how to perform calculations,

2  I'm guiding myself on the schedule and the hours that I

3  worked, on the hours that I did afterwards, after the 6 p.m.

4  time.

5  Q.   But that's not my question.  I have a very specific

6  question.  You don't know, you have no idea at all how many

7  hours you worked at La Flor per week, correct?

8            MR. NUSSBAUM:  Objection, Your Honor.  This question

9  has been asked multiple times and answered tens of times

10 today.

11           THE COURT:  Denied.  You can translate and let's get

12 the answer.

13 A.   My hours were from 6 a.m. to 6 p.m. and then Ms.

14 [indiscernible] will pay me $30 for the extra hours past 6

15 p.m.

16 Q.   I'm going to stand right here and ask the question as

17 clearly --

18           THE COURT:  You're not going to stand there because

19 we can't hear you.  You need to use the microphone.

20           MR. GLASER:  Oh, I'm not going to stand here.

21           THE COURT:  Again, listen to the question.  If you

22 know the answer, answer it.  If you don't know the answer,

23 tell us you don't know.

24 Q.   You have -- as you sit here now --

25           THE COURT:  Hang on.  Just let him translate the

```
              Juarez-Cardoso - Cross                    99
```

1   instruction.

2   Q.   As you sit here now you have no idea how many hours you

3   worked per week at La Flor, correct?

4   A.   Every week I could have ten or nine hours.

5   Q.   As you sit here now you have no idea, do you, how many

6   hours a week you worked at La Flor, correct?

7   A.   Maybe I'm not able to express myself clearly.  I could

8   give you an example of how I do it.

9   Q.   As you sit here --

10           THE COURT:  All right.  Enough.  She doesn't answer

11   the question so move on.

12   Q.   The ten to nine hours you just talked about, is that the

13   total number of hours you worked overtime in a given week?

14           MR. NUSSBAUM:  Objection to the use of the term

15   overtime, Your Honor.

16           THE COURT:  Sustained.

17   Q.   The ten or nine hours you just talked about, is that the

18   total number of extra hours that you worked a week at La Flor?

19   A.   Yes, after 6 p.m.

20   Q.   In fact, it's after 2 p.m., isn't it?

21           MR. NUSSBAUM:  Objection.

22           THE COURT:  Denied.

23   A.   No, that's not correct.

24   Q.   Now, we were discussing previously the number of hours

25   you claimed in the Picnic Foods claim and the number of hours

Juarez-Cardoso - Cross                    100

1  you're claiming in this case.  Specifically, is it fair to say

2  that the total number of hours that you're claiming to have

3  worked per week in the Picnic Foods claim, the 66 hours per

4  week, is very similar to the claim you're making in this

5  lawsuit today?  I'm going to ask that you answer that question

6  yes it is, no it isn't, or that you don't know.

7          THE COURT:  We've already gone over that.  Move on.

8  Q.   I'm going to read the last sentence in that portion of

9  the complaint.  Work performed above 40 -- I'm sorry, that's

10 not correct.  Withdrawn.  The last sentence of Paragraph 37 of

11 the Picnic Foods complaint, work performed above 40 hours per

12 week was not paid at the statutory rate of time and one half

13 as required by state and federal law.  I'm going to ask that

14 the interpreter read that to you, Ms. Juarez-Cardoso.  And do

15 you recall that claim being made on your behalf in the Picnic

16 Foods case?

17 A.   I didn't understand the sentence.

18 Q.   Which sentence?

19 A.   I didn't understand the sentence from the beginning to

20 the end.  Would you be so kind to repeat it for me?

21 Q.   The last sentence of Paragraph 37 of the Picnic Foods

22 complaint --

23          THE COURT:  Right.  The translator is going to read

24 it again to her.

25          MR. GLASER:  Oh, is that --

Juarez-Cardoso - Cross                    101

1    THE COURT:  The interpreter is going to read it

2  again.

3  A.   That is correct.

4  Q.   So do you recall that claim being made on your behalf in

5  the Picnic Foods complaint?

6  A.   I don't remember that.

7  Q.   That claim is exactly one of the claims that you're

8  making in this case, correct?

9  A.   That is correct.

10 Q.   Ms. Juarez-Cardoso, wasn't the co-plaintiff in the Picnic

11 Foods claim -- withdrawn.  Wasn't one of the co-plaintiffs in

12 the Picnic Foods claim case Nubia [Ph.] Martinez?

13 A.   That is correct.

14 Q.   And she's also a co-plaintiff against Mr. Santos in a

15 sexual harassment case that you filed against your last boss

16 in 2015, right?

17     THE INTERPRETER:  The interpreter needs repetition

18 please.

19 Q.   That woman, Ms. Nubia Martinez, is also a co-plaintiff

20 against Mr. Santos in a sexual harassment case that you filed

21 against your last boss in 2015, right?

22     THE INTERPRETER:  That is correct because Mr. Santos

23 also sexually touched her.

24 Q.   And so the two of you have worked before, correct?

25 A.   At Picnic Foods?  Yes.

Juarez-Cardoso - Cross                    102

1   Q.   Okay.  And you filed cases together with her, right?

2   A.   I didn't present a claim with her to begin with.  Our

3   claims were independent.  And at one point the lawyer combined

4   both cases together.

5   Q.   They appear in the same complaints, correct?  Your name

6   and Ms. Nubia Martinez appear in the same complaints, correct?

7   A.   Yes, that's true because Mr. Santos talked to the lawyer

8   and told her that for him it was better to combine or to join

9   both cases.

10  Q.   Is that case open or settled?

11           MR. NUSSBAUM:  Objection.  Your Honor, what does

12  this have to do with this case?  It's irrelevant, standing.

13           THE COURT:  Denied.  But let's move it along.

14  A.   We reached an agreement and the case is closed now.

15           MR. GLASER:  Your Honor, I know that we discussed

16  the -- well, I guess it's part of the same issue that we've

17  been discussing, but I'm going to offer what's been marked as

18  Defendant's 2 into evidence.  I'm stating that it's a

19  complaint made in this court and it's an admissible document.

20           MR. NUSSBAUM:  Your Honor, I understand the document

21  to be inadmissible.

22           THE COURT:  Inadmissible?

23           MR. NUSSBAUM:  Inadmissible as not being probative,

24  as having no evidentiary meaning in this case at all.

25           THE COURT:  It's admitted for the fact that it is

Juarez-Cardoso - Cross                    103

1  the complaint, that it is in part in her name, and that it has

2  the consent to become a plaintiff, an opt in plaintiff, in

3  that case.

4                  (Defendant's Exhibit 2, Received.)

5  Q.  You said that the case against Santos is closed.  Did you

6  settle that case?

