UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


YARID JUAREZ-CARDOZO,          *    Case No.  15-CV-6671(VMS)
                               *
              Plaintiff,       *    Brooklyn, New York
                               *    December 19, 2016
       v.                      *
                               *
LA FLOR de SANTA INES, INC.,   *
 et al.,                       *
                               *
              Defendants.      *
                               *
   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

            TRANSCRIPT OF CIVIL CAUSE FOR BENCH TRIAL
              BEFORE THE HONORABLE VERA M. SCANLON
                 UNITED STATES MAGISTRATE JUDGE

   APPEARANCES:

   For the Plaintiff:         JOSEF NUSSBAUM, ESQ.
                              Josef & Kirschenbaum LLP
                              233 Broadway
                              New York, NY  10279

   For the Defendants:        MARION ANN CONDE DaSILVEIRA, ESQ.
                              EZRA BERNARD GLASER, ESQ.
                              Conde & Glaser LLP
                              291 Broadway
                              New York, NY  10007


   Certified Interpreter:     MR. JAMES HONOTORIA




   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.


**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

1           (Proceedings commenced at 9:50 a.m.)

2           THE CLERK:  Civil cause for bench trial, case no.

3    15-CV-6671, Juarez-Cardozo vs. La Flor de Santa Ines.

4    Counsel, state your name for the record, please.

5           MR. NUSSBAUM:  Good morning, Your Honor.  Josef

6    Nussbaum, from Josef and Kirschenbaum, for plaintiff.  To my

7    left, is Bev LaTores (ph), a paralegal at our firm.

8           THE COURT:  Good morning.

9           MS. CONDE:  Good morning, Your Honor.  Marion Conde,

10   of Conde Glaser, on behalf of the defendants.  On my right is

11   Ezra Glaser, by business partner.

12          THE COURT:  Good morning.

13          MR. NUSSBAUM:  Good morning, Your Honor.

14          THE COURT:  Okay.  So what's the plan for today with

15   regard to your witnesses?

16          MR. NUSSBAUM:  I think we have to discuss

17   defendant's rebuttal witness, and then other than that,

18   plaintiffs were done.  Plaintiff is done.

19          THE COURT:  Okay.

20          MS. CONDE:  We don't have any more witnesses.  There

21   is someone in the courtroom on the left, and we don't know who

22   he is.  So if maybe plaintiff can tell us who that is in the

23   back.

24          THE COURT:  Is that your witness?

25          MR. NUSSBAUM:  He is a former co-worker of the

3

1      plaintiff.

2                  THE COURT:  You're not calling him as a witness?

3                  MR. NUSSBAUM:  He's here to observe.

4                  THE COURT:  Okay.  That's fine.

5                  MR. GLASER:  Well, if he's here to observe, he can't

6      at any point be called as a witness.

7                  THE COURT:  I just said he can stay.  Go ahead.  All

8      right.  Do you have witnesses?

9                  MS. CONDE:  Yeah.

10                 THE COURT:  Go ahead.

11                 MS. CONDE:  This is --

12                 MR. NUSSBAUM:  Your Honor, do we want to take the

13     rebuttal witness issue first?  The Court said we would

14     consider it today, and, I mean, rebuttal witness didn't rebut

15     anything, so I guess it's a motion to strike his testimony

16     from the record.

17                 THE COURT:  Right.  We don't need the motion now.

18                 MR. NUSSBAUM:  Oh, I thought we wanted to that do

19     first.  Okay.

20                 THE COURT:  No.

21                 MS. CONDE:  All right.  I would like to call our

22     first witness, Luisa Centeno.

23                 THE COURT:  Okay.  Does your client need the

24     interpreter?

25                 MS. CONDE:  Yes, she does.

4

1          THE COURT:  Okay.  You can come on up.  Okay.  Do

2     you need a chair or are you --

3          (Pause.)

4          MS. CONDE:  Your Honor, I just wanted to make sure

5     that the plaintiff has rested his case.  He didn't say he did.

6     I just wanted that to be on the record.

7          THE COURT:  Okay.  The only issue is the testimony.

8     But I want the transcript, before we have to decide that

9     motion.  So, there will just be an -- whatever post-trial

10     motions you want to make.

11          (Pause.)

12          THE COURT:  If you just stay standing for a minute.

13     Okay.

14          (Interpreter translates testimony as follows:)

15                    LUISA CENTENO, Sworn

16          THE CLERK:  Can you state your full name for the

17     record?

18          THE WITNESS:  Luisa Centeno.

19          THE CLERK:  Thank you.  You can have a seat.

20          THE COURT:  Okay.  So, wait -- you can have a seat.

21     Would the interpreter, if you don't mind, when you're seated,

22     just make sure the microphone is close to you --

23          THE INTERPRETER:  Yes.

24          THE COURT:  -- so that what you say, it's picked up

25     for the recording.

5

1              THE INTERPRETER:  Yes.

2              THE COURT:  Okay.  Can you spell your name for the

3      record?

4              THE INTERPRETER:  James Hontoria, Spanish

5      interpreter.

6              THE COURT:  All right.  I'm not doing it --

7              THE INTERPRETER:  H-o-n-t-o-r-i-a.

8              THE COURT:  -- sorry.  Are you previous -- well, you

9      should be -- yeah.  We should swear him in for this.

10             THE CLERK:  Okay.

11             THE COURT:  Because you usually -- you're usually

12     down at arraignments, right?

13             THE CLERK:  Are you court-certified?

14             THE INTERPRETER:  Oh, yes.  Of course.  Of course.

15             THE CLERK:  Okay.

16             THE COURT:  Let's just do it.

17             THE CLERK:  Okay.

18             THE INTERPRETER:  Okay.  Anyway --

19             THE COURT:  Yeah.

20         (The interpreter is sworn.)

21             THE CLERK:  Can you state your full name for the

22     record?

23             THE INTERPRETER:  James Hontoria, H-o-n-t-o-r-i-a.

24             THE CLERK:  Thank you.

25             THE COURT:  Okay.  And for the witness, can you

1    spell your name for the record.

2              THE INTERPRETER:  Do you want me to do it?

3              THE COURT:  Well, you can ask her, and then --

4              THE INTERPRETER:  Okay.

5              THE COURT:  -- spell it.

6              THE WITNESS:  It is L-u-i-s-a.  And last name is C-

7    e-n-t-e-n-o.

8              THE COURT:  Okay.  All right.  So you've been in

9    court, so you've seen this.  But the way this will work is

10   that the attorney will ask you questions.  We'll go through

11   the interpreter.  If you can answer the question, answer it.

12   If you can't, you can ask for clarification.

13              After that, plaintiff's attorney will ask you

14   questions and we'll do that one more time, if that's what the

15   lawyers would like, and then your testimony is done.

16              THE WITNESS:  Okay.

17              THE COURT:  And for the interpreter, do you have any

18   preferences to whether we do it in longer paragraphs, or

19   shorter, or you -- are you going to do a contemporaneous

20   translation?

21              THE INTERPRETER:  Normally I prefer shorter

22   paragraphs.

23              THE COURT:  Okay.  And are you going to do a

24   simultaneous translation or --

25              THE INTERPRETER:  It will be a combination of both.

Centeno – Direct                                          7

1          THE COURT:  Okay.  All right.

2          THE INTERPRETER:  I'll try to do both.

3          THE COURT:  Whatever is comfortable.

4          THE INTERPRETER:  Yeah.

5          THE COURT:  All right, Counsel.

6          MS. CONDE:  Thank you, Your Honor.

7    DIRECT EXAMINATION

8    BY MS. CONDE:

9    Q.    Good morning, Ms. Centeno.

10   A.    Good morning.

11   Q.    Ms. Centeno, how old are you?

12   A.    53.

13   Q.    And where were you born?

14   A.    In Mexico.

15   Q.    Which part?

16   A.    Puebla.

17   Q.    Are you married?

18   A.    Yes.

19   Q.    What is your husband's name?

20   A.    Mario Centeno.

21   Q.    Do you have any children?

22   A.    Two.

23   Q.    How old are they?

24   A.    21 and 18.

25   Q.    Okay.  Can you tell us a little bit about your

1    educational background?

2    A.    Up to sixth grade.

3    Q.    Where did you go to school?

4    A.    In Mexico.

5    Q.    Do you know how to read in Spanish?

6    A.    Yes.

7    Q.    Okay.  Do you know how to write in Spanish?

8    A.    Yes.

9    Q.    Okay.  Do you know how to read in English?

10   A.    No.

11   Q.    Do you know how to write in English?

12   A.    No.

13   Q.    Okay.  Do you speak any English?

14   A.    No.

15   Q.    Okay.  Do you know how to use a computer?

16   A.    Just the bare -- just the bare minimum.

17   Q.    Okay.  Do you own a business?

18   A.    Yes.

19   Q.    What is the name of the business?

20   A.    La Flor de Santa Ines.

21   Q.    What does that mean in English?  If you know.

22   A.    Okay.  It's the name of my husband's town.

23   Q.    It's a town in Mexico?

24   A.    Yes.

25   Q.    How long have you owned the business?

 1    A.    Fifteen years.

 2    Q.    Where is it located?

 3    A.    731 Church Avenue.

 4    Q.    And what part of Brooklyn is that in?

 5    A.    In Brooklyn, New York, 11218

 6    Q.    Do you know which neighborhood that's in in Brooklyn?

 7    A.    It's between Coney Island and the Ocean Power [sic].

 8    Q.    Ocean Parkway.

 9          THE INTERPRETER:  Okay.

10    Q.    Can you describe the business?

11    A.    It's -- it's a store.  We sell bread and groceries and

12    some food in there.

13    Q.    Okay.  What type of groceries do you sell?

14    A.    Okay.  Anything that comes in cans, like beans, chiles.

15    Q.    Okay.  And what type of clientele do you have at the

16    store?

17    A.    Everything.

18    Q.    Okay.  And do you cater to a Latin community?

19    A.    Yes.

20    Q.    Okay.  And are most of the goods in your store Latin

21    goods?

22    A.    Yes.

23    Q.    And is the bread that you make also a Latin type of

24    bread?