7              MR. NUSSBAUM:  Objection.  Asked and answered.

8              THE COURT:  Didn't we cover this?  Wait.  Did I lose

9  track of -- which case?

10             MR. NUSSBAUM:  Yeah, it was asked and answered.

11 Santos.

12             THE COURT:  I thought Santos is the one they came to

13 an agreement about.  Didn't she just say that?

14             MR. GLASER:  She said it was closed.  That's what I

15 heard her say.

16             THE COURT:  She came to an agreement and the case is

17 closed.

18 Q.  So did you receive a financial settlement in that case?

19 A.  Yes.

20 Q.  And how much were you paid in that case?

21             MR. NUSSBAUM:  Your Honor, before the witness

22 answers I just want to remind you that if that settlement was

23 confidential that if she'd like to confer with me before

24 answering questions about a confidential settlement, she

25 should have that opportunity.

Juarez-Cardoso - Cross                    104

1         MR. GLASER:  Your Honor --

2         THE COURT:  Hold on.  Do you know if the -- is the

3    settlement in the Santos related case confidential?

4         THE WITNESS:  They told me not to talk about the

5    case, about the agreement, and I was sworn not to discuss the

6    settlement with anyone.

7         THE COURT:  All right.  So let's just put that

8    question on the back burner.  Let's keep going with the

9    testimony.  And just before we finish today, you can talk with

10   your lawyer about -- I don't know how much you know about

11   whatever the agreement is.  We'll go from there.  So let's

12   move on.

13        MR. GLASER:  Well, I'd like to know when it settle.

14   Q.   When did it settle, Ms. Juarez-Cardoso?

15        THE COURT:  You can answer if you know the answer.

16   A.   The agreement was this year.  I don't remember the exact

17   date.  It was early in the year.

18   Q.   And who were your attorneys?

19   A.   Actually I didn't hire a lawyer.  Somebody from Human

20   Rights was representing me.

21        THE COURT:  Was it someone from a government agency

22   Human Rights?

23        THE WITNESS:  Yes.

24   Q.   I'm sorry, you said somebody from Human Rights.  Was it

25   somebody in this courthouse or --

Juarez-Cardoso - Cross                    105

1          THE COURT:  She just said it was from a government

2   agency.

3   Q.   A government agency?  Are you the first person to be

4   represented by a government agency --

5          THE COURT:  Stop.  Don't need to have a tone like

6   that.  Just move on.

7   Q.   Isn't it true -- so we are clear that you have one

8   lawsuit and one workers compensation claim against Santos,

9   correct?

10  A.   Correct.

11  Q.   And we just talked about the lawsuit against Picnic

12  Foods.  And isn't it true, Ms. Juarez-Cardoso, that in May of

13  2014 while you were working for Picnic Foods you filed a

14  workers compensation claim based on the fact that you cut your

15  finger, right?

16  A.   Could you repeat please the question.

17  Q.   Isn't it true that in May of 2014 while you were working

18  for Picnic Foods, you filed a workers compensation claim based

19  on the fact that you cut your finger?

20  A.   It is true that I presented a claim because I wasn't paid

21  for the days I was disabled and for the expenses of the

22  hospital.

23         MR. NUSSBAUM:  Your Honor, what's the probative

24  value of any of this?

25         THE COURT:  Let's move it along.  You made your

                    Juarez-Cardoso - Cross                    106

1   point.  She has several lawsuits.  Okay.  What else?

2   Q.    Well, you took only a week off, right?

3   A.    The time that the doctor assigned me or gave me.

4   Q.    You met -- well, the question is -- well, two more

5   questions on this.  You made $8,600 on that claim where you

6   claim to have cut your finger without needing stitches.

7   That's my question.

8              MR. NUSSBAUM:  Objection.

9              THE COURT:  Sustained.

10  Q.    You made $8,600 on that claim where you claim to have cut

11  your finger, correct?

12  A.    That is correct.

13  Q.    And you took a week off and didn't even need stitches,

14  right?

15  A.    I don't remember whether it was I returned the next day

16  or it was three days.

17  Q.    So it was less than a week?

18  A.    It was less than a week but although I did not receive

19  the stitches, the problem was that the cut was at the level of

20  the nail and I was told not to move the hand around because it

21  had to heal by itself.

22  Q.    Okay.  And Ms. Juarez-Cardoso, we talked about a workers

23  compensation claim that you made against the same defendant

24  that you have in this case back on April 16, 2013, right?

25  A.    I didn't understand that.

Juarez-Cardoso - Cross                    107

1   Q.   We discussed here in this courtroom that you also made a

2   workers compensation claim against the same defendant that's

3   in this case back on April 16, 2013, right?

4   A.   Yeah.  What I remember is that a claim made in

5   relationship with La Flor was on April 16, 2013.

6   Q.   And that claim was also due to cutting your finger while

7   you were cutting meat, correct?

8   A.   I'm confused there.

9   Q.   That claim was also for an injury that was received from

10  cutting your finger while you were in the process of cutting

11  meat, correct?

12  A.   Correct.  Oh, incorrect.

13  Q.   It was due to cutting a finger, right?

14  A.   I received the cut from a chili can.

15          MR. NUSSBAUM:  Your Honor, I thought we were moving

16  on.

17          THE COURT:  Yes, come on, move along here.

18  Q.   You settled that claim for $4,012.25, correct?

19  A.   I'm confused because I'm not sure whether you're talking

20  about the finger or the cut in my left hand at La Flor.

21  Q.   Let's go to Page 18, Lines 14 to 25 of the transcript.

22  Question -- excuse me a second.

23          THE INTERPRETER:  For the interpreter, could you

24  repeat the page and line?

25          MR. GLASER:  I'm sorry, Your Honor.  Can I have one

Juarez-Cardoso - Cross                    108

1  moment?

2          THE COURT:  Sure.

3  Q.   I'm going to go to actually Page 137, Line 25 of the

4  deposition transcript.

5  "Q.  Was this amount of 4,012.25 paid to you on October 20,

6  2014 as a result of the workers compensation case that you had

7  filed against La Flor?

8  "A.  Yes."

9          THE COURT:  Let the interpreter read it first,

10  translate it.

11          MR. GLASER:  Yes.

12  A.   That is correct.

13  Q.   And did you give that answer to that question at your

14  deposition in April of 2016?

15  A.   I don't recall.

16  Q.   Let's go to Page 18, Line 14 through 25 of your

17  deposition transcript.

18  "Q.  Go ahead.

19  "A.  I remember that on that day I had lots of work and Mrs.

20  Luisa told me that I had to finish with about 100 meatballs

21  and besides, I had to cut meat and I was under that pressure

22  of finishing what I had to do plus the meat.  And since we do

23  not have a person there to sharpen the knives, I was cutting

24  meat to make beef steaks and when I started to sharpen the

25  knife they gave me eight stitches here."