25    A.    Yes.

Centeno - Direct                                    10

1    Q.    Okay.  And who else works there at this point in time?

2    A.    At this time, it's my husband, myself, and the baker.

3    Q.    Okay.  And in general, what is the average amount of

4    employees that you would have during the year?

5    A.    Two and I have had up to four.

6    Q.    Okay.  And what are the store hours?

7    A.    7:00 to 10:00.

8    Q.    7:00 a.m. to 10:00 p.m.?

9    A.    Yes.

10   Q.    Okay.  And back in 2011 and in 2012, did the store also

11   have the same hours?

12   A.    Yes.

13   Q.    Okay.  And what hours do you work?

14   A.    7:00 to 10:00.

15   Q.    Okay.  And how many days a week do you work?

16   A.    Seven days.

17   Q.    And what about Mario, how many hours a week does he work?

18   A.    Okay.  From 6:00 a.m. to noon, then he goes home to sleep

19   and then he comes back in the afternoon.

20   Q.    Okay.  And where does -- where do you live?

21   A.    731 Church Avenue.

22   Q.    Okay.  And the business is located at the same address;

23   is that correct?

24   A.    Yes.

25   Q.    Okay.  So you live and work in the same building; is that

1   correct?

2   A.   Yes.

3   Q.   Okay.  Who handles the schedule when you have employees?

4   A.   Myself.

5   Q.   Okay.  Has your husband ever handled the scheduling of

6   employees?

7   A.   No.

8   Q.   Okay.  And who handles paying employees?

9   A.   I do.

10  Q.   And what in general does your husband do there at the

11  store?

12  A.   He helps me -- he -- he helps with the cleaning.  He

13  makes -- he goes to the bank.  He does some purchasing.  He

14  buys goods.

15  Q.   Have you always been the person that handles scheduling

16  and paying employees?

17  A.   Yes.

18  Q.   Okay.

19          MS. CONDE:  Your Honor, I would like to put the sign

20  up, if that's okay.  It will be Defendant's Exhibit 4.

21          THE COURT:  And hold on.  What's the reason you're

22  offering it?

23          MS. CONDE:  The reason I'm offering it is to

24  establish --

25          THE COURT:  Or that you want to show it to her?

1          MS. CONDE:  -- that its her sign and that it was up

2     in the store.

3          THE COURT:  This is -- just to go back.  This is the

4     sign that wasn't turned over in discovery; is that right?

5          MS. CONDE:  That's right.  I'm not offering it for

6     the content within the sign.

7          THE COURT:  Mm-hmm.

8          MS. CONDE:  Just for the sake of establishing that

9     it was in the store.

10         MR. NUSSBAUM:  We object, Your Honor.  It's also

11    come to my attention that there's an interrogatory response

12    which not only -- not only did the defendants not produce the

13    sign, but there's an interrogatory response that misled

14    plaintiffs to believe that there is no sign.

15         THE COURT:  Yes.

16         MR. NUSSBAUM:  That there was no sign.

17         MS. CONDE:  There's also --

18         THE COURT:  Hang on.  Hold on.  Hold on.

19         What is it?  Do you have the interrogatories?

20         MR. NUSSBAUM:  Yes.

21         THE COURT:  Why don't you just -- you can read it

22    and then --

23         MS. CONDE:  So --

24         MR. NUSSBAUM:  It's -- it's plaintiff's

25    interrogatory to defendants.  Interrogatory no. 6.

Centeno – Direct                                    13

1           Which asked defendant to identify what forms of

2    notice, if any, defendants gave plaintiff of her pay rate.  The

3    answer defendants gave on February 1st, 2016 -- excuse me --

4    is that defendant advised the plaintiff verbally of her pay

5    rate and kept a detailed payroll report.  There's nothing

6    about a sign at all there.

7                 THE COURT:  Okay.

8                 MS. CONDE:  Your Honor, it's also being used for

9    impeachment purposes where the plaintiff testified that she

10   never saw a sign in her life.

11                THE COURT:  Yes.  You didn't -- you should have

12   given them the sign in discovery, so you can't use it.   Go

13   ahead.

14                MR. NUSSBAUM:  For impeachment purposes as well,

15   right?

16                THE COURT:  Yes.  You can't use it.  Really, it

17   should have been turned over.  Go ahead.

18   Q.   Did you have a sign posted in your business regarding

19   minimum wage?

20   A.   Yes.

21   Q.   Where was the sign posted?

22   A.   Okay.  In the door or as you enter in front, you can see

23   it in the kitchen.

24   Q.   Okay.  Was it on the door to the kitchen?

25                THE COURT:  All right.  Don't lead the witness.  All

1    right.  Translate it.

2            THE INTERPRETER:  She's –– the plaintiff –– the

3    witness is just showing interpreter a picture.

4            MS. CONDE:  Okay.

5    Q.   Was this sign –– when was this sign posted?

6    A.   It has been there since 2011.

7    Q.   Okay.  And how was it affixed to the door?

8    A.   It was taped.

9    Q.   Did you hear the testimony of Yarid Cardozo while you

10   were in court the last couple of days?

11   A.   Yes.

12   Q.   And was the door where the sign was affixed a door that

13   she needed to use?

14   A.   Yes.

15   Q.   And how many times a day on average would you say she

16   walked through that kitchen door while she was working there?

17   A.   Many times, because that was the passage from the store

18   to the kitchen.

19   Q.   Okay.  All right.  So I want to go back in time to the

20   first time that you met Yarid Cardozo.  Okay.  How did she ––

21   how did you first come to meet her?

22   A.   Through the baker.

23   Q.   Okay.  And what is the baker's name?

24   A.   Armando Ordasz (ph).

25   Q.   Okay.  Is Mr. Armado Ordasz the baker that is still

Centeno – Direct                                        15

1    working with you now?

2    A.    Yes.

3    Q.    And why did she come to meet you?

4    A.    Because I have told the baker that I needed a person to

5    help in the kitchen.

6    Q.    Okay.  And did he say that he knew someone?

7    A.    Ah-ha, a girl.

8    Q.    Okay.

9    A.    Or a young girl.

10   Q.    And when did you first meet Yarid Cardozo?

11   A.    In January, but I'm not sure whether it was 2010 or 2011.

12   Q.    Okay.  And can you describe the substance of the

13   conversation that you had with her when you first met her that

14   day?

15   A.    I ask her if she knew how to cook and she told me that

16   she did.

17   Q.    Okay.  Did you discuss what her salary would be?

18   A.    Yes.

19   Q.    Okay.  What did you say to her?

20   A.    I asked her if she wanted to work and she said yes.

21   Q.    Okay.  Continue.

22   A.    She was supposed to work from 7:00 a.m. to 6:00 p.m.

23   Q.    Okay.  And how many days a week?

24   A.    Six.

25   Q.    Was there an understanding which day she would be off?

1    A.    Sunday.

2    Q.    Okay.  All right.  And did you discuss what her pay rate

3    would be?

4    A.    $10 per hour.

5    Q.    Was it $10 per hour from 7:00 a.m. to 6:00 p.m., or was

6    it less than that?

7               THE COURT:  Don't lead the witness.

8               MS. CONDE:  I'm sorry, Judge.

9    Q.    Can you be more specific about the $10 an hour?

10   A.    It was supposed to be 7.25 for our regular hour and $10

11   for an overtime hour.

12   Q.    Okay.  When you say 7.25 for her regular hours, what did

13   you mean by that?

14   A.    Forty hours.

15   Q.    Okay.  All right.  And then after 40 hours she was

16   getting $10 --

17              MR. NUSSBAUM:  Objection.

18   Q.    -- an hour for over time?

19              THE COURT:  Sustained.  Don't answer it.  She's

20   going to reformulate the question.

21              MS. CONDE:  Sure.

22   Q.    When would the $10 an hour overtime begin?

23   A.    After eight hours.

24   Q.    All right.  This was her schedule in 2010?

25   A.    Yes.

1    Q.    Okay.  Now, in 2011, did she have the same schedule?

2    A.    Yes.

3    Q.    Okay.  And in 2012, did she have the same schedule?

4    A.    No.  She would come in at 6:00 and leave at 2:00.

5    Q.    Okay.  And when did that 6:00 a.m. to 2:00 p.m. schedule

6    start in 2012?  Beginning of the year, middle of the year, or

7    something else?

8    A.    It was about the middle of the year, but I don't remember

9    exactly.

10   Q.    Okay.  And why did her schedule change in the middle of

11   the year in 2012 for 6:00 a.m. to 2:00 p.m.?

12   A.    Because I started preparing sandwiches earlier.

13   Q.    Okay.  And when you say you started, you did the -- you

14   did the sandwiches yourself?

15   A.    Well, the young lady will prepare the eggs and make the

16   sandwiches at that time and put them up front.

17   Q.    Okay.  When did -- when did Yarid stop working for you?

18   A.    In 2010.

19   Q.    Oh, I said stop.  Stop working for you.  When did Yarid

20   stop working for you?

21   A.    In 2013.

22   Q.    Which month?

23   A.    September or October.  I don't remember.

24   Q.    Okay.  And in 2013, what was her schedule?

25   A.    6:00 to 2:00.

```
                          Centeno - Direct                        18
```

1    Q.   Okay.  When Yarid worked from 6:00 to 2:00, did she make

2    $10 an hour overtime?

3    A.   That was eight hours to begin with.  If she would stay

4    longer, one or two hours, then I would pay her $10 per hour.

5    Q.   Okay.  And when you paid her overtime of $10 an hour, did

6    you pay her -- how did you pay her?  Was it daily, weekly,

7    monthly, something else?

8    A.   Everyday.

9    Q.   Okay.  Can you describe how you would pay her?

10   A.   In cash.

11   Q.   Okay.  And did you hand it to her?  Put in an envelope?

12   Do something else?

13   A.   No.  I will give it from my hand to her hand.

14   Q.   Okay.  So on a daily basis you would hand her her

15   overtime pay; is that correct?

16            MR. NUSSBAUM:  Objection, Your Honor.  $10 is not

17   overtime pay.