Juarez-Cardoso - Cross                    109

1        MR. GLASER:  Mr. Interpreter?

2        MR. NUSSBAUM:  Your Honor, there's no --

3        THE COURT:  No, no, just --

4        MR. NUSSBAUM:  Just translate.

5        THE COURT:  Translate it.  Okay.  So you wanted him

6   to -- he read it to her.  Now what?

7   Q.   Did you give that answer to that question when you

8   testified at your deposition in April of 2016?

9   A.   In the case of [indiscernible], okay, it's correct that I

10  said that I have cut myself sharpening the knife to cut the

11  meat.

12  Q.   You did give that answer to that question at the

13  deposition in April 2016, correct?

14  A.   Yes.

15  Q.   And going to Page 19, Line 2 of your deposition

16  transcript.

17  "Q.   Indicating where?

18  "A.   Here, this wound.  Indicating.

19  "Q.   Indicating left wrist?  So you cut your wrist with a

20  knife?

21  "A.   Yes."

22  Q.   Did you give those answers to those questions at your

23  deposition in April 2016?

24           THE INTERPRETER:  The interpreter will ask

25  permission to add something to put this in context what is not

1  said in here, otherwise it's not going to make any sense the

2  way I ask this.  I would like to translate the first question

3  indicating where I cut myself.

4          THE COURT:  Yes, that's fine.

5  A.   That is correct.

6          MR. NUSSBAUM:  Your Honor, this is fascinating stuff

7  but --

8          THE COURT:  I don't need the --

9          MR. NUSSBAUM:  -- it's clear the Court asked defense

10 counsel to move on.

11         MR. GLASER:  Well, I'm wrapping up and these are my

12 last three questions on this.

13 Q.   So all together two claims against Santos, a lawsuit, and

14 a workers compensation claim, right?

15 A.   That is correct.

16 Q.   Two claims against La Flor, a lawsuit and a workers

17 compensation claim, right?

18 A.   I'm not a lawyer but I understand that we are speaking

19 about this case now and the case of workman's comp because Ms.

20 Risa [sic] didn't pay me the repair or the treatment of my

21 wound.

22         THE COURT:  Okay.  Again, he's asking you questions.

23 He's simplified them.  You answer the question if you know the

24 answer.  It's not appropriate for you to give a commentary on

25 the question he's asking.

Juarez-Cardoso - Cross                     111

1          THE WITNESS:  Okay.

2    Q.   So there were two claims against La Flor, this lawsuit

3    and a workers compensation claim, right?

4    A.   Yes.

5    Q.   There were two claims against Picnic Foods, a lawsuit and

6    a workers compensation claim, right?

7    A.   At Picnic Foods I did not start the complaint.

8    Q.   There were two claims, a lawsuit and a workers

9    compensation claim, true or false?

10   A.   True.

11   Q.   And Ms. Cardoso, back in 2007 you filed a claim against

12   the first boss you had since entering this country, right?

13   A.   The case of 2007 was for sexual harassment.

14   Q.   And you made a claim against your boss at that time,

15   correct?

16   A.   Could you repeat the question, please?

17   Q.   You made a claim against the first boss you had for

18   sexual harassment, correct?  I'm asking about the first boss

19   you had in this country.

20   A.   There was no claim.  All I did was to go to the police

21   station because he had sexually harassed me for which I'm

22   still receiving therapy.

23   Q.   Yes.  You said earlier that you've been leaving work at

24   times for some reason, right?

25          MR. NUSSBAUM:  Your Honor, objection.  The probative

Juarez-Cardoso - Cross                    112

1   value of asking the witness questions about therapy she's

2   receiving for sexual harassment that occurred approximately

3   nine years ago is severely outweighed by the prejudice it

4   causes to the witness.  The harassment defense is trying to

5   put the witness through just really serves no purpose in this

6   litigation.

7          MR. GLASER:  It has everything to do with this case.

8   And in fact, she testified about it and why she's had to leave

9   work.  She's talking about hours per week that she had to

10  leave work.  And Your Honor, it goes to several times that she

11  leaves work.

12         THE COURT:  Okay.  We don't need -- the question is,

13  what you just said, the point would be her schedule and not

14  what she was doing except going to some sort of doctor or

15  mental health related treatment appointment.  Is there any

16  reason you need to go into the details of any of this?

17         MR. NUSSBAUM:  Outside of harassing her.

18         THE COURT:  Stop with the side commentary.  Are you

19  just -- what is your point?

20         MR. GLASER:  I think your instruction -- I mean --

21         THE COURT:  Is your point just about that she had to

22  leave for an appointment or are you trying to make some other

23  point?

24         MR. GLASER:  I hate to do this because of the

25  proceedings here, but can I answer your question with a

Juarez-Cardoso - Cross                    113

1   question?  Because I'll be guided by --

2          THE COURT:  What's the question?  What's your

3   question?

4          MR. GLASER:  Are you instructing me not to discuss

5   the type of treatment it is?  I don't have an issue with that.

6          THE COURT:  All right.  Then don't talk about it.

7   Just deal with the fact that she had some sort of reason to

8   leave work.

9   Q.   And you have been seeing someone for some reason that has

10  caused you to leave work from time to time based on what

11  occurred in 2007, correct?

12         MR. NUSSBAUM:  Your Honor, objection.  The question

13  is suggestive of exactly what the Court just instructed the

14  defense to avoid.

15         THE COURT:  Yes.  Just --

16         MR. NUSSBAUM:  Let's not be cute.

17         THE COURT:  Do you have a -- the only relevance that

18  I can see on this topic was that she had some reason to leave

19  work for a medical appointment.  So I don't see why we need to

20  go beyond that.

21         MR. GLASER:  But I just want to get that issue

22  answered and I'll do that --

23         THE COURT:  Right.  So then don't talk about the

24  2007, don't talk about --

25         MR. GLASER:  Okay.

Juarez-Cardoso - Cross                    114

1        THE COURT:  -- the employment.  We got enough of

2    that on the record.

3    Q.   And you had to leave work -- during the time you worked

4    at La Flor you had to leave work from time to time due to the

5    appointments that you had with this medical professional,

6    correct?

7    A.   That is correct.  It was two hours once a week --

8    Q.   And --

9        THE COURT:  Was that --

10   A.   -- unless the doctor but down otherwise.

11   Q.   Just so it's clear, Ms. Juarez-Cardoso, I didn't ask how

12   many times you left a week, right?

13   A.   That is correct, you didn't ask that.

14   Q.   And you did leave work on time to time to see a medical

15   professional while you were working at La Flor, correct?