18            THE COURT:  She already answered the question.

19            MS. CONDE:  All right.

20   Q.   And how -- how would you determine how much you were

21   going to give her for her extra hours?

22   A.   I will just look at the clock and if she would leave at

23   4:00, that meant that it was two hours overtime.  If she would

24   leave at 5:00, that meant that it was three hours overtime.

25   Q.   Okay.  And you would hand her how much money if she

Centeno – Direct                                    19

1    worked two hours?  How much money if she worked three hours?

2    A.    Twenty or 30, depending on the number of hours.

3    Q.    Okay.  And were there says that she would work more than

4    the three hours of overtime?

5              MR. NUSSBAUM:  Objection.  Objection.

6              THE COURT:  Well, you can answer the question.

7    A.    Yes.

8    Q.    Okay.  And would you always pay her her extra hours on

9    that date?

10   A.    Yes.

11   Q.    Okay.  And why would you -- why would you pay her that

12   way on a daily basis?

13             THE INTERPRETER:  May I inquire?

14   A.    Okay.  Well, at the end of the week, I was paying her her

15   regular salary, and I found that it was easier to pay for

16   every day for the overtime and at the end of the week, for her

17   regular -- for the regular hours.

18   Q.    Okay.  And what was -- why was it easier?  What do you

19   mean by that?

20   A.    For me it was easier that way.

21   Q.    Okay.

22   A.    It was better that way.

23   Q.    So it was better -- so you could keep track that way --

24             THE COURT:  Don't lead the witness.

25             MS. CONDE:  Okay.

Centeno – Direct                                        20

1   Q.   Can you -- can you be just a little more specific why it

2   was better that way for you?

3            THE INTERPRETER:  May I inquire?

4            THE COURT:  Yes.

5   A.   Okay.  Because I didn't have to pay her that much or

6   more.  No.  I --

7            THE INTERPRETER:  Correction by the interpreter.

8   A.   Because I didn't have to pay her a much larger amount at

9   the end of the week.

10  Q.   Okay.  So at the end of the week you gave her her regular

11  salary, which was how much?

12  A.   The minimum salary.

13  Q.   Okay.  And when you say minimum, what do you mean by

14  that?

15  A.   Okay.  It was something around 260 or 200 and something.

16  It was 7.25 per hour.

17  Q.   Okay.  Okay.  And which day of the week did you give her

18  her regular salary?

19  A.   On Saturdays.

20  Q.   Okay.  Was her salary also given to her in cash?

21  A.   Yes.

22  Q.   Okay.  Did you pay her all of her hours of overtime?

23  A.   Yes.

24  Q.   Other than what you've testified to being her regular

25  salary and overtime, did Yarid also make any other types of

Centeno – Direct                    21

1    money in the store?

2    A.   When she was helping me to prepare the food, I will pay

3    her something.

4    Q.   Okay.  Can you explain that a little bit more?

5    A.   Okay.  When we had a large order, for example, prepare

6    food for a large party, I would give her $10 per tray.

7    Q.   Okay.  All right.  And did Yarid ever make -- work as a

8    waitress?

9    A.   Well, I only have -- I only have three tables in the

10   store, and they -- so I don't have waitresses or waiters.  The

11   cook will go to the table and ask for the order for the

12   client.

13   Q.   Okay.  Do you know if she ever made any tips?

14   A.   If the clients -- if the clients did, but I don't know.

15   Q.   Can you estimate what the maximum amount of money you

16   paid Ms. Cardozo was?  In a week -- in a week's time.

17   A.   Are you talking about the minimums -- for the minimum

18   salary or also --

19   Q.   I'm asking you in a total.  In the entire week including

20   any extra hours in her wages, what would have been the maximum

21   that you think that she ever made?

22   A.   Maybe 620, 650.

23   Q.   For the week, right?

24   A.   Yes.

25   Q.   Okay.  All right.  Did you keep any written time records

1    of Ms. Cardozo's hours?

2    A.    No.

3    Q.    Okay.  Did you ever -- withdrawn.  Was -- was Ms. Cardozo

4    required to work overtime, or was it an option, or something

5    else?

6    A.    For overtime?

7    Q.    Yeah.  Was it her decision or did she have to do overtime

8    or something else?

9    A.    When I needed her, I'll ask her a favor to stay.

10   Q.    Okay.  And if she wanted to stay, she would stay?

11   A.    Uh-huh.

12   Q.    Did you ever force her to stay?

13   A.    No.

14   Q.    Okay.  Now, you said that her schedule was reduced.  Was

15   Yarid making less money when her schedule was reduced?

16   A.    I didn't pay her for overtime.  I only paid for the 40

17   hours.

18   Q.    Okay.  Did you -- do you know what a pay notice is?

19   A.    No.

20   Q.    All right.  Did you ever give Ms. Cardozo a notice -- a

21   written pay notice?

22   A.    No.

23   Q.    Okay.  Did Ms. Cardozo's son ever work for you?

24   A.    One day, a Saturday.

25   Q.    One day in total or one day a week?

Centeno – Direct                                        23

1    A.    Only on Saturdays.

2    Q.    Okay.

3    A.    The guy will help me.

4    Q.    Okay.  And when did her son work for you?  What years or

5    months?

6    A.    When he came from Mexico, but I don't remember the year.

7    Q.    Okay.  And approximately how long did he work for you?

8    A.    It was like five or six Saturdays.

9    Q.    Okay.  All right.  Why did Yarid stop working for you?

10   A.    Because we have a lady that came to be the cook and I ask

11   Yarid to help me with the sandwiches and also to help as

12   needed to this new cook.

13   Q.    And what happened?

14   A.    She told me that -- she told me that she didn't want --

15   wanted to work like that.  She didn't want to be a helper.

16   Q.    Okay.  Did she quit?

17   A.    She told me that she didn't want to work in that.

18   Q.    Okay.  Did she leave -- did she leave on good terms or

19   bad terms or something else?

20   A.    Yes.  In good terms.

21   Q.    Okay.  Before being involved in this lawsuit that we're

22   here for, have you ever been a defendant in a lawsuit?

23   A.    No.

24   Q.    Okay.  In the 15 years that you've been in business, have

25   any of your employees ever sued you for wages?

Centeno – Direct                                                    24

1      A.    No.

2      Q.    Did you offer to sell a business to Yarid once?

3      A.    That was for a business that I have on 72nd and 3rd

4      Avenue.

5      Q.    Okay.  All right.

6      A.    Yeah.

7      Q.    Okay.  Was she interested?

8      A.    She said so.  She said yes.

9      Q.    Okay.  And what happened with that?

10     A.    She didn't have the money I was asking for it.

11     Q.    Okay.  Why did you offer it for her?

12     A.    Because I trusted her and we were getting along just

13     fine, and so I offered her the business.

14     Q.    Okay.  Do you remember what year that was?

15     A.    It was in 2013, before she left.

16     Q.    Okay.  Did Yarid ever have to leave work to go to a

17     doctor?

18     A.    Yes.  She told me that she had an appointment and that

19     she was sick.

20     Q.    Okay.  What did she mean by that?

21            MR. NUSSBAUM:  Objection.

22            THE COURT:  Sustained.

23            MS. CONDE:  Okay.  What --

24            THE COURT:  Rephrase that.

25            MS. CONDE:  Sure.

Centeno – Direct                                    25

1    Q.    With what frequency would she go to see a doctor?

2    A.    Maybe once or twice a month.  She had different

3    appointments.

4    Q.    Okay.  And would she go during her workday?

5    A.    Yes.  Depending on what was appointment.

6    Q.    Okay.  Did you have any problems with her leaving and

7    going to see the doctor during the day?

8    A.    No, because she would come earlier, do her work, go to

9    the doctor, and then if it was the -- she had the time or

10   depending on the time that she finished, she would come back

11   to complete her hours.

12   Q.    Okay.  And if she didn't have the time, would she not

13   come back on some days?

14   A.    No.  She would come at 7 o'clock and if the appointment

15   was at 4:00, she would leave at 4:00 and then not come back.

16   But that, she had already completed her eight hours.

17   Q.    All right.  Did Yarid have to pay for her food?

18   A.    No.

19   Q.    Okay.  Was she able to eat whatever she wanted during the

20   day?

21   A.    Yes.

22   Q.    Okay.  Was Yarid baptized?  Ms. Cardozo, was she

23   baptized?

24   A.    Well, not -- not in her original religion or creed.  But

25   she converted and I was her madrina is the --

Centeno – Direct                                         26

1              THE COURT:  Godmother?

2    A.    -- godmother.

3              THE INTERPRETER:  Thank you.

4    Q.    And how did you participate as a godmother in the

5    baptism?

6    A.    Okay.  I just gave her money for the clothes that she

7    will need, but I didn't go.  I just gave her the money.

8    Q.    Okay.  So you bought her a gift; is that correct?

9    A.    Yes.  I gave her the money.

10   Q.    Okay.  And what year was that?

11   A.    Maybe 2012.

12   Q.    Okay.

13   A.    I don't know.

14   Q.    Can you describe overall during the period of time that

15   Ms. Cardozo worked for you your general relationship with her

16   over the years?

17   A.    It was -- we have a very good relationship.  I will ask

18   her to do things, take care of things while I have to go the

19   ladies room and go -- go and charge the clients up front.  Do

20   things in the kitchen.  It was a good relationship.

21   Q.    Okay.  All right.

22             MS. CONDE:  Okay.  I have nothing further.

23             THE COURT:  Can you just inquire?

24             MS. CONDE:  Sure.

25             THE COURT:  I'm confused.  What was her pay for

Centeno – Direct                                    27

1    Saturday?  Or at -- you don't have to answer my question.  Can

2    you --

3              MS. CONDE:  Do -- oh, you want me to ask the

4    question?

5              THE COURT:  Yes.  Can you -- yes.

6              MS. CONDE:  Okay.

7              THE COURT:  Just Saturday.

8              MS. CONDE:  Right.

9    Q.  Can you explain how her pay for Saturday was calculated?

10             MR. INTERPRETER:  Okay.  Interpreter alludes that

11   she didn't understand the question.  But the answer is that

12   Saturday was the day that I will pay her.

13             THE COURT:  Okay.

14             MS. CONDE:  Okay.  Let me see if I can ask it

15   better.