16       MR. NUSSBAUM:  Objection.  Asked and answered.

17       THE COURT:  Sustained.  Let's move on.

18   Q.   All together, prior to today you've testified four times,

19   right?

20   A.   Four?  What do you mean by four weeks?  Four times a

21   week?

22       THE COURT:  Just say the question again.  I don't

23   think it was clear.

24   Q.   Prior to today, prior to testifying here today, you've

25   testified four times previously whether at a deposition or

                    Juarez-Cardoso - Cross                      115

1    some other proceeding, correct?

2    A.   That's not correct because it was once a week for two

3    hours.

4              THE COURT:  Okay.  He's moved on from that topic.

5    He's asking you about something else.  Okay.  Ask her if she

6    understands what the word testifying is.

7              THE WITNESS:  What I am doing now.

8              THE COURT:  Yes.  Okay.  He's going to ask you the

9    question one more time.

10   Q.   And prior to today in this courtroom today, you testified

11   four times either at a deposition or a hearing or a trial,

12   correct?

13   A.   Yes, that is correct.

14   Q.   All right.  You said earlier that you didn't know what

15   you're going to get paid when you were first hired by Ms.

16   Luisa Zenteno, correct?

17   A.   Yes.

18   Q.   But you accepted the job from your first conversation

19   with her, correct?

20   A.   Yes.  We failed to reach an agreement about the salary.

21   Q.   You took your job before you had any idea what your

22   salary was going to be, Ms. Juarez-Cardoso?

23             MR. NUSSBAUM:  Objection.  Asked and answered.

24             THE COURT:  Denied.

25   A.   Yes, because I hadn't been working before or so far.

Juarez-Cardoso - Cross                    116

1    Q.   Well, you did have a previous job, didn't you, in this

2    country?

3    A.   Yes.

4    Q.   And when you were first hired by Ms. Cardoso [sic], you

5    were making significantly more money than the previous job,

6    right?

7              MR. NUSSBAUM:  Objection.  Who's Ms. Cardoso?

8              THE COURT:  Yes.  You have to -- the question got a

9    little tangled.

10             MR. GLASER:  Okay.

11   Q.   When you are hired by Ms. Zenteno, you were making

12   significantly more money than you were on your previous job,

13   correct?

14   A.   That is correct.

15   Q.   Your previous job was at Pueblo Bakery, right?

16   A.   That is correct.

17   Q.   And you're making $250 a week at Pueblo Bakery, correct?

18   A.   As far as I remember, yes.

19   Q.   Well, going to Page 42, Line 15 of your deposition

20   transcript.  Question --

21             MR. NUSSBAUM:  Are we getting this?

22             THE CLERK:  Can you go to the microphone and repeat

23   that?

24   Q.   Going to Page 42, Line 15 of your deposition transcript.

25   "Q.  How long were you at Pueblo Bakery?

Juarez-Cardoso - Cross                    117

1    "A.   For like two years.   I don't remember.

2    "Q.   Do you remember what years that was?

3    "A.   No.

4    "Q.   Were you getting paid an hourly wage?

5    "A.   No.

6    "Q.   How were you being paid?

7    "A.   I was making $250.

8    "Q.   Was that a week?

9    "A.   Yes."

10           THE COURT:   All right.   Let the translator translate

11   that.

12   Q.   Did you give those answers to those questions when you

13   testified at your deposition in April 2016?

14   A.   Yes.

15   Q.   And do you recall the number of hours you were working in

16   a week while you were working at Pueblo Bakery?

17   A.   No, I don't remember.

18   Q.   Ms. Juarez-Cardoso, you have work papers to work in this

19   country, don't you?

20           MR. NUSSBAUM:   Objection, Your Honor.

21           THE COURT:   Sustained.   It's irrelevant.   Keep

22   going.

23   Q.   Well, you can legally work anywhere you want in the

24   United States of America, can't you?

25           MR. NUSSBAUM:   Objection, Your Honor.

Juarez-Cardoso - Cross                   118

1        THE COURT:  Sustained.  Her immigration status is

2   not relevant here so just move on.

3   Q.   Well, how many restaurants are there in New York City?

4        MR. NUSSBAUM:  Objection, Your Honor.

5        THE COURT:  Sustained.

6   Q.   Is it fair to say that you could have chosen a job at

7   virtually any restaurant in New York City back in 2009?

8        MR. NUSSBAUM:  Objection, Your Honor.

9        THE COURT:  Sustained.

10        MR. GLASER:  I guess Your Honor is telling me that I

11  can't get into --

12        THE COURT:  Your question is were there any other

13  employment opportunities available to you in the bakery

14  industry, the service industry, whatever else she did at the

15  business.

16  Q.   Were there any other economic opportunities available to

17  you in New York City, New York State, or the United States

18  when you started working before back in 2009?

19        MR. NUSSBAUM:  Objection.

20        THE COURT:  Denied.  If you can answer it, answer

21  it.  If you can't, don't answer it.

22  A.   I don't remember.  It was a long time ago.

23  Q.   On the issue of -- I mean we know you can't read English

24  but we know you can read a little Spanish, right?

25  A.   At the most basic level I would say.

Juarez-Cardoso - Cross                    119

1   Q.   You can read some things, right?

2   A.   Yes.

3   Q.   And you know a little bit about counting money, right?

4        MR. NUSSBAUM:  Objection, Your Honor.

5        THE COURT:  Denied.

6   A.   Well, small amounts I can count but not large amounts.

7   Q.   But you've established that you can count up to -- you

8   can count money up until the amounts that you claim to have

9   made while working at La Flor, right?

10  A.   Yes, 420.

11  Q.   Well, also at times you said that you can read -- you can

12  count up to 620 too, right?

13  A.   Yes.

14  Q.   Count currency up until 620 at least, right?

15  A.   Yes, that is correct.

16  Q.   And you know when you count currency you can count

17  American currency, right?

18        MR. NUSSBAUM:  Objection.

19        THE COURT:  Denied.

20  A.   Yes.

21  Q.   And you would have no trouble reading the currency amount

22  $7.25, correct?

23  A.   Could you explain the question, please?

24  Q.   You would have no trouble reading the currency amount

25  $7.25, right?

Juarez-Cardoso - Cross                    120

1   A.    I may have a problem counting cents.

2   Q.    Well, you worked as a waitress, right?

3   A.    Yes.

4   Q.    And you got currency in coins, correct?

5   A.    They were not coins.  They will leave one dollar or two

6   dollars.

7   Q.    During the entire time that you worked as a waitress did

8   you ever get coins when people left tips?

9   A.    I don't recall.

10  Q.    How many times were you left tips during your entire

11  career as a waitress?