16   Q.  Were Saturdays part of her 40 hour week or something

17   else?

18   A.   No.  It was part of the 40 hours, because since her day

19   off was on Sundays, I had to pay her on Saturday.

20             THE COURT:  It's up to you to inquire, but I'll tell

21   you, what's been said is confusing.

22             MS. CONDE:  Yes, I understand.

23   Q.  Did you ever pay her for extra hours on Saturdays?

24   A.   Okay.  And on Saturdays, she had to clean the kitchen.

25   So she will do her regular work during the morning, and then

1     come back and then clean the kitchen and clean all the

2     utensils in the kitchen.

3     Q.   Okay.  And so, did you pay her any extra money on

4     Saturdays when she came back to clean the kitchen?

5     A.   Yes.

6     Q.   Okay.  So just to recap on her schedule.  Was her

7     schedule 7:00 to 2:00, six days a week?

8     A.   Yes.

9     Q.   Okay.

10          THE COURT:  Wait.  Now –– okay.  What years?  What

11    years did she work 7:00 to 2:00?

12    Q.   What years did she work from 7:00 to 2:00?

13    A.   In 2013.

14    Q.   Okay.

15    A.   I don't remember.

16    Q.   All right.  And in 2012, was her schedule from 6:00 to

17    2:00?

18    A.   Uh-huh.

19          THE COURT:  And was that six day a week?

20    A.   Okay.  No.  It was five days and then anything above

21    that, I will pay her overtime.

22    Q.   Okay.  In 2011, her schedule was 7:00 a.m. to what?

23    A.   To 6:00 in the afternoon, or evening.

24    Q.   And how many days a week?

25    A.   Okay.  She work six.  I will pay her five days at the

Centeno – Cross                                                    29

1     regular rate, and anything above that, it was overtime.

2     Q.    Okay.

3             THE COURT:  Was overtime $10 an hour?

4     A.    Yes.

5     Q.    Okay.  Thank you very much.

6             THE COURT:  All right.  We're going to go to the

7     plaintiff.

8             MR. NUSSBAUM:  Your Honor, could I have 15 minutes?

9             THE COURT:  Sure.  All right.  So we're going to

10    take a break.  It's 20 to.  So 15, is that what you're saying?

11            MR. NUSSBAUM:  Fifteen, 20 minutes, on the hour.

12    11:00.

13            THE COURT:  Let's come back at five to, 15 minutes.

14            Okay.  So, just some instructions.  We're going to

15    take a break for 15 minutes, so you can, you know, leave the

16    courtroom if you want.  But you can't talk to anybody about

17    your testimony.  Okay.  You can't talk to your lawyers about

18    your testimony.

19            And when you come back, the plaintiff's attorney is

20    going to ask you questions, and we're going to continue with

21    you under oath.  Do you understand?  Okay.  All right.

22            Oh, I'm sorry.  The clock is slow.  All right.

23    That's why.  All right.  11 o'clock.  Sorry.  We're going to

24    come back at 11:00.  I was looking at the clock in the back

25    and that's behind.

Centeno – Cross                                    30

1            MS. CONDE:  Oh, okay.

2            THE COURT:  So 11 o'clock, and everybody's watches,

3       back there.  Thanks.  Thank you.

4            (Recessed from 10:43 a.m. to 11:03 a.m.)

5            THE COURT:  All right. So I think you know Mr.

6       Nussbaum of the plaintiff's lawyer. He's going to ask you

7       questions. I'm going to remind you that you're still under

8       oath. Whenever you're ready.

9            MR. NUSSBAUM:   Thank you.

10                          CROSS EXAMINATION

11      BY MR. NUSSBAUM:

12      Q    Good morning, Ms. Centeno.

13      A    Good morning.

14      Q    Isn't it true that Ms. Juarez Cardozo began working at

15      LaFlor in 2009?

16      A    No, it was in 2010.

17      Q    Yes, you testified earlier that you have no record of the

18      time that -- no records of the time that Ms. Juarez Cardozo

19      worked at LaFlor, correct?

20            MS. CONDE:  Objection, Your Honor.  That wasn't

21      testimony.

22            THE COURT:  Sustained.

23      Q    Do you have any records of the time that Mr. Juarez

24      Cardozo worked at LaFlor?

25      A    She started in January, 2010 because in -- during 2009 my

1    business was located at the number 737.  And I moved my

2    business to the 731 number in September of 2009.

3    Q    I'm going to ask the question again.  You have no records

4    of the time that Ms. Juarez Cardozo worked at LaFlor, correct?

5    A    No.

6    Q    So you have no records of what time each of the days that

7    she worked at LaFlor, what time she began her day?

8    A    No, we just --

9         THE COURT:  Can I just say on thing? I think when

10   you ask the question in a cross examination style through the

11   translation, it's not coming out right, right?  Because she

12   said no, even though she was answering -- you could tell from

13   the demeanor, but just take that into account, Your Honor, if

14   you want for the record, because they -- looking at the

15   transcript.

16        MR. NUSSBAUM:   Right.  Thank you, Your Honor.

17   Q    So you have no record of each date that Ms. Juarez

18   Cardozo began working at LaFlor, correct?

19        MS. CONDE:  Objection to form.  It's the same issue.

20        THE COURT:  It's the same problem.

21   Q    Do you have any records of the time that Ms. Jaurez

22   Cardozo's shifts began at LaFlor?

23   A    No.

24   Q    And do you have any records of what time her shift ended

25   at LaFlor?

1   A    No, we just checked the clock.

2   Q    And you have no record of when she worked her first shift

3   at LaFlor, correct?

4              MS. CONDE:  Objection.

5              THE COURT:  Yes.  What's the first shift?

6              MS. CONDE:  You mean when she started?

7              THE COURT:  When she started working for her?

8              MR. NUSSBAUM:  I can ask her.

9   Q    You have no record of when Ms. Juarez Cardozo first began

10  working for LaFlor.

11             MS. CONDE:  Objection to form.

12             THE COURT:  It's the same -- you can ask the

13  question.  I'm just telling you the transcript's not going to

14  be very good in terms of the style of that.  The way the

15  answer's going to come out.  Okay.  Go ahead.

16  Q    I'll ask it differently.  Do you have any record of when

17  Ms. Juarez Cardozo first began working for LaFlor?

18  A    I do have a record, but I remember that it was in January

19  when she started to work.

20  Q    Do you recall testifying that you paid Ms. Juarez Cardozo

21  extra when she helped you make trays?

22  A    Yes.

23  Q    And that wouldn't happen very frequently, correct?

24  A    No, it wasn't frequent.  It was only once in a while.

25  Q    Like one or two times a year?

1    A    Something of that.  It wasn't that much.  Not that many.

2    Excuse me.

3    Q    Do you recall testifying that during the years 2010 --

4    2010 and 2011 Ms. Juarez Cardozo had a schedule of 7:00 a.m.

5    to 6:00 p.m. six days a week?

6    A    Yes.

7    Q    During that time period there was occasions that Ms.

8    Juarez-Cardozo worked after 6:00 p.m., correct?

9    A    Yes.  When she kept us stay and cleaned.

10   Q    And that would happen every week?

11   A    Once or twice per week.

12   Q    And there even occasions that Ms. Juarez-Cardozo would

13   stay till 10 o'clock at night, correct?

14   A    On Monday's, on occasion she will stay longer.  She will

15   stay --

16           THE INTERPRETER:  Let me -- interpreter will repeat.

17   A    On Monday's she will stay -- she will stay there.

18   Q    So were there occasions that she stayed until 10:00 p.m.?

19   A    Yes.

20   Q    And were there occasions that she was at LaFlor until

21   11:00 p.m.?

22   A    On days that she went to work longer, she will clean then

23   the store and facing the kitchen.  And we stayed there for an

24   additional hour.

25   Q    So you agree that there were times that she stayed until

1    11:00 p.m., correct?

2    A    Yes.

3    Q    Do you remember having your deposition taken by one of

4    Ms. Juarez-Cardozo's attorneys in this case?

5    A    Yes.

6    Q    And that that took place on April 18th, 2016?

7    A    Yes.

8    Q    Do you remember that there was an individual there that

9    was writing down your responses at the deposition?

10    A    Yes.

11    Q    And that that individual was writing down all of Mr.

12    Kirschenbaum's questions to you at that deposition, right?

13    A    Yes.

14    Q    And do you remember having been sworn in to tell the

15    truth that day?

16    A    Yes.

17    Q    And do you -- did you tel the truth that day?

18    A    Yes.

19              THE COURT:  Do you have an extra one?

20              MR. NUSSBAUM:   Yes.

21              THE COURT:  Thanks.

22              All right.  Defendants, do you have a copy?  This is

23    the April 18th deposition?

24              MS. CONDE:  Yes, Your Honor.  Thank you.

25              THE INTERPRETER:   I would like to have one, if

Centeno – Cross                                          35

1      possible, especially if he's going to read --

2           (Pause.)

3      Q    I'd like to turn your attention to page 31 of this

4      transcript?  And please tell me if you were asked these

5      questions and gave these answers, or I should say this

6      question and this answer.

7                THE COURT:  Which one are you --

8                MR. NUSSBAUM:   Page 31.

9                THE COURT:  What lines?

10               MR. NUSSBAUM:   Line 14.

11     Q    Were you asked this question and did you give this

12     answer?  "Question" on line 14. "Was Yarid scheduled to start

13     at 6 throughout her employment?  Answer:  No, it was from 6:00

14     a.m. to 2:00 p.m. her schedule throughout her whole

15     employment, but if I needed her after that, I would ask her to

16     stay until 3:00 p.m. or whatever extra hours.

17     A    No, I don't recall.

18     Q    Is there anything that happened to you since your

19     deposition in April of this year that affected your ability to

20     recall that testimony?

21     A    No.

22     Q    Do you have any reason to believe that that was not a

23     question to you and a response that you gave at your

24     deposition?

25     A    I don't remember.  It was quite some time ago.  It would

Centeno – Cross                                                      36

1    seem to be over a year.