12  A.    Okay.  Well the tips were not only for me.

13  Q.    That's not what I asked.  When you worked as a waitress,

14  how many times were you left tips?

15  A.    I cannot tell you how many because that depends on how

16  the client feels.

17  Q.    How many days did you work as a waitress?

18          THE COURT:  You have to be by the microphone.

19  There's not going to be a record.

20  Q.    How many days a week did you work as a witness during

21  your entire career as a waitress?

22  A.    I don't remember because on many occasions there was no

23  time to be a waitress.

24  Q.    Did you work more than 100 times as a waitress?

25  A.    From 2009 to 2013 I would say that yes, it was 100 times

Juarez-Cardoso - Cross                    121

1  or more.

2  Q.   Was it more than 1,000 times?

3  A.   I don't remember.

4  Q.   During that minimum 100 times that you served as a

5  waitress, were you given tips more than 100 times?

6  A.   Not every time.

7  Q.   During those 100 days -- listen to my question.  During

8  those minimum of 100 days that you worked as a waitress, did

9  you get tips more than 100 times?

10         THE INTERPRETER:  Could you repeat for the

11 interpreter this time?

12 Q.   During that minimum of 100 days that you worked as a

13 waitress, did you get tips more than 100 times?

14         THE COURT:  It's hard to follow up here.

15 A.   I don't remember.  It was several years.

16 Q.   Was it more than 100 times?

17 A.   I don't remember.  I cannot answer the question.

18 Q.   Do you know if it was more than 1,000 times?

19         MR. NUSSBAUM:  Objection.

20 A.   I cannot calculate.

21 Q.   Can you tell me -- do you know what this is?

22         THE COURT:  This is all a rhetorical effort.  Does

23 she understand what $7.25 is?  I get the point.  You know, ask

24 that question again and move on.

25         MR. GLASER:  I think I need to establish that.  I

Juarez-Cardoso - Cross                    122

1   think I need to establish that, Your Honor.  It's a real

2   problem here.  It really is.

3            THE COURT:  Go back to that question.  Ask her do

4   you understand what it means, $7.25?  And then you want to

5   know can she read it?

6            MR. GLASER:  Can I try this?

7            THE COURT:  It's going on for 15 minutes.

8            MR. GLASER:  I know but I'm going to ask her if she

9   knows what this is.

10           THE COURT:  If that's a quarter?

11           MR. GLASER:  Yeah.

12           MR. NUSSBAUM:  Your Honor, it's not on their list of

13  anything, joint pretrial order.

14           THE COURT:  Show it to her.

15           MR. GLASER:  Should we mark it?

16           THE COURT:  I'm not going to hold onto your money.

17  Q.   I'm showing you something.  Can you tell us what that is?

18           THE COURT:  Just for the record, counsel put an

19  object in front of the witness.  Do you know what that is?

20           THE WITNESS:  I only know it's a quarter.

21  Q.   Okay.  A quarter.  Do you know how many cents that's

22  worth?

23  A.   No.

24  Q.   When you say it's a quarter, do you know what it's a

25  quarter of?

Juarez-Cardoso - Cross                    123

1   A.   Yes.  My husband told me that four of them make one

2   dollar.

3   Q.   Okay.  So is it fair to say --

4          THE COURT:  You have to use the microphone.

5   Q.   Is it fair to say that each quarter is worth 25 cents?

6   A.   I don't count, I don't dedicate myself to count pennies.

7   Q.   Okay.  That's not what I asked.

8          THE COURT:  How many pennies are in a dollar?  How

9   many pennies do you need to make a dollar?

10          THE WITNESS:  I don't know if this is right.  Maybe

11   100.

12          THE COURT:  Correct.  100 pennies in a dollar.  And

13   how many pennies are in a quarter?

14          THE INTERPRETER:  The interpreter will repeat.

15          THE WITNESS:  I need sticks to count.

16          MR. NUSSBAUM:  Your Honor, the witness's

17   mathematical ability --

18          THE COURT:  All right.  We got the point.  She's

19   gotten to the point where she understands, she knows what a

20   quarter is.  She knows what a dollar is.  You want to ask her

21   about 7.25, right?

22   Q.   Can you read what's written on this piece of paper?

23          THE COURT:  This is going to be demonstrative.  It's

24   going to be Defendant's 3 as a demonstrative.  When he's

25   finished, put that on it.

Juarez-Cardoso - Cross                    124

1              (Defendant's Exhibit 3, Marked.)

2    Q.    I'm showing you an object with numbers on it.

3              MR. NUSSBAUM:  Your Honor, may I approach?

4              THE COURT:  Yes, go look at it.  I know.  I can see

5    it from here.  You can take your quarter back too.  All right.

6    When you go back to the microphone, ask her the question.

7    Q.    I'm showing you a piece of paper with numbers on it.  Can

8    you read those numbers for the record?

9    A.    There is a 7 and a 25.

10   Q.    Okay.  And there's a period between the 7 and the 25,

11   correct?

12   A.    Correct.

13   Q.    You stated earlier that you worked mostly in the kitchen

14   at La Flor, correct?

15   A.    Correct.

16   Q.    And you worked there for somewhere between three and four

17   years, correct?

18   A.    Approximately, yes.

19   Q.    And you're claiming to have worked there every day of the

20   week except for Sundays, right?

21   A.    Six days per week.

22   Q.    All right.  And isn't it true that while you worked in

23   the kitchen you had to walk in and out of the kitchen every

24   single day?

25   A.    When there was not enough work, I couldn't go out.

Juarez-Cardoso - Cross                    125

1   Q.   You had to walk through a door to get into the kitchen,

2   correct?

3   A.   Yes, correct.

4   Q.   You walked past that kitchen door every single day,

5   correct?

6   A.   There were two doors.  I would go through two doors.

7   Q.   How many times did you go through those doors during the

8   time that you worked at La Flor?

9   A.   For the front door I would only go once a day.  That was

10  my entry door.  The one in the kitchen, I never counted them.

11  Q.   But you had to go through it every day, right?

12  A.   Yeah.  In fact, in fact if I had to go to the ladies room

13  or I needed something from the basement, I will have to go

14  through there.

15  Q.   How many times did you pass through that door during the

16  entire time that you work at La Flor?

17  A.   I don't have any idea how many times.

18  Q.   Well, you worked in the kitchen at least 300 days a year,

19  didn't you?

20  A.   I never counted the days in the year.  I only counted the

21  six days per week.

22  Q.   During those six days of a week you walked through that

23  door, right?

24  A.   Yeah.  I had to go through there.  That's the only way to

25  the ladies room.