2    Q    But you swore to tell the truth that, correct?

3              THE COURT:  I'm sorry.   What -- what do you

4    disagree about here?  I mean, this is not really impeaching

5    her.  She hasn't said anything.

6              MR. NUSSBAUM:   Your Honor, she testified today that

7    the plaintiffs schedule for the years of 2010 and '11 began at

8    7:00 a.m., whereas clearly here in the deposition she

9    testifies that it was 6:00 a.m. throughout her employment.

10             THE COURT:  Okay.  You're disagreeing with that, but

11   not with the 2:00 p.m?  I mean --

12             MR. NUSSBAUM:   It just shows that she's not

13   credible.

14             THE COURT:  Okay.  But I understand she testified –

15             MR. NUSSBAUM:   I don't know how it could be seen

16   any other way.

17             THE COURT:  But you understand that this question

18   has her saying that she's working till 2:00.   All right.  You

19   go --

20             MR. NUSSBAUM:   Which directly contradicts her

21   testimony in front of the court today.

22             THE COURT:  All right.  Go ahead.

23   BY MR. NUSSBAUM:

24   Q    You testified earlier that you paid Ms. Juarez-Cardozo in

25   cash, correct?

Centeno – Cross                                                    37

1   A    Yes.

2   Q    Did you report the wages you paid Ms. Juarez-Cardozo to

3   the IRS?

4             MS. CONDE:  Objection, Your Honor.

5             THE COURT:  Sustained.

6             MR. NUSSBAUM:  Your Honor, she -- it just goes to

7   her credibility as a witness.

8             THE COURT:  No.  We haven't asked about taxes.  We

9   haven't asked about for your client or the witness, so no.  Go

10  ahead.

11            MR. NUSSBAUM:  It goes to her truthfulness.

12            THE COURT:  We're not talking about the tax payment.

13  It wasn't asked of your client.  Your client got a pass on

14  that.  We're not asking her.  Go ahead.

15  Q    Now your husband owns LaFlor with you, correct?

16  A    Yes.

17  Q    And he runs the operation of the business with you?

18  A    Yes.  We do that together.

19  Q    You do everything together?

20  A    Yes.

21  Q    And you have the same authority as each other as LaFlor,

22  correct?

23  A    As far as employees, I am the only one.

24  Q    I understand, but as owner of the business, you husband

25  has the authority to control the employees at LaFlor, correct?

1    A    Only to tell them they are not doing the things properly.

2    Q    So he would correct the employee was not doing something

3    proper at LaFlor?

4    A    Yes.

5    Q    And LaFlor is a small business, right?

6    A    Yes.

7    Q    So all the employees at LaFlor know your husband,

8    correct?

9    A    Yes.

10   Q    And they know that he is an owner with the same authority

11   as you at LaFlor, correct?

12   A    Yes.

13   Q    Now in 2012 and '13 Ms. Juarez-Cardozo continued to work

14   extra hours, correct?

15   A    Yes.

16   Q    And in 2012 and '13 there continued to be occasions that

17   she would work until 10:00 p.m., correct?

18        MS. CONDE:  I'd note my objection.  That wasn't the

19   testimony.

20        THE COURT:  Sustained.

21   Q    In 2012 and '13 were there occasions that Ms. Juarez-

22   Cardozo worked until 10:00 p.m.?

23        MS. CONDE:  Objection, Your Honor.  It's confusing

24   because there's different testimony for both years, so he's

25   lumping the two years into one question.

```
                          Centeno - Cross                        39
1              THE COURT:  Sustained.
2     Q    In 2012 there were occasions that Ms. Juarez-Cardozo
3     worked until 10:00 p.m. at LaFlor, correct?
4     A    As I said, it was once or twice per week, not always.
5     Q    And is that the same thing in 2013?
6     A    No.  In 2013 it was -- there was almost no occasion like
7     that -- there were no occasions like that, correction.
8              THE COURT:  There were no occasions like that?
9              THE INTERPRETER:  Yes.
10    Q    Were there occasions in 2013 that she worked until 9:00
11    p.m.?
12    A    No, because in 2013 in April she hurt her hand and I
13    believe that she fractured it.  And she was not certainly
14    working overtime. It was just a few hours, if she did.
15    Q    Prior to her injury in 2013 there were occasions that she
16    would work until 9:00 p.m., correct?
17             THE INTERPRETER:  Could you repeat for the
18    interpreter, please?
19             MR. NUSSBAUM:    Sure.
20    Q    Prior to Ms. Juarez-Cardozo's injury in 2013, there were
21    occasions that she worked until 9:00 p.m., correct?
22    A    Yes, but it was not every day. It was maybe once or twice
23    a week and maybe there were weeks where there was none of them
24    -- none of that.
25    Q    Now you gave -- you paid Ms. Juarez-Cardozo in cash,
```

1    correct?

2    A    Yes.

3    Q    So you have no records at all of how much you paid her,

4    right?

5            THE COURT:  It's the same problem.

6            MS. CONDE:  Objection.

7    Q    Do you have any record at all of the cash payments you

8    made to her?

9    A    No.

10    Q    Did you give her any piece of paper, such as a pay stub,

11    with the cash payments you made to her?

12    A    No.

13    Q    And you never gave her any such paper, correct?

14            MS. CONDE:  I note my objection, Your Honor.

15            THE COURT:  The same problem. You have -- it's not

16    coming across in the translation.  So you should rephrase it.

17    Q    Did you ever give Ms. Juarez-Cardozo a piece of paper

18    with the cash payments you made to her?

19    A    No.

20    Q    Did you ever give -- withdrawn.

21        Did you ever give Ms. Juarez-Cardozo any written

22    statement of how she was going to be paid at LaFlor?

23    A    No.

24    Q    Did you ever pay Ms. Juarez-Cardozo a spread of hours

25    pay?

Centeno - Cross                                           41

1              MS. CONDE:  I'm going to object, Your Honor.  I

2     don't know --

3              THE COURT:  Sustained.  Why don't you explain the

4     term, or use a longer -- you know, a longer question that

5     explains the term.

6              MR. NUSSBAUM:   Sure.  Sure.

7     Q    On the occasions that Ms. Juarez-Cardozo's workdays

8     spanned a period lasting longer than ten hours, did you pay

9     her anything extra?

10             MS. CONDE:  I'm going to object, Your Honor.

11             THE COURT:  Denied.

12    A    I paid $10 per hour for every extra hour that she worked.

13    Q    Right.  Beside for those $10 payments for the extra

14    hours, did you give her any other payments on those occasions?

15    A    No.

16    Q    Did you ever seek any legal advice to insure that

17    LaFlor's compensation policies complied with state and/or

18    federal law?

19             MS. CONDE:  Objection, Your Honor.

20             THE COURT:  Sustained.

21             MS. CONDE:  Your Honor, her good faith defense goes

22    to whether or not she took -- all right.  Withdrawn.  Not that

23    I have to withdraw it.

24    Q    Ms. Centeno, did you take any steps to ensure that your

25    compensation practices complied with state and federal law?

Centeno - Cross                                              42

1          MS. CONDE:  Objection, Your Honor.

2          THE COURT:  Denied.

3    A    No.  I didn't know about that.

4    Q    If Ms. Juarez-Cardozo did not work a full extra hour, how

5    did you pay her?

6    A    If she work only half an hour I would pay her five

7    dollars.

8    Q    And if she worked 15 minutes extra?

9    A    She never worked for 15 minutes extra, or an extra 15

10   minutes.  She always completed either her half an hour, half

11   hour or her full hour.

12         MR. NUSSBAUM:  Your Honor, I'd like to mark the

13   complaint and the answer, please.

14         THE COURT:  All right.  We already have them marked.

15   I lost track of them.

16         MR. NUSSBAUM:  I think that was from the --

17         THE COURT:  It was 4 -- it's in the case, right?

18   Exhibit 4 for this case and the answer -- or the other

19   complaint is the one from the other action.

20         All right.  So Defendant's Exhibit 4 is the

21   complaint in this action.

22      (Complaint received into evidence as Defendant's Exhibit

23   No. 4.)

24         So you want to mark the answer.  Is that what you

25   said?

```
                        Centeno - Cross                    43
```

1            MR. NUSSBAUM:   Sure.

2            THE COURT:  Is that your first exhibit?

3            MR. NUSSBAUM:   That's B.

4            THE COURT:  B.  Okay.

5       (Answer is marked as Exhibit B.)

6            MS. CONDE:  Your Honor, there is an amended verified

7    answer as well.

8            MR. NUSSBAUM:   Oh, yes. I'm sorry.

9            MS. CONDE:  Is that what you're marking?

10           MR. NUSSBAUM:   I'm marking the amended answer.

11           MS. CONDE:  Okay.

12           MR. NUSSBAUM:   Which was filed on ECF on January

13   20th, 2016.  It's document 15.

14           THE COURT:  That's the one that's been marked as B.

15   All right.  Can you remember what was A?

16           MR. NUSSBAUM:   It was the --

17           THE COURT:  Just at some point let's come back to so

18   we have a complete list.

19           MR. NUSSBAUM:   The answer to the complaint in the

20   other --

21           THE COURT:  The other case?

22           MR. NUSSBAUM:   The other lawsuit.

23           THE COURT:  Okay. Hang on one second, just so we can

24   get these numbers right.

25           So you're saying A was previously marked the answer

Centeno – Cross                                          44

1    in the other case.

2              MR. NUSSBAUM:   The answer in the --

3              THE COURT:  Okay.  And then you marked -- this

4    exhibit tab that's on the copy that you gave to the

5    interpreter that was just --

6              MR. NUSSBAUM:   That was pre-marked.

7              THE COURT:  All right.  So that's nothing. I'm going

8    to give you that back.  Okay.   All right.  So it's marked as

9    Plaintiff's Exhibit B is the amended answer in this action.

10             Do you have a -- you're going to ask about the

11   complaint as well?

12             MR. NUSSBAUM:   Yes.

13             THE COURT:  All right.  Do you have a copy for the

14   interpreter, or do you want me to give him my copy?  Do you

15   have an extra --

16        (Pause.)