Juarez-Cardoso - Cross                        126

1   Q.   You walked through that door at least 1,000 times, didn't
2   you?
3              MR. NUSSBAUM:  Objection.  Asked and answered, Your
4   Honor.
5              THE COURT:  Denied.  She never answered that
6   question.
7   A.   I don't think that it was 1,000 times for all the time I
8   was there.  I worked there for many years.
9   Q.   Well, if you take the six days -- do you know whether --
10  are there 52 weeks in a year?
11             THE COURT:  Let's not go down the path of the math.
12  Look, she says she worked just cumulatively how long?  January
13  '09 to --
14             MR. GLASER:  To October 2013.
15             THE COURT:  So she worked several years, she said
16  six days a week.  That's going to be more than 1,000 times.
17  So just get to the question about the 7.25.
18  Q.   There was a sign on the door to the kitchen that gave, in
19  English and Spanish, that provided that the minimum wage was
20  $7.25, correct?
21  A.   As far as I remember, Ms. Luisa never put that sign up.
22             MR. GLASER:  Can I have this marked?
23             THE COURT:  All right.  So --
24             MR. NUSSBAUM:  Which document is that?
25             THE COURT:  Hang on one second.  Let me just tell

1   the clerk.  Can you mark that one?  It's going to be 3.  It's

2   demonstrative.  That's 3.  And then --

3           MR. NUSSBAUM:  Your Honor, just before the defendant

4   marks that, could they point to me, to the Court, which

5   document on their exhibit list this poster is?

6           THE COURT:  Is it on your exhibit list?

7           MR. GLASER:  No.

8           MR. NUSSBAUM:  Your Honor, then I ask that it be not

9   admitted.

10          THE COURT:  Well, it's not admitted yet.  You can

11  show it to the --

12          MR. NUSSBAUM:  Well, not even presented --

13          THE COURT:  This is a standard poster.

14          MR. NUSSBAUM:  -- for identification.

15          THE COURT:  No, they can use it.  So this is going

16  to be 4.  That's the original?  You're claiming that's the

17  original?

18              (Defendant's Exhibit 4, Marked.)

19          MR. NUSSBAUM:  This is the first time we're seeing

20  this today.

21          MR. GLASER:  Your Honor, the outrageous part of the

22  argument is that this is impeachment.

23          THE COURT:  Yes.  So is there a clip or something on

24  the top?

25          MR. GLASER:  Yes.

Juarez-Cardoso - Cross                128

1          THE COURT:  I just want to mark it.  Okay.  I don't
2    want to put the sticker on your original.  He's using it.
3          MR. NUSSBAUM:  These were responsive to the
4    discovery requests and we never received it.  How does that
5    make sense?  This is a responsive document.  The discovery
6    requests were issued --
7          THE COURT:  Denied.  Have a seat.  He's using it.  I
8    don't know -- here, have a Post-It.  Put the Post-It on it.  I
9    think it'll stick to it.
10          MR. GLASER:  It's a tab.
11          THE COURT:  All right.  Let's just go.  I'm just
12    giving everybody a check in.  We've got 15 more minutes till
13    we have to close up and we need to have about two to three
14    minutes --
15          THE CLERK:  [Inaudible].
16          MR. GLASER:  Yes.  Do you want me to do it?
17          THE CLERK:  Do you want [inaudible] --
18          MR. GLASER:  Actually, can we, yes, can we hang it
19    up and possibly get the witness to step down from the witness
20    stand to get it?
21          THE COURT:  Sure.  If you can get that to work,
22    sure.  Just while she's figuring that out, so we have about 15
23    minutes and obviously this is going to continue on another
24    day, so we need to figure out that day.  I'm going to wait for
25    the deputy to be back so we can look at the calendar and do

Juarez-Cardoso - Cross                129

1  that.  Interpreter, you're okay to keep going for a few more

2  minutes?

3              THE INTERPRETER:  Oh, yes.

4              THE COURT:  Okay.  All right.  You want the witness

5  to look at that?

6              MR. GLASER:  Can I have the microphone?

7              THE COURT:  In front of you, Noreen, on the left-

8  hand side.  No, no, on the left.  The one -- yes.  Take the

9  first on the right.

10             THE CLERK:  [Inaudible].

11             THE COURT:  On the right.  I think it's the one he

12  was using before.  Thanks.

13  Q.  Showing you what's been marked for identification.

14             MR. GLASER:  Can I have the witness step down?

15             THE COURT:  Yes.  For the witness, you should -- go

16  closer to that so you can see.

17             MR. NUSSBAUM:  Your Honor, may I approach the

18  exhibit as well?

19             THE COURT:  Yes, you can all stand around it.

20  Q.  Showing you what's been marked for identification as

21  Defendant's Exhibit 4 and I'm going to ask that you take a

22  look at the left side of the document.  Do you recognize this

23  --

24             THE COURT:  I'm sorry.  I'm going to interrupt you

25  for one second.  What's the year on that?  What is it?

Juarez-Cardoso - Cross                    130

1          MR. GLASER:  [Inaudible].

2          THE COURT:  Isn't it 2014 or am I missing --

3          THE CLERK:  '11.

4          THE COURT:  Oh sorry.  It's the light.  Okay.  Keep

5   going.  Sorry.  Just the way the light was.  Noreen, can you

6   give the interpreter one of those microphones as well?

7   Q.  I'm showing you what's been marked for identification as

8   Defendant's Exhibit 4.

9          THE COURT:  It needs to be turned on I think.

10  Q.  Do you recognize that exhibit?

11  A.  This is my first time I see it.

12  Q.  First time you've ever seen it?

13         THE COURT:  Interpreter, you have to stand -- I'm

14  sorry, this doesn't seem to be [indiscernible].

15  A.  This is the first time I see it.

16  Q.  Isn't it true, Ms. Juarez-Cardoso, that this exact

17  exhibit was posted on the door and that you saw it every

18  single day that you walked in and out of the door?

19         THE COURT:  I'm sorry, you have to -- I don't even

20  know if -- what's going on with these microphones?  Is yours

21  on?  The green light is supposed to come on when you're using

22  it.

23         MR. GLASER:  I see a red flashing light.

24         THE COURT:  I know.  I'm not sure what's going on

25  with the unit.

Juarez-Cardoso - Cross                    131

1          THE CLERK:  I can hear it.

2          THE COURT:  You can hear it?  All right.  Can you

3   listen through the earphones and if there's a problem, let us

4   know.  Interpreter, if you can use the mic.  Okay.  I'm sorry.

5   Go ahead with your question.

6   Q.   Isn't it true that this document is here on the kitchen

7   door of La Flor while you worked there in 2011?

8   A.   As far as I remember, this posting was never there.

9   Q.   And that box on the left top side of the document where

10  it provides minimum wage information for 7/24/09, you saw that

11  before, didn't you?