17             MR. NUSSBAUM:   Does the witness have a copy of the

18   complaint, defendant's 4?

19             THE COURT:  He can look at the copy -- I mean, she

20   answered before she didn't read English, so it's all going to

21   be done through translation, but the interpreter has a copy

22   right next to her, right?

23             THE INTERPRETER:  Yes, I have.

24             THE COURT:  All right.  So she needs to look at it.

25   You can show her your copy.  Okay.

1    Q    Ms. Centeno, are you familiar with the complaint and

2    amended answer that were filed in this lawsuit?

3    A    When I received the paper about the complaint, I didn't

4    know about it.

5    Q    Since that time, has someone ever translated the

6    complaint or answer for you?

7    A    No.

8    Q    Are you familiar with the fact that your attorneys filed

9    an amended answer for you in this lawsuit?

10   A    Yes, they are helping me, but they are the ones who know

11   about these things.

12   Q    I'd like to turn your attention and the translator -- the

13   interpreter will translate it for you -- to paragraph 9 of Ms.

14   Juarez-Cardozo's complaint, which --

15        MS. CONDE:  Sorry. I didn't hear you.

16   Q    Paragraph 9 which states that defendant, Mario Centeno,

17   is an owner of La Flor de Santa Ines, Inc.

18        And in the amended answer that was filed by your

19   attorneys in paragraph 9 it states denies knowledge and

20   information sufficient to form a belief as to the allegations

21   contained in paragraph 9 of the complaint and refers all

22   questions of law and fact to the court.

23        Now that's incorrect, right?  Isn't it incorrect that

24   Mario Centeno is not an owner at LaFlor?

25        MS. CONDE:  Objection to form.

Centeno - Cross                                    46

1            THE COURT:  Sustained.  You can ask her a substance

2    question, but the comparison does not lead to the statement

3    that you said.

4            MR. NUSSBAUM:   The answer -- the response --

5            THE COURT:  I'm not arguing about it.  You can ask

6    her about whether he is an owner of La Flor de Santa Ines, if

7    you'd like.

8    Q    Mr. Centeno is an owner of LaFlor, correct?

9    A    Yes.

10   Q    Do you know why you denied any knowledge about that fact

11   in your answer?

12           MS. CONDE:  Objection, Your Honor.

13           THE COURT:  Sustained.

14           MR. NUSSBAUM:   Your Honor, the plaintiff in this

15   case was put through a grueling review of a complaint an

16   answer in an extraneous lawsuit.  We sat here for hours.

17           THE COURT:  You're not asking her about this.  I

18   just told you, no.  Move on.  You can ask her more about the

19   substance of his ownership that would go to the test of

20   whether he's somebody who would be responsible, which is what

21   you are trying to prove here.

22           MR. NUSSBAUM:   I think I've covered that. I'm

23   trying to prove that they denied knowledge in the answer, even

24   though the defendant in the case clearly has knowledge about

25   this topic.

Centeno – Cross                                    47

1           THE COURT:  All right.  Move on then.

2    Q    Paragraph 12 of the complaint states the defendant, Luisa

3    Centeno, controls employee's schedules and rates of pay.

4           THE COURT:  She's already admitted that.

5           MR. NUSSBAUM:  I'm trying to show -- they deny

6    knowledge in their answer. I mean, we did this in a --

7           THE COURT:  There's no point.  She's already

8    admitted.  There's no -- this is no impeachment.  She admitted

9    that, so move on.  Next.

10          MR. NUSSBAUM:  So we did we do --

11          THE COURT:  Move on.

12   Q    Do you know that your -- the parties entered into a

13   stipulation to amend part of your answer in this case?

14   A    No.

15   Q    Just to be clear, in terms of the authority that the

16   owners of La Flor had at the business, the had the authority

17   to hire and fire employees, correct?

18   A    When they are not performing their -- when the employees

19   are not performing their duties, we have to look after -- as

20   owners we have to look for the business -- for the good of the

21   business.

22   Q    So the answer is yes, the owners have the authority to

23   hire and fire at La Flor?

24   A    Yes.

25   Q    And the owners have the authority to determine how much

Centeno – Cross                                48

1    to pay employees at La Flor?

2    A    Yes.

3    Q    And the owners have the authority to schedule employees

4    at La Flor, correct?

5    A    Yes.

6    Q    And the owners have the authority to control the

7    conditions of employees' employment at La Flor, correct?

8              MS. CONDE:  Objection.  I don't know what that

9    means, Your Honor.

10             THE COURT:  Denied.

11   A    I didn't understand the question.

12   Q    The owners of La FLor are able to control what employees

13   do at La Flor, correct?

14   A    Yes, they work and all the things they have to do.

15   Q    And just to be clear, the other owners, Mario Centeno,

16   was present at La Flor almost every day that the business is

17   open, correct?

18   A    Yes.

19             MR. NUSSBAUM:   I have no further questions.

20             THE COURT:  Any redirect?

21             MS. CONDE:  No, Your Honor.

22             THE COURT:  All right.  Anyone have any other

23   evidence to offer?  Do you want to take a minute and talk with

24   your counsel?

25             MR. GLAZER:  Yes, if you don't mine, Your Honor.  We

1    only need one or two minutes.

2              THE COURT:  All right.  Why don't you take two

3    minutes?

4         (Off the record from 11:40 a.m. until 11:43 a.m.)

5              THE COURT:  All right.  So we're on the record again

6    in Juarez-Cardozo vs. La Flor de Santa Ines.

7              Okay.  So the outstanding question was any redirect?

8              MS. CONDE:  Your Honor, we do not have a redirect.

9              THE COURT:  Okay.

10              MR. NUSSBAUM:   I'd like to include the transcript

11    of Ms. Centeno's deposition as part of the record.

12              THE COURT:  You want to offer the whole transcript?

13              MS. CONDE:  There's no objection, Your Honor.

14              THE COURT:  Okay.  Did I give you -- I think, Chris,

15    did we get the copy back?

16              THE CLERK:  I gave it to --

17              THE COURT:  Yes, could we just take it back?  So

18    that's going to be your C, right?

19              MR. NUSSBAUM:   B, no?  Oh, no.  B was the --

20              THE COURT:  B was the amended answer.

21              MR. NUSSBAUM:   Correct.

22         (Mr. Centeno's deposition transcript received into

23    evidence as Exhibit C.)

24              THE COURT:  So no more testimony.  Is that right?

25              MS. CONDE:  That's it.

```
 1              MR. NUSSBAUM:   Yes, Your Honor.

 2              THE COURT:  All right.  So you step down if we're

 3    finished in terms of testimony.  Thank you.

 4              Anymore documentary evidence?  Anything anybody?

 5              MS. CONDE:  No, Your Honor.

 6              THE COURT:  All right.  So in terms of the

 7    equivalent of closing -- I'm sorry.

 8              MR. GLAZER:  So the court is aware we're going to

 9    let the -- we're going to let the defendant go back to the

10    store.

11              THE COURT:  Yes.  That's what I just.  So you don't

12    need the translator.  Does your client need a translator?

13              MR. NUSSBAUM:   I don't think so.

14              THE COURT:  She hasn't had a -- help.  I think we're

15    finished.  Nobody needs a translator anymore, right, for

16    today?

17              MS. CONDE:  No, Your Honor.

18              MR. NUSSBAUM:   No.

19              THE COURT:  Okay.  Thank you very much.  Have a good

20    New Year.

21              MR. CENTENO:  Thank you.

22              THE COURT:  Okay.  All right.  So in terms of post

23    trial submissions, we're going to order the transcript.

24              MR. GLAZER:  Before Your Honor actually does this

25    I'm going to move to dismiss, Your Honor. I don't think any
```

51

1    burden has been established on the notion that this defendant

2    actually engaged in commerce, the production of good for

3    commerce that had annual gross sales of at least $500,000.

4            And in addition to that, with respect to any failure

5    to pay minimum wages hours, that also hasn't been satisfied

6    because the only thing that we really have is the self serving

7    testimony of the plaintiff where she says that she doesn't

8    even know her hours.

9            With respect to anything else that has come into

10   evidence, we know that she was paid overtime.  We believe any

11   discrepancies in that is a de minimis matter, and we believe

12   for -- based on the factual issues that have been presented by

13   the plaintiff that this court should dismiss this case.

14           MR. NUSSBAUM:  Your Honor, I'm not sure I caught

15   all of defendant's reasons.

16           I think there were a few reasons jumbled in there

17   for their motion to dismiss, but it's shocking that they can

18   straight facedly tell the court that defendant paid plaintiff

19   overtime when we all know that the overtime rate during the

20   times in question was more than $10 an hour.  So I don't even

21   know how that gets off the ground.  So --

22           MR. GLAZER:  So --

23           THE COURT:  Don't interrupt, please.  Go ahead.

24           MR. NUSSBAUM:  I'm not sure I caught all the other

25   grounds, because this is on the fly, but plaintiff testified

1      that her understanding was that the business earned more than

2      $500,000 a year. I don't believe that testimony was rebutted

3      at all.

4              The court will see in the transcript of defendant's

5      deposition that she testifies that she has no clue about what

6      the business owns.  In other words, she essentially hid the

7      ball from plaintiff making it impossible for us to meet our

8      burden.

9              And if anything, we would ask the court for an

10     inference as to the business earning $500,000 in order to get

11     FLSA coverage.

12             THE COURT:  What about the interstate commerce

13     piece.

14             MR. NUSSBAUM:  We're not -- it's just on the

15     $500,000 requirement.

16             THE COURT:  Do you not think that they engaged in

17     business that involved interstate commerce?

18             MR. NUSSBAUM:  I'd be happy to brief -- I mean,

19     it's a varying standard, but I think -- I mean, they have a

20     bunch of employees, but we believe on the $500,000 alone,

21     that's enough to get FLSA coverage.  Engaging in --

22             THE COURT:  What about the testimony about the kinds

23     of goods that they sold?

24             MR. NUSSBAUM:  The goods they sold that were -- but

25     they added sold can goods.  I mean, it's a little bit thin on

1     --

2              THE COURT:  That were Latin goods was the term.

3              MR. NUSSBAUM:   I believe we can meet it on the

4     interstate commerce prong as well, but in any event, there's

5     testimony from the plaintiff that they earned $500,000.