12  A.   No, I didn't see it because it wasn't there.

13  Q.   Well, isn't it true in fact that you saw the information

14  listed in both English and Spanish stating that the minimum

15  wage was 7.25 an hour every time you walked through the door

16  at La Flor?

17  A.   No, because the poster wasn't there.

18  Q.   Of course not.

19          THE COURT:  Stop with the commentary.

20  Q.   Have you ever seen the --

21          THE COURT:  You can move that Post-It.  Just put it

22  -- yes.  Just move the whole thing.  And the yellow piece that

23  you're holding up, just put it on some other part of it.

24  Thanks.

25  Q.   Have you ever seen this poster in any other places that

132

1  you worked in the United States?

2  A.   No.  As far as I remember I have never seen it before.

3  This is the first time I see it.

4  Q.   So none of the employers in any of the establishments you

5  ever worked in had the sign for you to see?

6  A.   Maybe they did have it but I never focused on the poster.

7

8  Q.   You didn't notice this poster here?  Did you notice that

9  in 2012, right?

10  A.   No.

11  Q.   And you didn't notice it in 2013 when you worked at La

12  Flor either, right?

13  A.   No.

14  Q.   Picnic Foods didn't have that poster, right?

15  A.   I don't recall seeing it.

16  Q.   Santos didn't have that poster?

17  A.   No.

18        MR. NUSSBAUM:  Your Honor, I finished with one

19  topic.

20        THE COURT:  I'll adjourn.  How much more do you

21  think you have?

22        MR. GLASER:  I say that but I want it clear it's a

23  topic.  I'm not finished with my cross examination.

24        THE COURT:  No, in terms of your overall cross what

25  do you think you have?  Another hour or two?  I don't know,

1  what's your estimate?

2         MR. GLASER:  I don't know, Your Honor.  Everything

3  is taking longer than I thought.  But I will say that I'm not

4  even halfway through.

5         THE COURT:  Okay.  So you can have a seat.

6         MR. GLASER:  Thank you.

7         THE COURT:  All right.  But are you at a break?  Are

8  you finished --

9         MR. GLASER:  Yes.

10        THE COURT:  -- with your questions about the poster?

11  Okay.  All right.  I want to do two things before I break.

12  I'm going to give the plaintiff an opportunity to talk with

13  her lawyer about -- you had that open question about whether

14  she had received dollars for the Santos case.  You need the

15  interpreter, right?

16        MR. NUSSBAUM:  My colleague will speak Spanish to

17  her.

18        THE COURT:  Oh, she can do it?  Okay.  All right.

19  So why don't you do that?  We're going to -- I'm just going to

20  see where my deputy is, see if we can get dates for when we

21  can follow up, continue the trial.  Okay.  So you can -- the

22  trial is going to continue on another day.  There's one open

23  question which I want to give you an opportunity to speak with

24  your lawyer about which were the questions that possibly touch

25  on the confidentiality of your settlement in the Santos case.

1   So what I am to do is let you step down.  There's little rooms

2   outside the first set of doors.  Meet with your lawyer and his

3   paralegal will translate for you.  And after that then we'll

4   come back and counsel can just ask you those questions.  That

5   is the only topics that you can talk with your lawyer about,

6   this confidentiality question.  Okay?  Now, talk with your

7   lawyer.  The paralegal will translate outside.  Only about the

8   Santos.  Do you understand, counsel?  Solely about the

9   confidentiality question.

10          MR. NUSSBAUM:  Understood, Your Honor.

11          THE COURT:  Okay.  I'm just going to -- everyone

12  have a time check.  I have 4:37 here.  Okay.  And then --

13          THE WITNESS:  Your Honor, I need to go to the ladies

14  room.

15          THE COURT:  All right.  You can go to the ladies

16  room as well.  Come back as soon as you can.

17          MR. NUSSBAUM:  Your Honor, while she goes to the

18  ladies room, if plaintiff wanted to make a motion for

19  discovery sanctions for failing to produce that document --

20          THE COURT:  You can go to the rest room.  Go to the

21  rest room.

22          MR. NUSSBAUM:  I'd be happy to make that now or when

23  the witness steps down but I can show the Court the document

24  request that this was responsive to.  This is also a document

25  that is not on the defense's exhibit list and is really just a

135

1    surprise out of nowhere today.

2            THE COURT:  All right.  I mean --

3            MR. NUSSBAUM:  Not that it's a threatening document

4    but it should be precluded and there should be additional

5    sanctions.

6            THE COURT:  Is that your motion?

7            MR. NUSSBAUM:  Yes, Your Honor.

8            MR. GLASER:  Your Honor, it's the most ludicrous

9    argument I've ever heard in court.  It's impeachment material.

10   It's demonstrative.  And Your Honor, I think that the

11   plaintiff is very concerned about where this goes.  And also,

12   we're about to adjourn and there's really going to be no

13   prejudice because he's going to have the time --

14           THE COURT:  He's not going to be talking to her.

15           MR. GLASER:  What's that?

16           THE COURT:  He's not going to be talking to her.

17           MR. GLASER:  He's not going to be talking to her but

18   at this point I'm going to try to get it into evidence through

19   our client.  So Your Honor, I think the motion itself for

20   sanctions is frivolous and should be sanctioned for being

21   frivolous.

22           THE COURT:  All right.  We're not having dual

23   sanctions here.  He can use it.  It's impeachment material.

24   It's also a standard New York poster.

25           MR. NUSSBAUM:  He did not address why it wasn't

1 produced.  There's no response to that.

2          THE COURT:  It doesn't matter.  There's no prejudice

3 to it not being produced.  So even if it could have been

4 produced, there's no problem that it wasn't produced.  I mean

5 so far he's using it as impeachment material, so there's

6 absolutely no problem here because he wouldn't have had to

7 produce all that.  And when we get to dealing with his client,

8 so so far there's no prejudice, so he can use it.

9          MR. GLASER:  Your Honor, that's the other --

10          THE COURT:  So there's no sanctions.  That's it.

11 There's no sanctions.

12          MR. GLASER:  I'm not arguing for sanctions, but

13 that's the other issue for why it should go into evidence

14 without --

15          THE COURT:  We're not up to that yet.

16          MR. GLASER:  Okay.

17          THE COURT:  When we get to your client -- she hasn't

18 even authenticated it yet, so --

19          MR. GLASER:  But it's a self-authenticated document

20 provided by the state.  So it --

21          THE COURT:  Well, whatever.  There's a whole line of

22 questions.  Is she going to say it was ever at her place of

23 business hanging by the door that apparently everybody walked

24 through?  I don't know.  We're not there yet as to whether

25 this document has anything to do with your client.  I can

1 guess what your answers are going to be but they're not here

2 yet.  So let me see if I can find the deputy.