6              THE COURT:  Okay.  All right.  What about --

7              MR. NUSSBAUM:   But yes, I agree with the court that

8     on the interstate commerce prong we would win as well.

9              Even if for whatever reason the court does not infer

10    that the business earned $500,000, or it's not fined, that

11    this was a business engaged in interstate commerce, given the

12    Latin goods that were being sold there, there is a lot of

13    precedent that when a case gets to trial, even though the

14    federal claims may not survive that the court would still

15    decide the state law claims because of the prejudice that

16    would be involved to the plaintiff if the case were dismissed

17    at that stage.  I don't know if there were any other reasons

18    underlying the motion to dismiss.

19             MR. GLAZER: Your Honor, I just want to say I know

20    that this has been a contentious trial. I thought that the

21    defendant -- that the plaintiff was actually finished with his

22    argument when I attempted to speak.

23             I just want you to know, Your Honor, I can totally

24    with a straight face, and I have no problem doing this, come

25    before this court and say that this plaintiff was paid

1    overtime.

2         There was testimony by the plaintiff and -- by the

3    plaintiff that actually speaks to these issues, but also from

4    the defendant herself that says she paid overtime of $10 per

5    hour. The difference is de minimis.

6         The issue of intent comes into play. The notion of

7    intent has not been made out by the plaintiff.  The plaintiff

8    has the burden.

9         But in addition to that on the $500,0000 all we have

10   is self serving testimony by the plaintiff in terms of what

11   she believes that the defendant took in in the course of a

12   day.

13        That doesn't mean -- that doesn't account for --

14   she's only talking about what she took in and especially there

15   really is no credible evidence from this plaintiff and we

16   can't with a straight face ever really believe that there

17   really is any credible testimony.

18        And Your Honor knows that this court has the

19   authority and the right to ignore all or part of the

20   plaintiff's testimony.  In or all or in part.

21        But in addition to that, the issue of the $500,000

22   in interstate commerce, that burden clearly is not met in

23   terms of the goods sold, as well as what this business takes

24   in in the course of a day. What this business actually

25   grosses.  That testimony has not -- that testimony and that

1     proof has not been made out in any way.

2              And, Your Honor, just once again, get to the point

3     that it is, in fact, the plaintiff's burden to make this --

4              THE COURT:  So the motion's denied.  Putting aside

5     whether one believes the plaintiff or not, which isn't

6     necessary for this motion, there's -- the testimony here today

7     was that they have Latin, was the term, and -- that was used

8     by the question from plaintiff's -- I'm sorry, from

9     defendant's counsel, and that's enough to bring it into

10    interstate commerce.

11             And my understanding is that it's an or question, so

12    that's not answering whether the plaintiff's had enough to

13    have $500,000.

14             You're saying we have an FLSA claim and, you know,

15    my calculation -- it just depends on how everyone rounds up or

16    down, would be that it should have been at least 10.87 an hour

17    for overtime.

18             So there's abundant testimony by the defendant as to

19    the hours that were worked.  And you know, I'll read the

20    transcript, but there were -- there are many hours -- you

21    know, whether she started at 6:00 or 7:00, there's still

22    testimony that the day went --

23             MR. NUSSBAUM:   I think it's 77 hours.

24             THE COURT:  Is that what it adds up to?  So I didn't

25    do --

1          MR. NUSSBAUM:   13 hours a day for six days a week.

2          THE COURT:  Okay.

3          MR. NUSSBAUM:   78 hours, I'm sorry.

4          THE COURT:  So even if it were de minimis on a day

5     here, or a day there, it's going to be however many hours

6     overtime times the 87 cents.  Whatever the number is.  I mean,

7     we'll do the math in a better way.

8          The point is overtime is no longer de minimis.  And

9     even if there were not FLSA claims, which I think there are

10    here, there are definitely New York claims.  I think given all

11    the work that's gone into this, I would definitely exercise

12    supplemental jurisdiction.

13          So we're looking at the New York Labor Law claims.

14    There are notice problems, which this is all based on the

15    defendant's testimony.  She didn't given any paperwork to the

16    plaintiff and she also, I believe, admitted she didn't pay her

17    spread of hours, which I think based on what the defendant is

18    testifying to, she was entitled to spread of hours pay for

19    some days.

20          So there is some claim here.  Whether one accepts

21    the plaintiff's version of the time, which, you know, I'll go

22    back and read the transcript, you know, that I'm not deciding

23    here.

24          But there is -- the plaintiff definitely has some

25    claims here, whether they're as significant as what she said,

1    that remains to be resolved.  But on the defendant's own

2    admissions, there are some claims here.

3            So that being said, how do you want to put in a

4    post-trial submission, if that's what you want to do?  I mean,

5    I understand the arguments. I can just read the transcripts

6    and run these numbers, but if you want to put something in,

7    that's fine, too.  So what would you like?

8            MR. NUSSBAUM:   Does the court have a preference?

9            THE COURT:  No.  I mean, honestly, what would be, as

10   a practical matter helpful, would be just to see your

11   calculations, what you're saying. I don't need the long

12   descriptions of --

13           MS. CONDE:  Yes.

14           THE COURT:  -- this, that or the other thing.  Just

15   the hours, the rate. I'll tell you right now, I'm not going to

16   award treble damages.

17           If there's only the liquidated -- whatever the money

18   would be that was the unpaid wages, plus one set of liquidated

19   damages.

20           MS. CONDE:  Yes, Your Honor. I think you have a very

21   good understanding of the issues in the case and I don't think

22   it's necessary for us to create more cost for our client and

23   have to do this whole final document that you're asking for.

24           So I would agree, just submit calculation.

25           MR. NUSSBAUM:   So to be -- putting aside the

1      overtime claims for a second, the calculations -- the spread

2      of hours and spread of hours --

3              THE COURT:  Just --  I mean, you can make the claim

4      for the overtime. I mean, I know your client says she was

5      working more overtime hours than what the defendant was

6      saying.  So you can just tell me -- if you want to do two

7      calculations, one.  If one believe your client and if one

8      accepted just the defendant.  Just where the numbers end up.

9      I don't really need anything narrative. I'll get the

10     transcripts and --

11             MR. NUSSBAUM:   So we don't need a brief -- we don't

12     need a brief liability on spread of hours or liquidated

13     damages or any of that stuff.

14             THE COURT:  I don't think I need any briefs.

15             MR. NUSSBAUM:   This is just calculation.

16             THE COURT:  This is very -- in my view, it's

17     straight forward. I don't see -- if you tell me there's some

18     legal -- the only legal question is the witness who is here. I

19     guess, I said that we could talk about it in your papers, but

20     we could talk about it now. I'm sorry, I don't remember his

21     name, but --

22             MR. NUSSBAUM:   Martinez.

23             THE COURT:  Yes.  But otherwise -- so let's just

24     talk about the substance.  I mean, it's up to you.  If you

25     want to make a narrative submission, that's fine. I don't

1    think I need it, but it's up to you.

2              MR. NUSSBAUM:   At risk of being an annoying lawyer,

3    it sounds like the court is finding liability on the

4    underlying claims, and I just want to be clear that's -- so we

5    don't get into a whole fight all over again --

6              MR. GLAZER:   I don't think we should assume anything

7    that the court is doing.

8              THE COURT:   I'm not making a finding on the record.

9    What I'm saying is I'm not granting the motion to dismiss.

10   You can put in whatever post-trial submissions you want. I'm

11   telling what I would find useful would be a chart with your

12   proposed calculations.

13             Ideally, you do it in an Excel spreadsheet so that

14   we can work with it.

15             MS. CONDE:   Yes.  Yes.

16             THE COURT:   That's even better.  You can email it to

17   me.

18             But if you want to put something narrative in you

19   can. I don't think it's necessary, but it's really up to you.

20   I don't want any closing statements.

21             So I'll just -- I've said what I've said. Tell me

22   when you would be able to put it in.

23             MR. GLAZER:   Would it be acceptable to the court --

24   I know that you're saying that a lot of things are acceptable,

25   but would -- in terms of the very simplistic version that Your

1    Honor described, is an Excel spreadsheet with maybe a

2    paragraph narrative.

3                THE COURT:  Yes.  If you want, that's fine.

4                MR. GLAZER: I'm thinking something like that.  A

5    little -- a very small narrative and the calculations.  And I

6    guess two versions of the calculations because I heard

7    something about 78 hours and we know that the defendant is

8    nowhere near that.

9                THE COURT:  I know.  We don't need to have argument

10   about it.  You have two --

11               MR. GLAZER:   I mean, we could test that.

12               THE COURT:  We have what your client testified to.

13   We can start there.

14               MR. NUSSBAUM:   You can test your client's

15   testimony.

16               MR. GLAZER:   I can test for 78 hours.

17               THE COURT:  And you can go --

18               MR. NUSSBAUM:   Do the math.

19               THE COURT:  Stop.  And you can go from there.

20               So when you -- I can take the submissions at the

21   same time. I don't need opposition.  If something unexpected

22   comes up, then I'll ask for it.  But when do you want to do

23   it?  What do you think the transcript turnaround time is

24   about?  With the holidays --

25               THE CLERK:  Maybe a week.

61

1          THE COURT:  Do you think they'll do it that fast?

2    No, because that's Christmas and New Year's, and Hanukkah's in

3    there.  I mean, there's a whole -- you got a whole lot of

4    holidays coming up.

5          THE CLERK:  (Inaudible).

6          THE COURT:  I'm not trying to torture --  so we'll

7    order it and see if the court reporter can get it by January

8    6th, but if they tell us it's going to take longer, I'm going

9    to give them the time, because it's okay.

10         So assuming we have the transcripts by January 6th -

11   -

12         MR. NUSSBAUM:  I think the 18th is doable.

13         MS. CONDE:  Can we have until the end of the month?

14   Whatever the last date in January is?

15         THE COURT:  Sure. I'm fine --

16         MR. NUSSBAUM:  It's not --

17         THE COURT:  The end of January is fine.  Just one

18   set from each.