3          MR. NUSSBAUM:  So I'll step out to meet with --

4          THE COURT:  Yes.  Go talk to your client.

5 (Off the record at 4:40 p.m.)

6 (Back on the record at 4:49 p.m.)

7          THE COURT:  Well, why don't you tell me where are we

8 at with this?

9          MR. NUSSBAUM:  So she says to the best of her

10 recollection there is a confidential settlement agreement.

11 I've asked her that since we're adjourning today to go home

12 and check and I think we can pick that up if the Court's okay

13 with that when we're back on.

14          THE COURT: All right.  Let's do that.  Okay.  So

15 this trial is going to continue.  We'll talk in one minute

16 about dates.  I just want to be clear.  And this may turn out

17 to be inconvenient but on the plaintiff's side, since she's

18 still on the witness stand with an open line of questions, you

19 cannot talk about the substance of the case or her testimony,

20 or anything really about the substance of the case with

21 anybody, but particularly her lawyers about this case.  Okay.

22 So everybody understands that?

23          MR. NUSSBAUM:  Yes, Your Honor.  Just one

24 clarification.  We had a little bit of difficulty today,

25 especially because of the two languages going on.  Can I

1  remind the witness to just answer the questions that are being

2  asked to expedite things?

3          THE COURT:  I'll remind her when she gets here next

4  time.

5          MR. NUSSBAUM:  Okay.

6          THE COURT:  And remind me to remind her although it

7  may come up.

8          MR. NUSSBAUM:  Okay.

9          THE COURT:  So in terms of continuing dates when I

10 have a full day open, you can just check your calendars, it's

11 not for a couple of weeks.  21, 22 -- this is November 21st,

12 22nd, and 23rd or the 30th.  I'll say on the 22nd there would be

13 a two hour lunch break, or December 2nd.

14         MR. GLASER:  We have a conference in Bronx Supreme.

15 It's really kind of an important conference.  We're trying to

16 get the discovery on the 22nd of November.

17         THE COURT:  Okay.

18         MR. GLASER:  Which I'm thinking that Ms. Conde has

19 to be at, so --

20         THE COURT:  Okay.  It's not the 22nd.  So 21, 23, 30,

21 and the 2nd.

22         MR. GLASER:  Oh, the 21st we have a deposition on

23 that exact case.  I'm dealing with deadlines on that case that

24 --

25         MS. CONDE:  December 2nd was an option?

1          THE COURT:  Well, the Wednesday before Thanksgiving.

2   But I can't see everybody --

3          MR. GLASER:  I'm available I believe.

4          THE COURT:  You're looking fearful there.  The 23rd,

5   the 30th of November, or the 2nd of December.  Those are really

6   the options.

7          MR. GLASER:  December 2nd looks good to us.

8          MR. NUSSBAUM:  The only issue with December 2nd is

9   that we're going to run into a shorter day than today even.

10  Not the day is short but --

11         THE COURT:  Is that a Friday?

12         MR. NUSSBAUM:  Yeah.

13         THE COURT:  We could start earlier.  Everybody be

14  here.  We can start at 9.

15         MS. CONDE:  At 9?

16         THE COURT:  Yes.

17         MS. CONDE:  Okay.  It works.

18         THE COURT:  You guys be on time.

19         MS. CONDE:  Yeah, I apologize for that.  There was

20  traffic.

21         THE COURT:  All right.  Plan ahead.  So I mean

22  that'll start the day earlier.

23         MR. NUSSBAUM:  Do we have any sense of if we'll be

24  able to finish it on that day?  Because we should probably --

25  we could just knock it out, right?  I'm happy to do the 2nd but

140

1   it would be really unfortunate --

2              THE COURT:  Well, do you know what time --

3              MR. NUSSBAUM:  -- to come back a third time for a

4   two witness case.

5              THE COURT:  Do you know what time you have to leave

6   on -- can you tell?

7              MR. NUSSBAUM:  That time of year it's 4:30 is

8   sundown, so 3:45 let's say, 3:30.  Probably 3:30 the latest.

9              THE COURT:  Can you finish by 3:30?  What about --

10  what's the story with November 30th?

11             MS. CONDE:  November 30th?

12             MR. GLASER:  That's the day before Thanksgiving?

13             THE COURT:  No, that's the 23rd, right?

14             MS. CONDE:  The 30th looks okay.

15             MR. NUSSBAUM:  Yeah, I think the 30th works for us as

16  well.

17             THE COURT:  30th.  Okay.  Can you just check with

18  your respective clients if they can do the 30th of November?

19                      [Pause in proceedings.]

20             THE COURT:  How does it work?  Do they contact you

21  to continue?

22             THE INTERPRETER:  They will have to call the agency.

23             THE COURT:  They call the agency.

24             THE INTERPRETER:  I will mention it to them but

25  those things happen.  I don't know how it will work for me

141

1  [inaudible].

2  　　　　THE COURT:  Okay.  All right.  November 30?

3  　　　　MR. NUSSBAUM:  It's good, Your Honor.

4  　　　　MS. CONDE:  Yeah.  Ours as well.

5  　　　　THE COURT:  9:30 here.  You have to have a

6  translator.  I don't know how it works.  If you have the same

7  translator who already knows what's going on and that works

8  for everybody, that would be helpful.  He's had a lot of

9  patience.

10  　　　　MS. CONDE:  Yes, that's right.

11  　　　　THE COURT:  Okay.  But you all work it out.

12  　　　　MR. NUSSBAUM:  We'll speak to him.  Yes.

13  　　　　THE COURT:  All right.  Anything else?

14  　　　　MS. CONDE:  You said 9:30, correct?

15  　　　　THE COURT:  9:30.

16  　　　　MS. CONDE:  Okay.

17  　　　　THE COURT:  Yes, 9:30 November 30th.  Okay.  It's

18  going to be November 30th at 9:30 all day.  Okay?  Have a good

19  weekend.

20  　　　　MS. CONDE:  Thank you.

21  　　　　THE COURT:  All right.  I'm going to ask whoever's

22  respective exhibits they are that you keep the originals in

23  your custody and bring them back for trial.

24  　　　　MS. CONDE:  Okay.

25  　　　　THE COURT:  Actually, I have the stipulation.  I

142

1  gave you back the transcript.  Anything else?  We're good?

2  Off the record?  All right.  Have a good weekend and we'll see

3  you on November 30th.  Take care.

4          MS. CONDE:  Happy Thanksgiving.

5  (Proceedings concluded at 4:54 p.m.)

6                    *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1       I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                      Shari Riemer, CET-805

7  Dated:  November 7, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25