19         All right.  You want to talk about the witness who

20   was here last week.  The --

21         THE COURT:  What's his name again?

22         MR. NUSSBAUM:  Brigidio Martinez.  I'm sorry if I'm

23   not pronouncing it right.

24         THE COURT:  Yes.  You propose -- you want to strike,

25   right?

1          MR. NUSSBAUM:   Except for the part where he admits

2     to settling with him because of his violations, which we think

3     shows that the plaintiff brings credible lawsuits.

4          THE COURT:  All right. I'm not -- he's either in or

5     he's out.  What do you want?

6          MR. NUSSBAUM:   Out.

7          MR. GLAZER:  Your Honor, there were two points that

8     made -- that were made that really is all that matters in

9     terms of impeachment and the -- and that is -- I mean, he was

10    called as a rebuttal witness specifically.

11         There were two issues.  One was the issue of whether

12    or not there was a sign that posted the wages and hours and

13    the second thing is that she couldn't proceed with her claim

14    because -- or at least one portion of the claim because he

15    actually kept ledgers of the hours themselves, which totally

16    undermined her claim.

17         And that is the reason why we know that this

18    plaintiff does not bring credible lawsuits. The one thing that

19    he did testify to is that he kept records of hours and that's

20    why that portion of the claim did not got forward in any way.

21    Those were the two points of testimony that we thought are

22    relative for impeachment purpose alone.

23         It goes to weight, Your Honor.  Your Honor, can --

24    you know, Your Honor can consider this based on the weight of

25    the evidence and the bottom line is there's only two real

1    points that we're -- this isn't about what was actually given

2    in a long statement in the complaint, and the long answer that

3    was given.

4         The only two issues that this is about is was there

5    a sign?  Did this woman -- did this plaintiff ever, ever see a

6    sign before, because she said she didn't.

7         And the other thing is whether a claim could go

8    forward on the wages and hours claim, because that's the one

9    thing that he did keep.  Those are the two issues. Nothing

10   else matters in terms of --

11        THE COURT:  Okay.

12        MR. NUSSBAUM:   Your Honor, very briefly.

13        THE COURT:  Actually, I want to ask a question here

14   of both of you.

15        So I may have been wrong in terms of thinking that

16   that was going to move it along by having Mr. Martinez

17   testify, but what I don't understand is under federal -- what

18   rule of evidence you think his substantive testimony is coming

19   in, because it seems to me it's bull string and you're trying

20   to get to her -- the plaintiff's character, her truthfulness,

21   or untruthfulness and, you know --

22        MR. GLAZER:  Well, the count on the one issue of the

23   signing, Your Honor.  On that one issue.  If we're only --

24        THE COURT:  Yes -- go ahead.

25        MR. GLAZER:  The testimony's only for that issue.  I

1    mean, that goes to her own testimony as to whether she ever,

2    ever saw a sign before. I mean, I think that's --

3                MR. NUSSBAUM:   Your Honor, I know --

4                THE COURT:   Hang on.   Hold on.

5                MR. GLAZER:   -- a significant issue.

6                MR. NUSSBAUM:   I know the court's going to see the

7    transcript and review the part of the direct evidence from Ms.

8    Cardozo as to whether or not she saw the sign, but I want to

9    highlight that what she says is I do not recall.   And that's

10   not a rebuttal statement. It's just simply not a rebuttal

11   statement.

12               MR. GLAZER: I think I asked several questions on

13   this. I don't know whether she testified differently on one

14   portion, but I asked her were there ever in her entire -- this

15   is my recollection of the testimony -- whether she ever in her

16   entire life saw the sign.  And she said --

17               MR. NUSSBAUM:   Point to the line in the transcript.

18               THE COURT:   I'll get the transcript. I get the

19   substantive point.

20               What I just want to know is what your take is on why

21   that testimony should be admissible, because to me it seems

22   like a Rule 608 problem.

23               You have specific instances of conduct that test the

24   truthfulness or untruthfulness and you're offering extrinsic

25   evidence.

1          So just as a general evidentiary rule, it's unclear

2     to me why that testimony should be admissible.

3          MR. GLAZER:  I feel the plaintiff actually brought

4     in extrinsic issues on --

5          THE COURT:  So you can look at it on cross

6     examination, but what you want is to offer the testimony of

7     Mr. Martinez to deal with the ancillary issues related to her

8     second -- well, her employment with him and then the lawsuit

9     related to the employment.

10          MR. GLAZER:  If I just drop that portion of it, and

11     I --

12          THE COURT:  Focus on the sign.

13          MR. GLAZER:  That's what it's all about.  That it's

14     only about the sign.  And I still think that that's an

15     important issue, just based on what I thought was very clear

16     evidence on the part of the plaintiff as to never seeing the

17     sign.

18          THE COURT:  Okay.  All right.  Anything else?

19          MR. NUSSBAUM:   Just to add to what I said before,

20     she said she said she doesn't recall seeing a sign.

21          THE COURT:  All right.  And Mr. Martinez's testimony

22     is excluded under 608(b).  It doesn't -- it's extrinsic

23     evidence about truthfulness or untruthfulness, however one

24     looks at it.

25          So okay.  So the end of January you'll give me your

1    submissions.  Anything else?

2           MS. CONDE:  No.  Thank you so much.

3           THE COURT:  Okay.  I'm happy to rule.  We've spent

4    all this time on this.

5           If you decide you want to have settlement

6    discussions, I don't want to have them with you, but we could

7    get you another magistrate judge if you wanted to do that or,

8    obviously, there's the court annexed mediation, if that's

9    something that you are interested in.

10          We would just give you the referral, if you want to

11    do that.  But -- all right. Thanks.  Happy holidays.

12          MS. CONDE:  Thank you.  Happy holidays.

13          MR. NUSSBAUM:  Happy holidays.

14          THE COURT:  Happy new year.

15          MS. CONDE:  Happy new year.

16          MR. NUSSBAUM:  Happy new year.

17          THE COURT:  Thank you.

18      (Off the record from 12:05 p.m. until 12:08 p.m.)

19          THE COURT:  Just for the record, so I have the

20    exhibits, which are not that thick, but one -- defendant's

21    Exhibit 6 was the transcript, which is -- do you have an

22    electronic copy of that that you could send to us?  I'll

23    upload -- we'll upload the exhibits, because they're not very

24    long.

25          MR. GLAZER:  There's an assignment too.

1          THE COURT:  But the defendant's exhibits, do you

2     have electronic -- this is number 6, the deposition --

3          MR. NUSSBAUM:   The sign was denied.

4          MR. GLAZER:  It was not denied.

5          MR. NUSSBAUM:   Your Honor, denied --

6          THE COURT:  Yes, it wasn't admitted. I thought it

7     was marked but not admitted, right?

8          MR. GLAZER:  I thought it was admitted specifically

9     for impeachment purposes.

10          MR. NUSSBAUM:   It was denied.

11          THE COURT:  No, I think it was denied.  I don't --

12     we'll have to check the transcript. I don't know.  Chris, did

13     you have the list of --

14          THE CLERK:   No, Your Honor.

15          MR. GLAZER:  I recall during the --

16          THE COURT:  We had a working sheet. I just don't

17     have it down here in the courtroom.  All right.  We'll look at

18     the transcript.  We can hold onto that.  There's no way I can

19     -- I can't scan that.

20          MR. NUSSBAUM:   To recap, it was offered for

21     identification, Your Honor.

22          THE COURT:  That's what I believe.

23          MR. NUSSBAUM:   There was testimony and the court

24     asked defendants not to admit it until defendant was on the

25     stand and then it was denied today when defendant was on the

1    stand.

2          MR. GLAZER:  It's not (inaudible).

3          MR. NUSSBAUM:   The transcript --

4          THE COURT:  I'll look at the transcript.  We're not

5    going to be able to do it, so defendants, you should hang onto

6    this.  If we need it uploaded, we'll tell you.

7          MR. GLAZER:  But you either -- you need the

8    electronic -- that's no problem, Your Honor.  You want a pdf

9    of the transcript.

10         THE COURT:  Yes.  Just -- all right.  Just so the

11   record is clear, because of -- defendants -- as things stand

12   now, Defendant's Exhibit 1 is the response objections to

13   defendant's first set of interrogatories.

14         Two was the complaint in the other case.  Three was

15   this handwritten note about 725.  That I think has a sticker

16   on it that says Defendant's 4.

17         MS. CONDE:  It does, yes.

18         THE COURT:  But what was actually also marked as

19   Defendant's 4 and referred to today was the complaint in this

20   action.  5 are the printout of the text messages and 6 is the

21   exhibit.  And the plaintiff's A was the answer.  Plaintiff's

22   B, the amended answer and Plaintiff's C is the transcript of

23   Ms. Centeno's testimony.  We also have the stipulation.  So we

24   can check.

25         Maybe my recollection is wrong, but I thought that

1    the poster was not included.  If I'm wrong about that, just

2    for the record, that will be 4A, if it was admitted. All

3    right.  Anything else?  No.  All right.  Thanks.

4            MS. CONDE:  Thank you.

5            MR. NUSSBAUM:   Thank you, Your Honor.

6        (Proceedings concluded at 12:08 p.m.)

7        I, CHRISTINE FIORE, court-approved transcriber and

8    certified electronic reporter and transcriber, certify that

9    the foregoing is a correct transcript from the official

10   electronic sound recording of the proceedings in the above-

11   entitled matter.

12

13   *Christine Fiore*

14   _____        December 28, 2016

15       Christine Fiore, CERT

16

17

1                              INDEX

2

3     WITNESS

4     FOR THE

5     <u>DEFENDANT</u>:                    <u>Direct</u>     <u>Cross</u>

6     Luisa Centeno                   8          31

7                                                 <u>ID</u>    <u>Rec'd</u>

8     <u>Defendant's Exhibits</u>:

9     4     Complaint                                   42

10

11    <u>Plaintiff's Exhibits</u>:

12    B     Amended Answer                             44

13    C     Deposition transcript                      50

14

15

16

17

18

19

20

21

22

23

24

25